The NAVAJO TRIBE OF INDIANS

v.

The UNITED STATES.

Nos. 69, 299 (Timber and Sawmill Claim).

United States Claims Court.

Jan. 15, 1986.

See also 9 Cl.Ct. 227.

Paul D. Barber, Albuquerque, N.M., attorney of record, for plaintiff; Sarah W. Barlow and Jill E. Adams, of counsel.

James M. Upton, Washington, D.C., with whom was Asst. Atty. Gen. F. Henry Habicht II, attorney of record, for defendant; Robert F. Fraley, of counsel.

## OPINION

LYDON, Judge:

In these Indian Claims Commission Act cases,[1] plaintiff, The Navajo Tribe of Indians (hereinafter the Tribe), seeks to recover damages from the United States on the ground defendant breached fiduciary duties and obligations it owed the Tribe in the management and operation of the Tribe's forest lands at various times during the period 1880 to the present. The claim, referred to as the "Timber and Sawmill" claim by the parties, actually embraces seven categories of claims and seeks to recover over $117 million. The Timber and Sawmill claim arose out of a demand by the Tribe for a general accounting by defendant. Defendant filed, at various times since 1961, accounting reports relating to defendant's management of the Tribal forest and attendant money matters, to which plaintiff filed exceptions. This process was finally completed in 1983. The matter was subject to trial sessions in January, February and June, 1984, at which time an extensive and voluminous trial record was compiled. The post-trial briefs and submissions of the parties consumed 853 pages, exclusive of appendices, and were followed by oral argument.

The Timber and Sawmill claim is only one of many claims asserted by the Tribe against defendant in these cases. Resolution of the Timber and Sawmill claim herein does not serve to terminate the docketed (Nos. 69 & 299) litigations.[2]

---

1. The Navajo Tribe of Indians (Tribe) initially brought these actions in the Indian Claims Commission in 1950 and 1951 under the Indian Claims Commission Act of August 13, 1946, 60 Stat. 1050, as amended, 25 U.S.C. § 70a (1976). Subsequently, these actions were transferred to the United States Court of Claims, this court's predecessor, on January 3, 1977, pursuant to the Act of October 8, 1976, 90 Stat. 1990, 25 U.S.C. § 70v (1976).

2. Some of these claims have been resolved, *e.g.*, *Navajo Tribe v. United States*, 231 Ct.Cl. 1057 (1982) (management of Tribal oil and gas resources); many pending claims remain to be resolved, *e.g.*, Grazing Lands claim, Treaty and Education claims, *etc.*

## I.

### A

The Navajo Indian Reservation was created by the 1868 Treaty between the Tribe and the United States. *See* 15 Stat. 677, II Kappler 1015 (2d ed. 1904). At that time, it comprised some 3.5 million acres. Over the years, the Reservation expanded. As of 1983, it comprised over 15 million acres. The Reservation is now situated in portions of three states: northwest New Mexico, northeast Arizona, and southeast Utah.

Since the Reservation covers a large area, its topography is quite diverse. For the most part, it is located on the southern end of the Colorado Plateau. The region is generally flat, with inclusions of tilted rocky plains interrupted by canyons, buttes and mesas. The elevation of the area is from 4,500 feet mean sea level (m.s.l.) in the lower alluvial valleys of the San Juan and Little Colorado Rivers to over 9,000 feet m.s.l. in the east central mountains, the most dominant topographic features on the Reservation. Other mountain masses on the Reservation are: Navajo Mountain, Black Mesa, Carrizo Mountains, and Segi Mesa. Extremes in elevation are 2,800 feet m.s.l. at the mouth of the Little Colorado River and 10,416 feet m.s.l. at Navajo Mountain. The climate is normally arid. Temperature extremes range from –20° Fahrenheit during the winters to 100° Fahrenheit in the summers. Forty percent of the annual precipitation of at least 14 inches occurs in July, August and September. Snow blankets the forest area in winter. In accordance with elevation and climate, the vegetation on the Reservation tends to be variable in composition.

The Navajo commercial forest is situated in the east central portion of the Reservation, and is located within the counties of Apache in Arizona, and McKinley and San Juan in New Mexico. Because of its physiographical location on the Reservation, the forest receives greater amounts of precipitation than the rest of the Reservation. The forest area contains more perennial surface water than any other area on the Reservation, except for the San Juan River area. In 1983, the Navajo commercial forest covered about 690,498 acres, consisting of some 152,945 acres of non-commercial lands (pinyon, juniper, oak, rock, grass, water and brush), 31,507 acres of inaccessible areas (slopes greater than 40 percent), and about 498,897 acres of commercial timberlands. The above figures were taken from the 1983 *History Of The Navajo Commercial Forest* by the Navajo Forestry Department.

The extent of the Navajo "commercial" forest at times material to these cases is disputed.[3] Plaintiff argues that the Navajo commercial forest should be deemed to be 450,000 acres for litigation purposes. However, the commercial acreage of the forest was viewed differently over time. In 1910, for example, the commercial forest was estimated to encompass 255,500 acres as a result of a survey by a Department of Interior District Forester. Another survey prior to August 13, 1946 estimated the commercial forest to consist of 270,000 acres. Presently, the commercial forest is felt to comprise some 450,000 acres. Some timbered areas of the Reservation, *e.g.*, the Chuska mountain area, were not considered commercial acreage in the early years because of the inability to harvest the timber commercially from this area.

From a topographic point of view, the Tribal commercial forest can be divided into three units. The first unit, the Defiance Plateau unit, is located some ten miles from the Arizona-New Mexico state line.

---

**3.** The parties differ in various instances regarding Reservation acreage figures generally. Plaintiff states the Reservation comprises almost 17 million acres, whereas defendant uses a 15.5 million acre figure. Plaintiff states that the non-commercial woodlands on the Reservation total 3,846,000 acres, while defendant uses a 3,000,000-acre figure. These particular differences are deemed irrelevant to the issues at bar since the focal point of dispute in the presentations of the parties is management of a commercial forest on the Navajo Reservation over a period of time from 1880 to the present. The size of the commercial forest becomes important because plaintiff's damage computations are geared to a 450,000-acre commercial forest for the various periods covered by the claims.

It is roughly 35 miles long and varies from six to twelve miles in width. The topography in this unit is rolling and flat, with rock outcrops and steep canyons occasionally interrupting the pattern along the perimeter. The east and west boundaries of this unit are bordered by steep escarpments. The southern end of this unit fades into the pinyon-juniper woodlands, approximately ten miles south of State Highway 264. The northern boundary of this unit ends at the dropoffs of Canyon de Chelly. The range in elevation on the Defiance Plateau unit is between 7,000 and 8,500 feet m.s.l., with an average elevation figure of 8,000 feet m.s.l.

The second unit, the Tsaile-Wheatfields area, starts northward from the Canyon de Chelly-Whiskey Creek association and ends just north of Tsaile Creek. The eastern boundary is the rim of the Lukachukai-Chuska mountains; the western edge is between the upper tributaries of Canyon de Muerto and Canyon de Chelly. The entire Tsaile-Wheatfields area is almostly exclusively located in Arizona's Apache county; only the extreme eastern edges of the unit extend into New Mexico's San Juan county. Topography of the unit is generally level, with a gradual slope from the Lukachukai-Chuska mountains westward into the broken hills and canyons of Canyon de Chelly's tributaries. The range in elevation is from 7,000 feet to 8,000 feet above sea level; the average elevation is 7,500 feet.

The third unit, the Lukachukai-Chuska unit, is quite mountainous. The mountain range extends some 60 miles in a northwesterly direction paralleling the Arizona-New Mexico state line. Throughout the range, the width varies between five and ten miles. Starting from the midpoint between Fort Defiance, Arizona and Tohatchi, New Mexico, the Chuskas extend northward from McKinley County, New Mexico. Midway northward, the mountains pass partially into Apache County, Arizona and San Juan County, New Mexico. East from Tsaile, Arizona, the Chuskas transcend into its subordinate Tunicha mountains. To the north, the mountain range ends with the Lukachukai Mountains and Beautiful Mountain. As previously explained, the northwestern edge of the unit adjoins the Tsaile-Wheatfields unit along the rim of the Lukachukai-Chuska mountains. The remaining southwestern boundary of the unit is along the base of the Chuska mountains. The eastern forest boundary ends with the pinyon-juniper woodland. Throughout the Lukachukai-Chuska range, the summit occurs as an extending meadow averaging two (2) miles in width. Many canyons extend inward breaking the perimeter. From the eastern plateau rim, the mountain has a sharp precipitous dropoff into a bench that parallels the entire length of the unit. Eastward from the bench, the forest steadily declines into the pinyon-juniper slopes above the desert floor below. Dominant features on the Lukachukai-Chuska unit are Twin Buttes, Chuska Peak, Washington Pass, Roof Butte, and Beautiful Mountain. The Chuskas generally start at an elevation of 8,000 feet and end with the Lukachukai mountains where the elevation exceeds 9,000 feet; average elevation is 8,500 feet. The highest point on the unit is Roof Butte at 9,784 feet.

As of 1983, the gross timber volume within the operable timberlands was comprised of 94.9 percent ponderosa pine, 4.3 percent Douglas-fir and 0.8 percent aspen. Other species (Englemann spruce, blue spruce, and corkbark fir) occur in minute quantities and in inaccessible areas so that they have little impact on the overall forest composition and thus are considered as noncommercial timber species. As of 1983, the average net volume per acre, considering all timber species in the commercial forest, was 3,942 board feet, Scribner Rule. For ponderosa pine, the average net volume per acre was 2,740 board feet, Scribner Rule. Since ponderosa pine and Douglas-fir comprise the highest percentage of the total timber volume, they were managed the most as of 1983.

As of 1983, there were two main commercial markets for timber (ponderosa pine and Douglas-fir) harvested from the Tribal commercial forest. The primary commercial market for Tribal timber was the Navajo Forest Products Industries (NFPI), a

Tribal enterprise that from 1962 to 1982 annually harvested and processed from 25 to 48 million board feet of lumber, although in 1977 it did harvest some 54 million board feet of lumber. In 1980, NFPI harvested 26.6 million board feet of lumber, and in 1982, it harvested 34 million board feet of lumber. NFPI is located at Navajo, New Mexico and provides substantial employment and revenue to the Navajo Reservation's economy. All timber harvested by NFPI is paid for at current appraised commercial stumpage rates, with the revenue generated thereby paid to the Tribe.

The second commercial market for Navajo timber products is the pulp and paper mill operated by Southwest Forest Industries located at Snowflake, Arizona. NFPI's mill residues, such as chips and slabs, are shipped by trucks to the Snowflake plant for processing.

As of 1983, no current market existed for commercial sized timber poles. Accordingly, pole cutting permits were issued to Navajo Indians for residential or personal uses such as hogans (Indian type homes), fences and posts. As of 1983, non-commercial cutting permits were also issued for firewood and fenceposts. All members of the Navajo Tribe are permitted free and unrestricted use of all dead and down firewood material for personal use. During the Christmas season, permits are also available for Christmas trees.

Today, the Navajo commercial forest additionally offers opportunities for a wide variety of recreation during both winter and summer, e.g., camping, hiking, fishing, boating, hunting, fuelwood gathering, and ice fishing. The commercial forest has on and about it many monuments, parks, campgrounds and picnic areas. Logging operations generate dust clouds about the roads in use, but this problem is deemed localized and minor. Conflicts between recreational use and timber management activities exist, but are deemed minimal. The transportation system on the forest is developed extensively, and most areas are therefore accessible during the non-winter months.

In addition to the Tribe's industries related to its commercial forest, livestock grazing, especially sheep, was and is an important aspect of the Navajo economy and way of life. It is believed that the Spaniards introduced sheep and other livestock to the Indians. Some feel that the Navajos obtained the lowly Mexican breeds of charro sheep through barter. Navajo livestock ownership became even more certain after 1680. The introduction of sheep profoundly changed the lives of the Navajo Indians, and thereafter they became full-time pastoralists with dependence on hunting, gathering and horticulture secondary matters with them. To the Navajo Indian, sheep were considered gifts of God. Sheep to them were a means of subsistence as a readily available source of food, clothing and wealth. Further, sheep were mobile. Since sheep were so highly valued by the Navajo Indians and conducive to the Navajo way of life, they quickly stratified the society into a hierarchy of prestige. With the ownership of sheep, the Navajo had a sense of physical and psychological well-being. In order to protect their flocks, the practice of "hogan-grazing" evolved in the early 1700's, i.e., sheep were corralled nightly near residents to protect them from neighboring Indian tribes, Spaniards or others. The ever increasing number of Navajo Indians along with their flocks of sheep necessitated emigration. *See History Of The Navajo Commercial Forest, supra,* p. 17.

Ever since the Navajo Indians emigrated to areas now within the Reservation borders in the mid and late 1700's, the Chuska Mountain range and its adjoining range lands have been used continuously and excessively for livestock grazing, principally sheep. The lowlands are grazed year round, while the upper regions of the mountains experience seasonal use. From early times, the commercial forest area was utilized for grazing purposes. Seasonal grazing patterns were established by the early 1800's with the occupancy of the Chuska Mountains and related areas by the Navajos and their flocks. Thus began the

start of the longest grazing history on any part of the Reservation. In time, grazing became a way of life for the Navajos and their flocks on other parts of the Reservation. As of 1983, the majority of the acreage in the commercial forest was still being used as range land for some 42,000 Navajo livestock along with many wildlife species. Wildlife species such as porcupine, mouse, chipmunk and prairie dog pose problems in forest management, although on a smaller scale than livestock grazing. Because of excessive livestock numbers, the range area deteriorated to the extent that during the 1930's, a Navajo livestock reduction program along with soil and water conservation programs were instituted. However, the problem of overgrazing still exists on the Reservation at the present time, although the problem has been alleviated somewhat by the introduction of the permit system based on land carrying capacities. Following World War II, grazing control measures were not favored by many Navajos, and at their insistence were reconsidered. Thereafter, pressure was applied to permit greater latitude for Tribal management in this regard. In April 1956, with the approval of the Secretary of Interior, the Navajo Tribal Council adopted Revised Grazing Regulations for reservation range management. From at least 1956 on, it is reasonable to conclude that grazing land management was under the control of the Navajo Tribal Council. From the standpoint of forestry, grazing within the Navajo commercial forest has been a problem for over one hundred years, and it continues to be a problem today. *See History Of The Navajo Commercial Forest, supra,* pp. 7, 9, 19. This problem and its history is discussed in detail *infra* in Part II, Subpart D of this opinion.

### B

 While legal title to the Navajo Indian Reservation was held by the United States in trust for the Navajo Tribe, the Tribe was the beneficial owner, in possession, of the Reservation at all times material herein. *See Navajo Tribe v. United States,* 176 Ct.Cl. 502, 550–51, 364 F.2d 320

(1966). From the creation of the Reservation in 1868, the Tribe obtained the rights to the timber on Tribal Reservation lands. Under federal law, timber on Reservation land is owned by the United States for the benefit of the Tribe and cannot be harvested for sale without the consent of Congress. *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 138, 100 S.Ct. 2578, 2580, 65 L.Ed.2d 665 (1980). As beneficial owner of the land and the timber standing upon it, the Tribe was entitled to the proceeds of any timber sale subject to the plenary power of control by the United States to be exercised for the benefit and protection of the Indians. *United States v. Algoma Lumber Co.,* 305 U.S. 415, 420, 59 S.Ct. 267, 270, 83 L.Ed. 260 (1939). The relationship between defendant and the Tribe is a special one, and from it springs special responsibilities where defendant has control and supervision over Tribal property. This special trust relationship and the responsibilities it creates have been expressly held to extend to Tribal timber as well as other Tribal property. It has been held that this trust relationship between defendant and the Tribe engenders a fiduciary duty on the part of the defendant to account for its management of the Tribe's timber. *Navajo Tribe v. United States,* 224 Ct.Cl. 171, 187, 624 F.2d 981, 989 (1980). This holding was reinforced by the Supreme Court in *United States v. Mitchell (Mitchell II),* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983), *aff'g,* 229 Ct.Cl. 9, 664 F.2d 265 (1981). The Court of Claims in *Mitchell* observed that the standard by which the Department of the Interior's actions were to be judicially tested was "not the court's or plaintiff's own view of the preferable conduct, but the normal standard for government fiduciaries—were their actions in good faith and within the realm of their acceptable discretion, or were they arbitrary, capricious, in abuse of discretion, or contrary to law?" 229 Ct.Cl. at 14, 664 F.2d at 224.

Having determined that defendant acted as a fiduciary in its exercise of supervision and control over the Tribe's forest property

only states one factor in the judgmental equation facing the court in these cases. The court must now deal with each of the categories of claims presented by plaintiff to determine if defendant did, in fact, breach the fiduciary obligations it owed the Tribe in the management of the Tribal timberlands. In considering defendant's fiduciary obligations in this regard, the caveats of the Court of Claims in *Navajo Tribe v. United States, supra,* 224 Ct.Cl. at 185, 624 F.2d at 988 are deemed appropriate. The Court of Claims, in noting that "[t]he general law of fiduciary relationship can be utilized to the extent appropriate," stated:

This does not mean, however, that all the rules governing the relationship between private fiduciaries and their beneficiaries and accountings between them necessarily apply in full vigor in an accounting claim by an Indian tribe against the United States. We refer to such rules as the principle that once a breach of fiduciary duty is merely charged (without any supporting material), the beneficiary is entitled to recover unless the fiduciary affirmatively establishes that it properly discharged its trust, and the theory that failure to render the precise form of accounting required may be sufficient, in and of itself, to establish liability. In each situation, the precise scope of the fiduciary obligation of the United States and any liability for breach of that obligation must be determined in light of the relationships between the Government and the particular tribe.

Plaintiff presented the testimony of eight witnesses. The following individuals were its primary expert witnesses. Dr. Charles O. Minor (Minor), who was plaintiff's main expert witness on forest management, received a Doctor of Forestry degree in Forest Management from Duke University in 1958. He was the founder and former dean of the Northern Arizona School of Forestry at Flagstaff. The School of Forestry was founded around 1959, and in connection therewith, Minor first visited the Navajo Reservation to encourage and welcome Navajo students to enroll in the School. Thereafter, a number of Navajo students did graduate from the School, some of whom are now employed by the Navajo Forest Products Industry and one of whom was managing the sawmill at time of trial. Minor had over 25 years of academic experience relative to forestry matters. He developed site index curves for the measurement of productivity of ponderosa pine forests in the Southwest that were published by the Rocky Mountain Forest and Range Experiment Station in 1964 and which were thereafter utilized by the U.S. Forest Service throughout its Region Three. He may properly be deemed a most qualified expert on site index curves. Minor, at time of trial, was also knowledgeable about the National Forests and the Indian Forests in Arizona and New Mexico. Dr. Jean Mater (J. Mater), who received a Doctor's degree in Forest Products from Oregon State University in 1955, and her husband Milton Mater (M. Mater), were the plaintiff's chief expert witnesses on sawmill design, utilization and management. M. Mater was experienced in the design of sawmill machinery and the mechanization of forest products. He was retained by the Navajo Forest Products Industry (NFPI) in 1978 to do a sawmill feasibility study. Both Maters were principals in the firm of Mater Engineering, Ltd., which engaged, *inter alia,* in consulting work for commercial sawmills throughout the United States and in foreign countries. Dr. Don D. Dwyer (Dwyer), who received his Doctor's degree in Range Management from Texas A & M University in 1960, was plaintiff's main expert witness on the Regeneration claim. For the 13 years prior to trial, he had been a professor and head of the Range Science Department at Utah State University at Logan, Utah. His study of range problems on the Navajo Reservation began in 1959 and has continued on a consulting basis during his employment at New Mexico State and Utah State Universities. Paul J. Gillis (Gillis), a Certified Public Accountant in the District of Columbia and Maryland, was plaintiff's expert witness on the Unaccounted for Sales Invoices claim. Gillis has served as an accounting

witness in numerous Indian cases over the course of some 20 years.

Defendant presented the testimony of seven witnesses. Dr. Robert P. Latham (Latham), who received a Doctor's degree in Resource Economics from the University of Minnesota, was licensed as a professional forester in California and Oklahoma. He was defendant's main expert witness on forest management. Latham worked for the U.S. Forest Service in the late 1950's and 1960's, during which period he worked for a time on the Coconino National Forest in Arizona. In 1972, Latham was a principal in the forestry consulting firm of Hammon, Jensen, Wallen & Associates of California where he was responsible for resource inventories, economic studies and feasibility analyses. In 1977, Latham served on the faculty of Oklahoma State University as an associate professor where he taught courses dealing with the economics and management of timber. In 1982, Latham began to devote full time to a consulting firm he had established earlier. Latham had over 25 years of experience in the forest management area, although much of his work was outside the Arizona-New Mexico area. Latham began his study of the Navajo Reservation in 1982 in preparation for his testimony. James S. Plaxico (Plaxico), who received a Doctor's degree in Economics and Agricultural Economics, was one of defendant's expert witness on regeneration. Plaxico was not a range scientist, but rather a range economist. Plaxico taught at Virginia State and Oklahoma State Universities and had over 25 years of academic experience as an agricultural economist with emphasis on the financial side of grazing, *etc.* Plaxico lacked experience in the Arizona-New Mexico area and was not familiar with the Navajo Reservation until he became connected with this litigation. He was a professor at Oklahoma State University at time of trial teaching agricultural economics. Defendant also offered George L. Cullum (Cullum) as an expert witness on regeneration. Cullum retired in September 1982 from the U.S. Forest Service where he had some 28 years of experience in develop-

ing successful regeneration techniques on the Apache-Sitgreave National Forest. His background with the Forest Service on regeneration made him an eminently qualified expert on regeneration matters, a fact admitted by Minor, plaintiff's main expert. Llewellyn S. Kazebee (Kazebee) was defendant's expert witness on the sawmill claim. He was a project manager for a consulting engineering firm. He had a degree in industrial engineering. During the 10 years preceding the trial, Kazebee divided his time between some eight sawmill-related projects and other work not involving the sawmill industry. Kazebee had no sawmill experience before 1973, and prior to his working on this litigation in 1983, he had never worked in Arizona, New Mexico or on an Indian Reservation. Frank C. Sapienza (Sapienza), a certified public accountant, was defendant's expert witness on the Unaccounted for Sales Invoices claim. He was employed as an accountant by the General Services Administration, Indian Trust Accounting Division for approximately 10 years prior to date of trial. Defendant offered as a fact witness E. Reeseman Fryer (Fryer), who was Superintendent of the Navajo Reservation from 1936 through 1941. Although in his 80's at time of trial, his testimony was credible, his memory very good, his presentation articulate and his demeanor praiseworthy. Fryer was in a position to know, and he imparted his knowledge persuasively, about the Navajo psyche relative to the regeneration issue that centered on Reservation grazing, and about a host of other matters germane to some of the other claims.

The court must state that the damage considerations in this action have been rendered very difficult by the manner in which the cases were presented. Plaintiff, in an effort to maximize its recovery, oftentimes simply passed over objective evidence that tended to lessen the magnitude of its claim. Defendant, on the other hand, was content, for the most part, in merely denying plaintiff's entitlement to any recovery, generally ignoring that evidence which dictated a re-

covery for plaintiff to some extent.[4] These opposite extremes and rigid positions have placed the court in the position of making determinations on a conflicting, disputed and sometimes confusing record with little constructive help from the parties. Nonetheless, the court has undertaken this task with a determined purpose to be fair and just given the record it had to work with. Whatever shortcomings there may be in the court's opinion are to be shared by counsel as well as under these circumstances.

The court also notes that in plaintiff's Proposed Findings of Fact, and Brief in support thereof, plaintiff tended to denigrate the defendant's witnesses, especially its experts, while, understandably, praising its own. The experts who testified on behalf of both parties at trial were all found qualified to express opinions about matters on which they were offered as expert witnesses.

As a general statement, however, the court was of the view that the experts, to a degree, favored the party that hired them. *See Seminole Indians of Florida v. United States*, 197 Ct.Cl. 350, 361, 455 F.2d 539, 545 (1972) (Nichols, J., concurring) ("The expert's opinion slants too much towards the litigation position of the side that employs him.") Nevertheless, on balance, the experts for both sides were all deemed competent and knowledgeable in their respective fields. Although some had more or less experience, relative to the locale of the Reservation or other matters, than others in their field, this was not deemed overly significant from the standpoint of level of weight to be accorded their testimony because of the nature of the claims, the time frames involved and the hypothetical assumptions inherent in their calculations. Minor, plaintiff's basic expert, testified that it was difficult to evaluate the losses claimed by plaintiff on its timber management and sawmill claims. While he felt his methods of evaluation were reasonable, he recognized that economists could reasonably disagree with him. The court is thus called upon to resolve issues with respect to which reasonable men can differ.

On balance, the court has not found the witnesses of either party to be lacking in credibility. However, the court does believe that plaintiff's witnesses were inclined to be more passionate and less objective in the assertion of plaintiff's claims, while defendant's witnesses were inclined to be more dispassionate and somewhat more objective.

## II.

Plaintiff has advanced seven categories of claims that it alleges flow directly from defendant's mismanagement of the Tribal commercial timberlands.

Plaintiff's first claim category is labeled "Failure To Cut." There are four separate subclaims in this category: (1) Failure to Cut—Breach of Contract claim; (2) Loss Due to Undercutting claim; (3) Loss of Mortality claim; and (4) Loss of Growth claim. The second claim category is denoted "Unpaid Stumpage." The third claim category is called "Logging Waste." The fourth claim category is headed "Lack of Regeneration." The fifth claim category is listed as "Sawmill Mismanagement". The sixth claim category is stated as "Processing Overmature Timber." The seventh and final claim category is set forth as "Unaccounted for Sales Invoices." The court will now consider each of these claims, setting forth its findings of fact in narrative form appropriate to each claim and its conclusions of law.

### A. *Failure To Cut—Claim Period 1910—1962*

As the court stated above, plaintiff's Failure to Cut claim contains four subclaims. None of these subclaims covers the entire period of 1910—1962, although each covers some portion of that period,

---

4. For example, it is interesting to note that defendant does not even cite *United States v. Mitchell*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983), a leading case relative to defendant's fiduciary obligations in supervising and managing Indian forest lands, let alone deign to discuss it in its brief.

and all of the subclaims overlap. Plaintiff's damage computations are somewhat unclear. Under subclaim 1, *supra*, plaintiff seeks to recover $1,013,044.40, plus interest (lost earnings) of $2,996,526.41, for a total claim of $4,009,570.81. Under subclaim 2, *supra*, plaintiff seeks to recover $4,520,486.80, plus interest of $11,208,-400.49, for a total claim of $15,728,887.29. Plaintiff concedes that total recovery on this claim would obviate any recovery on subclaim 1, *supra*. Under subclaim 3, *supra*, plaintiff is seeking an additional $4,406,400. No interest computation was provided by plaintiff on this claim, indicating plaintiff does not seek interest thereon. Under subclaim 4, *supra*, plaintiff seeks to recover $2,247,750 without any interest being sought thereon. The total amount claimed by plaintiff under its Failure to Cut claim probably exceeds $23 million. Each of these four subclaims will be addressed separately below.

1. *Failure to Cut—Breach of Contract (1928—1953)*

As indicated above, plaintiff seeks a total of $4,009,570.81 on its Breach of Contract claim. As near as the court has been able to determine, that amount consists of the following elements. Primarily, plaintiff seeks the principal amount of $988,024.48, representing the value, as of 1933, of the timber sale contract that was not enforced. Plaintiff also seeks interest of $2,922,-576.41 on this amount. As a partial offset, plaintiff seeks $50,000 principal and $147,-900 interest on account of a performance bond issued in connection with the contract that defendant failed to enforce. Finally, plaintiff claims it is entitled to $25,000 principal and $73,950 interest relating to an extension payment promised by the contractor that defendant failed to collect. Defendant claims that its actions in this regard were reasonable and therefore denies plaintiff's right to any recovery on this claim. For the reasons that follow, the court concludes plaintiff is entitled to $75,-000 on its Failure to Cut—Breach of Contract claim.

In reviewing plaintiff's claim regarding defendant's alleged failure to enforce a timber sale contract, it is first necessary to review the facts surrounding that contract. In 1928, the McGaffey Lumber Company of Albuquerque, New Mexico, contacted the Commissioner of Indian Affairs and applied to have the Navajo forest advertised for a large sale of timber. In expressing its interest in acquiring a contract to purchase plaintiff's timber, the McGaffey Company indicated that it would be willing to construct a railroad spur into the forest.

Apparently in response to the McGaffey Company's interest in an advertisement for sale of the Navajo timber, the Office of Indian Affairs prepared a report on the Defiance Plateau Timber Unit dated May 23, 1928. The report described the Defiance Plateau forest as being about 145,000 acres in area, a figure later revised downward to 110,000 acres, and carrying an estimated volume of 500,000,000 board feet of western yellow pine. The forest was said to be primarily composed of mature stands with generally very few trees in the 1 to 20 year age class. The report cited limited tree reproduction due to excessive livestock grazing to be discussed in more detail, *infra*. Given the limited reproduction, the report recommended that a maximum of 75 percent of the mature timber be cut to maintain at least minimum forest cover.

At least 75 percent of the trees on the Defiance Plateau were reported to be mature, but no decadence was found. However, due to the inferior site conditions, the trees were generally short, heavy bodied and limby, which indicated considerable defects. The quality of trees was generally quite low for yellow pine stands, but was comparable to similarly situated timber in the southwest.

The location of the trees was conducive to commercial harvest. The report concluded that the forest could be developed most economically by a railroad spur from Manuelito. This spur would run approximately 25 miles from the Santa Fe main line to the edge of the merchantable timber

near St. Michaels. The report anticipated no major problems in constructing the railroad spur. It found that the total cost of the job could be reasonably amortized during the harvest of the available volume. The only expensive feature of the railroad spur would come from the necessity of several spurs in the forest itself due to the limited volume of timber per acre. The use of trucks and tractors would somewhat limit the necessity of an overly extensive railroad network in the forest.

The report then appraised the value of the timber on the Defiance Plateau. The investment method of valuation arrived at a "Value of Stumpage, Log scale, on basis of eight percent overrun * * *" of $3.00 per thousand board feet (M.B.F.).[5] This value was commensurate with the price being received for similar quality timber in the southwest. The report noted that the contract form proposed by the McGaffey Company did contain provisions to allow for an increase in the price received for the stumpage to protect the interests of the Indians.

The report ultimately recommended that the timber on the Defiance Plateau Unit be placed on the market at a price of $3.00 per M.B.F. This recommendation was based on the maturity of the timber and the expression of interest by a local responsible lumber company.

Although the record is not clear on this point, apparently an advertisement was issued for the sale of the Defiance Plateau timber. As a result, on October 22, 1928, a contract was entered into between the Superintendent of the Southern Navajo Indian Agency and the McGaffey Lumber Company for the sale of about 500,000,000 board feet of timber within the Defiance Plateau Unit. The contract was supported by a bond in the amount of $50,000 with the American Employers' Insurance Company as surety. The contract was approved by the Assistant Secretary of the Interior on December 5, 1928.

The McGaffey contract provided in pertinent part:

That the Superintendent, in consideration of the agreements by the Purchaser, agrees to sell to the Purchaser upon the terms and conditions herein stated and the Indian Service General Timber Sale Regulations approved April 10, 1920, by the Assistant Secretary of the Interior, which regulations are hereby made a part of this contract, all the merchantable dead timber, standing or fallen, and all the merchantable live timber marked or otherwise designated by the officer in charge for selective logging as required by the General Timber Sale Regulations, comprising trees approximately eighteen inches and larger in diameter at a point four and one-half feet from the ground and estimated to be five hundred million feet of western yellow pine (including so-called "bull pine"), on 145,000 acres of unallotted lands within a tract hereby designated the Defiance Plateau Timber Unit, and more particularly defined as follows: * * *[6]

The contract provided that the purchaser (McGaffey Lumber Company) was to cut and remove all the timber covered by the contract prior to March 31, 1950. The schedule for such cutting was set out in pertinent part as follows:

---

5. This calculation included an estimated sales price for the 1924—1927 period of $26.80 per M.B.F., reduced by the cost of sales of $21.65 per M.B.F. The difference of $5.15 represented the "Margin for Stumpage and Profit". From that $5.15 figure was subtracted $2.40, the margin of profit. The $2.40 figure was calculated based on an annual cut of 25,000,000 board feet necessitating a yearly investment of $600,000. With a 10 percent return on this investment ($60,000), the margin of profit per M.B.F. would be $2.40. The difference between the $5.15 and $2.40 is $2.75, which equals the "Value of Stumpage, Lumber scale" prior to the addition of the 8 percent overrun add on ($2.75 x .08 equals $.22) that results approximately in the ultimate value of $3.00 per M.B.F.

6. The contract set out the boundaries within which the purchaser (McGaffey Lumber Company) could cut. Certain areas, however, were excepted and reserved for Agency sawmill purposes unless such a reserved area was cancelled. In that case, if the purchaser was logging an adjacent area, it would be required to log the initially reserved area as well.

The Purchaser further agrees that he will, unless relieved by the Commissioner of Indian Affairs, cut and remove from some portion of the sale area, at least twenty-five million feet, board measure, log scale, prior to March 31, 1932, and not less than twenty-five million feet each twelve months thereafter until the contract is completed. The maximum amount cut during any twelve months shall not exceed 35,000,000 without written permission from the Commissioner of Indian Affairs.

The contract provided that until March 31, 1934, the stumpage rate would be $3.00 per M.B.F. For the following three-year period, the stumpage rate per M.B.F. could be adjusted upward based on a reappraisal by the Commissioner of Indian Affairs. The adjustment could not exceed 20 percent of the original purchase price ($3.00), and any and all of the increase could later be remitted to the purchaser "to meet unusual conditions which in the opinion of the commissioner make it impossible for the purchaser to realize a reasonable profit." However, the price could never be reduced below the initial price at which the timber was purchased.

In addition to its $50,000 bond, the purchaser was obligated to make an initial cash deposit of $20,000 to insure that all stumpage payments that were due were paid in a timely manner. Additional deposits of $10,000 would be required to insure that the stumpage value of the timber cut and not paid for at any time did not exceed the cash deposits then on hand.

The record indicates that if the contract had been carried out in its entirety and the maximum stumpage price increases had been imposed, the sale would have produced some $2,200,000 in revenues for the Tribe. Even without increases in the initial stumpage rate ($3.00), the contracted-for cut would have returned an average minimum of $75,000 per year to the Tribe. Such a minimum return would amount to a total of $1,500,000 in income for the Tribe over the life of the contract.

On August 9, 1929, the McGaffey Lumber Company assigned its rights under the above timber contract to the Lutcher and Moore Lumber Company of Orange, Texas. For this assignment, the Lutcher and Moore Company paid the McGaffey Company $354,754. This amount included the $20,000 deposited by the McGaffey Company. The assignment stated in pertinent part:

And the said party of the second part [Lutcher and Moore Lumber Company], by the acceptance of this assignment, assumes, promises and agrees to keep, observe and perform all of the covenants, promises, agreements and conditions set forth in said timber contract which by the terms of said timber contract are made encumbent upon said party of the first part [McGaffey Lumber Company] therein to be kept, observed and performed, and that it will keep the said party of the first part, its successors and assigns, indemnified against all actions, claims and demands by reason of the non-observance of said contract, or otherwise in relation thereto.

Along with the assignment, the Lutcher and Moore Lumber Company submitted a bond dated August 17, 1929, for $50,000 with itself as principal and the Fidelity & Deposit Company of Maryland as surety. Said bond guaranteed the execution of the contract during the 5 years following the approval of the assignment by the Department of the Interior with subsequent bonds to be provided, as required, after that 5-year period. The assignment was approved by the Assistant Secretary of the Department of the Interior on August 20, 1929.

At the time the assignment was made, the McGaffey Company had not constructed a mill, begun a railroad spur, or harvested any timber. However, soon after the assignment the Lutcher and Moore Company started to acquire land for a planing mill near Gallup and began work on the railroad spur into the Defiance Plateau region. Nevertheless, it did not harvest any timber in 1929.

In 1930, the prices for all lumber products dropped drastically, and it was evident that severe overproduction of lumber was occurring nationwide. As a result of the Depression and its impact on the lumber industry, Lutcher and Moore requested that it be given an extension of time before it was required to produce the minimum cut set out in the contract (25,000,000 board feet prior to March 31, 1932). Initially, the government stated that it would approve a one-year extension if the Lutcher and Moore Company paid $75,000. On May 8, 1931, however, the Lutcher and Moore Company and defendant entered into an extension agreement giving Lutcher and Moore an additional year (March 31, 1933 instead of March 31, 1932) to meet its initial cutting obligations. In exchange for this extension, Lutcher and Moore assumed all fire risk for that extended period and agreed to pay $62,500 to defendant for the benefit of the Tribe in the following installments: $12,500 prior to March 31, 1931, $25,000 on or before March 31, 1933. Plaintiff's surety agreed to this extension on May 27, 1931. The first $12,500 was paid by the company.

Apparently, the Lutcher and Moore Company continued to feel the effects of the Depression and was struggling financially. Due to these financial hardships, F.M. Farwell, Vice President of Lutcher and Moore, wrote to Mr. John Hunter, Superintendent of the Southern Navajo Agency, requesting that several modifications be made in the original timber sales contract. These requests were forwarded to the Department of the Interior, and the Commissioner of Indian Affairs ruled on the various requested changes.

First he rejected Lutcher and Moore's request to reduce the stumpage rate per M.B.F. to $2.00 in view of a December 17, 1931 Comptroller General decision that denied such modifications without express statutory authority. Second, the Commissioner approved the company's request that defendant waive the $25,000 payment due on March 31, 1932, for the contract extension. He cited the extreme depression of the lumber industry to support this waiver.[7] However, the Commissioner did not waive the requirement that Lutcher and Moore pay $25,000 on March 31, 1933 for the one-year extension. Third, Lutcher and Moore requested that the minimum annual cut be reduced from 25,000,000 board feet to 7,500,000 board feet. The Commissioner ruled that Lutcher and Moore would only be required to cut 10,000,000 board feet for the first 5 years of the contract beginning April 1, 1932. This partial waiver was conditioned upon a requirement that $32,500 previously paid by Lutcher and Moore as a deposit with the assignment from the McGaffey Company ($20,000) and as an advance payment for the contract extension ($12,500) would not be credited against stumpage cut prior to April 1, 1937. The Commissioner also ruled on three other requested modifications, not relevant to this claim.

Lutcher and Moore failed to make the $25,000 payment required to be made on March 31, 1933. Instead, on March 21, 1933, it wrote to the Commissioner of Indian Affairs requesting a further extension for the beginning of operations on the Defiance Plateau Unit and asking that the $25,000 extension payment, due on March 31, 1933, be waived.

On May 23, 1933, John Collier, Commissioner of Indian Affairs, responded to Lutcher and Moore's requests of its March 21, 1933 letter. Due to the serious conditions confronting the lumber industry and

---

**7.** The record contains several indices of the severely depressed nature of the lumber industry in the early 1930's. For example, demand during that time period was so low that mills operating at 25 percent of the normal rate were still producing a great deal of surplus lumber. Lumber companies (sawmills and planing mills) were also suffering tremendous losses. Net income as compared to gross income in 1926 was 2.93 percent and in 1929 was 2.21 percent. However, in 1930 the net income turned to a 7.01 percent deficit. Deficits of 19.2 and 32.24 percent were recorded in 1931 and 1932, respectively. The next two years, 1933 and 1934, also showed heavy deficits, but smaller than in 1932. The record clearly demonstrates that the early 1930's were economically dismal years for the lumber industry across the country.

despite the Navajo Indians' need for funds derived from their timber, the Commissioner waived the requirement that Lutcher and Moore cut 10,000,000 board feet by March 31, 1933, but required the company still to cut 50,000,000 board feet by April 1, 1937. He also waived the requirement that Lutcher and Moore pay the $25,000 amount due on March 31, 1933. All of these extensions were again approved by the lumber company's surety.

On August 8, 1933, the Acting Solicitor General, Charles Fahy (Fahy), wrote a letter to the Secretary of the Interior expressing his legal opinion regarding modifications attempted to have been made to timber contracts on Indian lands since the passage of the Act of March 4, 1933. Fahy pointed out that the timber contracts were entered into under the authority of the Act of June 25, 1910, 36 Stat. 855–857. That act provided in pertinent part:

> Sec. 7. That the mature living and dead and down timber on unallotted lands of any Indian reservation may be sold under regulations to be prescribed by the Secretary of the Interior, and the proceeds from such sales shall be used for the benefit of the Indians of the reservation in such manner as he may direct * * *.

Congress subsequently passed the Act of March 4, 1933, 47 Stat. 1568. That act provided in pertinent part:

> That the Secretary of the Interior, *with the consent of the Indians involved, expressed through a regularly called general council,* and of the purchasers, is hereby authorized and directed to modify the terms of now existing and uncompleted contracts of sale of Indian tribal timber: * * * [Emphasis added.]

This act was apparently passed to permit modifications to timber sale contracts that were necessitated by the economic conditions of that time period. As part of his August 8, 1933 opinion letter, Fahy expressed his views regarding the modifications to the Lutcher and Moore contract entered into after the passage of the March 4, 1933 Act.

Regarding the post-March 4, 1933 modifications to the timber contract at issue, Fahy stated:

> On May 23, 1933, the Lutcher & Moore Lumber Company was relieved of the requirement that it cut 10 million feet of timber in the year ending March 31, 1933, and was relieved of making a payment of $25,000 due on or before March 31, 1933. The original contract called for certain payments based primarily upon the interrelation of stumpage prices with cutting requirements, each of those elements being, to certain extents, variables within the discretion of the Commissioner. Those clauses, however, have been superseded in a certain degree by those of the supplemental agreement of May 8, 1931. That agreement became, and is, a part of the working contract. Under its provisions an extension of time for cutting was allowed to the purchaser and $62,500 was to be paid in three installments by the purchaser, namely: $12,500 prior to March 31, 1931; $25,000 on or before March 31, 1932; and $25,000 on or before March 31, 1933.

> By letter dated February 18, 1932, the payment of the $25,000 due on March 31, 1932, was waived. It is to be noted that this waiver expressly stipulated:

> > "This action will not affect the requirement that $25,000 be paid on or before March 31, 1933."

> Such was the status of the contract on March 4, 1933. It called for certain cutting of timber and the $25,000 payment under the supplemental agreement of May 8, 1931. It was those requirements which the attempted modification of May 23, 1933, sought to affect. The attempted modification, then, is a modification of the contract itself and is within the purview of the act of March 4, 1933. Nor is the modification made under the valid waiver of February 18, 1932, for that waiver expressly excluded the 1933 payment from its application. Consequently I am of opinion that the release from the payment due March 31, 1933, and from

the cutting requirement as contained in the office letter of May 23, 1933, is subject to the act of March 4, 1933, and is invalid for lack of consent of the Indians. Based on this opinion, the Commissioner of Indian Affairs advised Lutcher and Moore that the order of May 23, 1933 was revoked because the nullifications were deemed invalid by the Department of the Interior due to a lack of consent to said modifications by the Navajo Tribal Council.

In response to this revocation of the modifications and the potential for being found in breach of its contract, Lutcher and Moore wrote a letter to Senator Bronson M. Cutting. The October 14, 1933 letter indicated the lumber company's desire to begin harvesting the timber as soon as business conditions permitted. It pointed out the necessity for cutting the timber at the earliest possible time and claimed that "there is no other company with the means and organization which can cut it and pay for it at as early date as can the Lutcher and Moore Lumber Company." It emphasized that the delay in commencing operations was only caused by market conditions, and Lutcher and Moore claimed that it had a moral right to cut the timber.

Sometime in late October 1933, Lutcher and Moore submitted a request to the Navajo Tribal Council that it consent to its proposed extension to perform the terms of the contract. It pointed out the economic hard times it and the lumber industry in general were enduring and asked the council not to cancel the contract because of circumstances beyond the company's control. Lutcher and Moore requested that the Navajo Tribal Council consent to the contract modifications needed by the company or, if the council decided to cancel the contract, the company asked the council to pass a resolution requesting that Congress refund Lutcher and Moore the $475,000 it had already invested due to the timber contract. The lumber company also suggested, if consent was withheld, that the council consider utilizing portable sawmills capable of producing 20,000,000 to 24,000,000 board feet of lumber annually. Lutch-

er and Moore offered to enter into a contract with the Indians to provide such mills along with the necessary management to run the mills. The lumber company would provide the equipment and services at a fixed cost per M.B.F., but the business would be owned by the Indians. The Navajo Tribal Council rejected both Lutcher and Moore's request for consent to the contract modifications and its suggestion that it supply the Tribe with portable sawmills at a special session meeting held on November 1, 1933 to be discussed *infra*.

On October 23, 1933, the Department of Interior, Solicitor, informed the Commissioner of Indian Affairs that Lutcher and Moore had breached the timber contract at issue. The Solicitor concluded that the breach occurred on April 1, 1933 when the lumber company failed to pay the $25,000 installment or harvest the required 10,000,000 board feet by March 31, 1933. The Solicitor stated that, as soon as notice of revocation was given to the lumber company, the government could arrange a new timber sale contract, or the Indians were free to set up their own logging operation.

The Solicitor pointed out in revoking the contract, because Lutcher and Moore was in breach, that the Indians were entitled to retain the $32,500 already deposited by the lumber company. He also set out the proper measure of damages if a breach of contract action were pursued by the Indians. He stated that the damages would include the following:

As to that timber which should have been cut by the time of breach, the difference between the contract price of that timber and its market value at the time of breach; as to that timber required by the contract to be cut at times subsequent to the date of breach, the difference between the contract price of that timber and its market value as of the time set for performance * * *. Since most of the timber, according to the contract, would have been cut subsequent to the date of breach, the market value of the timber would be most pertinent in determining the advisability of

suing for damages. If the market value is now or will be in the near future close to the contract price, then suit would not be worthwhile.

The Solicitor also pointed out in his memorandum that the government could continue to deal with Lutcher and Moore under the existing contract.

In addition to the Solicitor's views regarding a potential suit for damages, further support for finding Lutcher and Moore liable for damages resulting from its failure to comply with the terms of the contract can be found in the "General Timber Sale Regulations" that were made a part of the original contract by reference. Section 52 of those regulations provided in pertinent part:

Persistent failure to comply with any one of the requirements of the contract or regulations after written notice addressed to the purchaser by the superintendent or the officer in charge will be ground for revocation by the officer approving the contract of all rights of the purchaser under this and other contracts and the forfeiture of his bond and of all moneys paid, and the purchaser will be liable for all damage resulting from his breach of contract.

Section 56 of the same regulations stated:

Failure of the purchaser to complete his contract or to log promptly an area damaged by fire, wind, insects, or other causes, or the commission by him of any act for which the officer approving his contract shall declare the contract forfeited, will render the purchaser and his bondsmen liable for the depreciation in the value of the remaining timber on an estimate of value and quantity to be made under the direction of the officer approving this contract.

Upon learning that Lutcher and Moore was considered to be in breach of its timber contract, the Commissioner of Indian Affairs informed the Navajo Council of this ruling. The council then voted in favor of cancelling the contract. On December 7, 1933, the Commissioner by letter to the Secretary of the Interior recommended that the contract be declared forfeited. This letter was approved by the Assistant Secretary on January 4, 1934, but no action was taken by the Indian office or the Department of the Interior prior to the issuance of a formal legal opinion by the Solicitor, dated April 27, 1935. The company, however, was aware that forfeiture was being considered. After the Solicitor's April 27, 1935 opinion was issued, informal discussions between Lutcher and Moore and the Office of Indian Affairs were held. On June 12, 1935, the lumber company was given 30 days to show cause why the contract should not be declared forfeited. On July 26, 1935, formal notice was issued to Lutcher and Moore that its timber contract was cancelled due to its "persistent failure to comply with the requirements of the contract." The company was informed that all of its rights under the contract were revoked, that its bond and all moneys paid were declared forfeited, and that it would be held liable for all damages resulting from the breach.

At the November 1, 1933 special session meeting held by the Navajo Tribal Council during which the council voted to cancel the Lutcher and Moore contract and retain the $32,500 already deposited by the company into Tribal funds, the council also approved the following motion:

The question is that the Secretary of the Interior and the Commissioner of Indian Affairs be requested to proceed with the collection of the $25,000 due [as payment for contract extension] and also whatever damages that might have accrued in the breach of contract.

During the meeting, the Commissioner of Indian Affairs had recommended that the Tribe request that the Secretary of the Interior take appropriate action to recover the $25,000 and to determine whether a suit for recovery of additional damages was justified by the facts.

After the notice of cancellation was issued on July 26, 1935, the Commissioner of Indian Affairs clearly contemplated seeking court action as requested by the Tribal Council. Evidence of his feelings is found

in an August 28, 1935 memorandum to the Secretary of the Interior. He pointed out that the Lutcher and Moore Lumber Company had already paid to the Tribe a total of $34,406.[8] Regarding any court action to collect damages resulting from Lutcher and Moore's breach, the Commissioner stated:

> It should be made clear to the Navajos that the company is not held blameworthy; that, on the contrary, it is viewed with favor and esteem by the Department. A continued effort should be made to procure the capital for a modest (but not impractically modest) lumbering and remanufacturing operation, and if this is obtained, the Lutcher and Moore Lumber Company can make a proposition to the Navajo tribe, whether to become sales agent for the tribe, or to become a management corporation for a stated term of years, charged under contract with the development of the project toward Indian management.

> The company might desire to make some other kind of proposition, such as the loan of capital to the tribe, at a stated rate of interest and for other considerations such as those mentioned above.

> Should negotiations go forward to the appropriate stage and receive Departmental approval, then any court action looking to the collection under the bond could be suspended.

Though the record indicates that some negotiations occurred between Lutcher and Moore and the Department of the Interior, it is apparent that serious consideration of such an arrangement was not being made. In a May 8, 1936 letter to the lumber company from the Secretary of the Interior, the Secretary confirmed that the contract had been cancelled and that the Government intended to retain for the Indians the moneys that Lutcher and Moore had already deposited. However, the Secretary stated:

> 2. It is not the present intention of the Government to sue The Lutcher and Moore Lumber Company on its bond for any damages which may have resulted due to the non-performance of the contract, but the right to do so in the event such action becomes necessary is reserved.

The Secretary also mentioned that the Department had not yet determined whether it would enter into a new contract with Lutcher and Moore. This would appear to be inconsistent with the view of the Commissioner of Indian Affairs, who stated in his August 28, 1935 memorandum that court action would be suspended if negotiations between the government and Lutcher and Moore went forward to the appropriate stage and received departmental approval.

■ Based on these facts, the court's finding is that defendant did have a duty to bring legal action on behalf of plaintiff against Lutcher and Moore for its breach of contract. The facts surrounding this contract claim place it within the parameters of the fair and honorable dealings provision in 25 U.S.C. § 70a (1982) and defendant's obligations as a fiduciary. *See* F. Cohen, *Handbook of Federal Indian Law* 567 (1982 ed.). Defendant awarded this timber sale contract on behalf of the Tribe without its consent. Defendant also modified the contract without the Tribe's consent. When Lutcher and Moore was unable to perform, the Commissioner of Indian Affairs recommended that the Tribe cancel the contract, and the government would then take appropriate action to recover the damages resulting from the breach. The General Timber Sale Regulations (sections 52 and 56) clearly indicate that Lutcher and Moore would have been liable for such damages. Considering all of these facts, the court concludes that defendant had a fiduciary obligation to recover, on behalf of the Tribe, any damages resulting from the lumber company's breach of contract; its failure so to act was

---

**8.** This figure of $34,406 is comprised of the $12,500 initial contract extension payment, the $20,000 original deposit at the time of the contract assignment and $1,906 as a deposit for the purchase of a railroad right of way on Indian allotments.

a breach of that fiduciary duty. *See* II A. Scott, *Law of Trusts* § 177 (1967).

■ The issue with which the court must now grapple is the proper measure of damages due plaintiff for this breach of fiduciary duty. This has proven to be a difficult task given the record in this case. There is no question that plaintiff is entitled to the $25,000 payment which Lutcher and Moore was obligated to make and defendant failed to collect. The court also concludes that plaintiff is entitled to the $50,000 represented by the bond taken out by the lumber company to insure faithful performance of all the terms of the contract. Section 52 of the General Timber Sale Regulations provided for the forfeiture of the company's bond and all moneys paid and, in addition, provided that the company would be liable for all damages resulting from its breach of contract. The bond was penal in nature, and thus the lumber company was required to forfeit the entire amount in addition to paying any damages arising from its breach. Plaintiff concedes that any recovery on the basis of the $50,000 bond should be deducted from any damages due for breach of the timber contract. The court accepts this concession and will adjust any damage award accordingly. Presumably, plaintiff's concession in this regard is based on the rule that penal bonds are generally unenforceable. *See* C. McCormick, *Law of Damages* 601–03 (1935). As to the other damages involved in this claim, the more complex damage issue revolves around Lutcher and Moore's failure to harvest the amount of timber specified in the contract.

The record indicates that Lutcher and Moore was in breach of the timber sale contract as of April 1, 1933. As of that time it had failed to make the $25,000 contract extension payment, discussed above; nor had it harvested the 10,000,000 board feet of timber as it was obligated to do as of 1933. Damages arising from Lutcher and Moore's failure to cut the 10,000,000 board feet prior to the date of breach equal the contract price ($3.00 per M.B.F.) minus the market value at the time of the breach. *See* Annot., 44 A.L.R. 215, 217–18 (1926).

*See also* McCormick, *Law of Damages, supra,* at 588–91. Plaintiff, in its computation, utilizes this damage computation formula. This damage formula raises the issue as to the market value of plaintiff's timber at the time of the breach and thereafter.

Plaintiff contends that the stumpage value of its timber in 1933 was zero because of the poor economic conditions and limited markets available. Plaintiff reasons that these conditions would have rendered a sale of all of its stumpage impossible. The court recognizes the fact that the timber industry was in a state of serious economic distress in 1933. However, the testimony cited by plaintiff referred to the sale of *all* of the stumpage on the Reservation. The court is only concerned with the value of the 10,000,000 board feet on the date of the breach, April 1, 1933.

Although that time period was economically grim, the court finds, on this record, that the market could have absorbed this 10,000,000 board feet. However, the court also finds that the market value most probably was less than the $3.00 per M.B.F. contract price. While determination of what an actual stumpage market price should have been at that time is difficult on this record, the court finds it reasonable to utilize a $2.00 per M.B.F. figure based on the totality of the record. The record indicates that stumpage rates of $1.50 to $3.00 were being applied to the timber harvested from the Navajo forest in the early 1930's. The $3.00 rate, however, was applied primarily to smaller sales, although the court does note that plaintiff's expert utilized a $3.00 figure throughout the 1930's damage calculations. It is also noted that Lutcher and Moore in October 1931 sought to reduce the contract stumpage rate from $3.00 per M.B.F. to $2.00 per M.B.F., indicating the market would, in its view, support such a stumpage figure for 10 million board feet. Lutcher and Moore, like the rest of the industry, was experiencing hard times during the height of the Depression in the early 1930's and its willingness to continue the contract with a $2.00 per M.B.F. figure

instead of the $3.00 per M.B.F. figure strongly suggests that the $2.00 figure was a viable figure. As indicated previously, this request was turned down. The court finds it reasonable, on this record, to use the $2.00 per M.B.F. figure as the stumpage market value on April 1, 1933.

■ Utilizing this $2.00 figure, the court finds that plaintiff is entitled to $1.00 ($3.00 contract price minus $2.00 stumpage market value) per M.B.F. or $10,000 for the lumber company's failure to cut prior to the date of breach, i.e., April 1, 1933.

■ The court must next consider the damages arising from Lutcher and Moore's failure to harvest any timber after the date of breach, i.e., April 1, 1933. The court concludes that the breach subsequent to April 1, 1933, should be deemed to be an anticipatory breach. See United States v. Harris, 100 F.2d 268, 277 (9th Cir.1938).

Plaintiff argues that a market value of zero for stumpage as of April 1, 1933 should be utilized to calculate the damages arising from Lutcher and Moore's breach of its contractual obligation to harvest a specified amount of timber over the remaining life of the contract. In support of this argument plaintiff cites In re Marshall's Garage, Inc., 63 F.2d 759 (2d Cir. 1933). In that case the lessee, Marshall's Garage, Inc., was adjudicated an involuntary bankrupt. The lessor brought suit, in part, on the lessee's anticipatory breach of a contract to purchase leased land at the termination of the lease. The court first concluded that the lessee's bankruptcy was an anticipatory breach. Id. at 762. The court then addressed the issue of damages.

Regarding damages resulting from an anticipatory breach, the Second Circuit stated:

The fact that an anticipatory repudiation is a breach of contract does not cause the repudiated promise to be treated as if it were a promise to render performance at the date of the repudiation. * * * In the Contracts Restatement, last cited, it is explained (pages 548, 549) that the rules for determining the damages recoverable for an anticipatory breach are the same as in the case of a breach at the time fixed for performance, and if trial is reached before the time fixed for performance, then the value of the promised performance and the extent of the future harm must be reached by prediction. In the case at bar the damages which the lessor vendor would suffer from nonperformance by the lessee vendee at the appointed time is the difference between the market value of her land on October 9, 1936 (when she had contracted to convey it, but would retain it), and the purchase price she was to receive under the contract. [Id. at 762–63] [citations omitted].

The court then went on to find that the market value of the leased land had been proven as of the date of trial (January 1930) and since there was no method to forecast the value of the land in the future (October 9, 1936, the proposed date of sale) the court accepted the value at the date of trial.

Plaintiff agrees that its damages should reflect the difference between the contract price ($3.00 per M.B.F.) and the market value of the stumpage. Plaintiff argues that a breach of contract trial could have taken place on April 1, 1933 and, based on In re Marshall's Garage, Inc., supra, that the market value of the timber on the Reservation as of that date should be utilized to calculate the damages arising from Lutcher and Moore's anticipatory breach. As indicated above, plaintiff argues that because of market conditions, the value of the stumpage as of April 1, 1933 should be deemed to be zero. Thus, plaintiff maintains that it is entitled to recover damages of $3.00 per M.B.F. ($3.00 contract price minus zero market value). Utilizing the $3.00 per M.B.F. figure and the stumpage that should have been cut under the contract until it expired in 1953, plaintiff computes $988,024.48 as its final contract damage figure. Plaintiff arrives at this figure by concluding it would have received $75,-000 during each year of the contract, representing $3.00 times a cut of 25 million board feet per year (average annual cut

derived from dividing the total contract required cut of 500 million board feet by the number of years (20) of the contract). Multiplying $75,000 by 20 years equals $1,500,000, which plaintiff asserts it would have received if the contract had been performed. Plaintiff determined the 1933 value of these payments, utilizing a 4 percent discount rate and taking into consideration the $32,500 deposited by Lutcher and Moore, to be $988,024.48. Plaintiff computed interest on this amount up to January 1, 1984 of $2,922,576.41. Thus, the claim under subclaim 1 is $3,910,600.

If a $2.00 per M.B.F. stumpage market value (as of date of breach) were utilized, the 1933 value of the contract would be approximately $647,849.63 and the diminution in its value, *i.e.*, the measure of damages, about $340,174.85 ($988,024.48—647,-849.63). At best, this damage figure is much more reasonable than plaintiff's $988,024.48 figure.

Plaintiff's zero market value position ignores the substance of the ruling in the very case relied on by it. The court, in *In re Marshall's Garage, Inc., supra,* stated that the proper measure of damages in the case of an anticipatory breach is the difference between the market value of property on the date of sale, *i.e.*, date of performance, and the contract price.

*Id.,* 63 F.2d 762–63. In that case, the problem was that the trial preceded the date of sale by over 6 years, thus making the prediction of value as of the date of performance difficult. However, in the case at bar, the actual trial occurred long after performance, *i.e.*, the harvesting of plaintiff's timber, was due, and there is, therefore, no reason not to use the value of the performance at the date it was due to be rendered. "If the time for performance comes due before the trial, then the value of performance * * * should be taken as it was at the time when performance came due, and not at the time of the repudiation in advance." McCormick, *supra,* at 591 (citing *Roehm v. Horst,* 178 U.S. 1, 20, 20 S.Ct. 780, 787, 44 L.Ed. 953 (1900) ). *See also* 5A. Corbin, *Corbin on Contracts* § 1053, pp. 310–13 (1964). This appears to be the generally preferred

rule (McCormick, *supra,* at 591), and one that the court views as more accurately reflecting the damages incurred. Following this general rule, the court rejects plaintiff's position regarding damages arising from the lumber company's anticipatory breach.

■ Having rejected plaintiff's damage computation, the court believes the following damage computation reasonably comports with case law and the record in this case relative to the damages flowing from the anticipatory breach of contract by Lutcher and Moore. The record in this case describes the dire economic situation in which lumber companies found themselves during the 1930's, but it fails to set out any specific market values for stumpage during that time period. The court has already concluded that $2.00 per M.B.F. was a reasonable valuation figure for April 1, 1933. Although hard times continued after that date, 1933 appeared to be a very low point economically for the timber industry. The court finds it reasonable to conclude, however, that a value of $2.00 per M.B.F. represents a fair valuation of plaintiff's timber up until, at the latest, April 1, 1937. Lutcher and Moore was obligated to have harvested 50,000,000 board feet, by that date including the first 10,000,000 already addressed. That leaves 40,000,000 board feet that the company was required to harvest by April 1, 1937. Utilizing $2.00 per M.B.F. as the market value and $3.00 per M.B.F. as the contract price results in $40,000 in damages that plaintiff is entitled to receive due to Lutcher and Moore's failure to cut 40,000,000 board feet from April 1, 1933 until April 1, 1937. Adding to this $40,000 figure for past breach damages the sum of $10,000, previously discussed, for pre-breach damages results in total damages for the period 1929–1937 of $50,000.

Regarding the lumber company's failure to cut after April 1, 1937, the court finds that plaintiff is entitled to no additional damages. The record indicates that as the national economy gradually began to recov-

er, the timber industry did so as well. The record indicates that demand began to increase and prices began to rise gradually after the mid-1930's. The court finds it entirely reasonable to conclude that as of mid-1937 the market value of plaintiff's stumpage equalled or exceeded the $3.00 per M.B.F. contract price. At that point, under the damage computation formula utilized by plaintiff, plaintiff is entitled to no further damages to make it whole.[9]

The total contractual damages resulting from Lutcher and Moore's failure to cut is therefore $50,000. However, from this amount must be subtracted the $20,000 (*see supra* note 7) the lumber company deposited to insure future stumpage payments. Plaintiff concedes that such an adjustment to the damages must be made. However, plaintiff subtracted $32,500 from the damages it felt it was entitled to, but the court disagrees with this figure. A portion of the $32,500 ($12,500) was an initial payment for the contract extension and thus not a deposit. The other $20,000, however, must be subtracted from the damages awarded, leaving a total net award of $30,000. *See* McCormick, *supra*, at 614–16.

The court accordingly concludes that plaintiff is entitled to $25,000 representing the uncollected contract extension payment and $50,000 from the uncollected bond. The $30,000 in damages resulting from Lutcher and Moore's breach of its obligation to harvest the specified amounts of timber is reduced to zero because of plaintiff's recovery of the entire $50,000 bond. This makes plaintiff's total recovery on its contract claim $75,000.

It is arguable that plaintiff's entire recovery on this contract claim should be $55,000, *i.e.*, its actual damages ($25,000 plus $30,000), as opposed to the $75,000 the court is awarding to plaintiff on this contract claim. This approach would reject the validity and legal applicability of the penal bond of $50,000. However, the court finds it reasonable to conclude, given the

magnitude of the contract involved, the uncertain nature of any damages that might have resulted from a failure to perform, and the court's view that $50,000 was a fair and reasonable attempt to fix compensation for anticipated losses caused by a breach of the contract, that the $50,000 bond constituted liquidated damages and thus served as the limit on damages that plaintiff is entitled to recover as a result of the breach. *See Priebe & Sons v. United States*, 332 U.S. 407, 410–12, 68 S.Ct. 123, 125–26, 92 L.Ed. 32 (1947); *JMNI, Inc. v. United States*, 4 Cl.Ct. 310, 315 (1984); *International Electronics Corp. v. United States*, 227 Ct.Cl. 208, 228, 646 F.2d 496, 508 (1981); *Jennie-O Foods, Inc. v. United States*, 217 Ct.Cl. 314, 337, 580 F.2d 400, 414 (1978); *Higgs v. United States*, 212 Ct.Cl. 146, 151–52, 546 F.2d 373, 376–77 (1976). The court concludes that the fact that the actual damages incurred were less than the $50,000 bond does not affect characterizing the bond as a liquidated damages provision. *See Priebe & Sons v. United States, supra*, 332 U.S. at 412, 68 S.Ct. at 126. The fact that the bond was labeled "penal" does not mean that it cannot be considered a liquidated damages provision. *See* McCormick, *supra*, 607. The court finds this to be a liquidated damages provision covering a breach of the lumber company's obligation to perform the terms of its contract, but it was not intended to cover the contract extension payment of $25,000. The court therefore concludes that plaintiff is entitled to $75,000 on its Failure to Cut—Breach of Contract claim. As set forth, *infra*, no interest is allowed on either of these elements.

### 2. *Failure to Cut—Loss Due to Undercutting (1920–1962)*

The next claim under the general category of defendant's Failure to Cut is a claim for losses due to undercutting during the period of 1921–1962. Plaintiff's damage claim covers the period from 1921, when

---

**9.** The court acknowledges that a certain amount of line drawing was necessary in order to arrive at these damages figures. Given the totality of the record, however, the court concludes that these figures are reasonable under the economic circumstances of the times.

plaintiff argues defendant should have conducted an annual timber harvest of 28 million board feet, to 1962, when the Tribe established a modern sawmill operation. Plaintiff's contention is that it lost a great deal of annual income because of defendant's failure to harvest plaintiff's forest in a manner consistent with contemporary technical knowledge and consistent with defendant's practices on other southwest Indian reservations and nearby national forests. Plaintiff asserts that defendant was obligated based on its general fiduciary duty and applicable regulations to: (1) conduct an inventory of plaintiff's forest; (2) establish an annual allowable cut [10]; (3) harvest this allowable cut; and (4) develop markets for this harvest. Plaintiff maintains that if defendant had acted properly it would have established an allowable cut of 28 million board feet in 1920 and harvested at least that amount of timber from 1921 until 1962. If such a cutting schedule had been carried out, plaintiff asserts it would have received an additional $4,520,-486.80 in revenue. If that income had been deposited such that it was earning the proper interest, plaintiff contends it would have received a total of $11,208,400.49. Plaintiff seeks to recover this amount under its Loss Due to Undercutting claim.

In considering this claim, it is necessary to set out the facts in some detail to show defendant's actions throughout the period in question.

As early as 1871, a report from the Commissioner of Indian Affairs to the Secretary of the Interior pointed out the interest a Navajo agent had in utilizing some of the timber found on the Navajo Reservation. The report stated:

> There are large forests of good pine timber, which, if mills were furnished to saw, would supply the tribe with lumber for all time to come: and in this connection I would say that in case of putting up new buildings at this place and school houses in different parts of the reservation, it would be a matter of economy for the Government to furnish at least one saw-mill [sic], as lumber is by no means the least expensive article found in this country * * *.

After a delay of 6 years, the government finally provided a sawmill, and the Commissioner reported in 1880 that it had already cut 20,000 board feet.

This sawmill, intended only to supply lumber for the Indians' own use, ran smoothly until 1883 when it fell into a state of disrepair, apparently due to the lack of a roof to protect it from the elements. The government failed to repair the mill, and its interest in continuing to run the mill waned. However, in 1886, the Commissioner's Report again expressed an interest in acquiring a new sawmill to be used to produce the lumber and shingles needed by the agency. The report pointed out the substantial savings such a mill could produce, i.e., $5.00 per M.B.F. as opposed to $35.00 to $60.00 per M.B.F. for lumber purchased from off the Reservation. A new sawmill was supplied by the government sometime in 1889.

By 1891, the Navajo agent was recommending that the capacity of sawmill be increased. The record indicates that improvements may have been made, and through the 1890's mill production was up to an approximate annual average of 150,-000 to 200,000 board feet. Such lumber was utilized entirely to meet the building needs of the Navajo Indians. That mill was destroyed by fire in 1905 and was promptly replaced by an improved mill. A second sawmill was also installed in 1906.

In 1909, Congress appropriated money to create the Branch of Forestry within the Indian Department. The Act of March 3,

---

**10.** The "annual allowable cut" is defined as "[t]he volume of timber that would be cut on commercial timberland during [a year] under specified management plans aimed at sustained production of timber products." United States Department of Agriculture, Forest Service, *The Outlook for Timber in the United States, Forest*

*Resource Report No. 20*, at 310 (1973). One witness at the trial described "annual allowable cut" as the cut that a forest can biologically sustain year after year. It does not take economic and social factors into consideration which may impact on the actual cut.

1909, 35 Stat. 781 (1909 Act), provided funds:

> To enable the Commissioner of Indian Affairs, under the direction of the Secretary of the Interior, to make investigations on Indian reservations and take measures for the purpose of preserving living and growing timber, and removing dead timber, standing or fallen; to advise the Indians as to the proper care of forests, and to conduct such timber operations and sales of timber as may be deemed advisable and provided for by law. * * *

In a letter dated May 16, 1910, Joe Worris, a Department of the Interior Inspector, probably in response to the 1909 Act, reported the existence of a great deal of "splendid pine timber" on the Navajo Reservation. Although he concluded that at that time no real profitable use, except for local purposes, could be made of the timber because of the lack of railroad facilities, he did feel it should be supervised in order to protect the forest. On January 5, 1910, the Navajo Superintendent reported to the Commissioner of Indian Affairs that there was up to 2,000,000,000 board feet of timber on the Navajo Reservation. He also recommended that measures be taken to protect the forest, which served as a moisture conserver in the arid country of the Reservation. He recommended that five men be hired to act as forest guards for a portion of the year.

In 1910, G.A. Gutches (Gutches), a district forester, prepared a more detailed study of forest conditions on the Navajo Reservation. The report was dated December 12, 1910. In the report, Gutches discussed two types of yellow pine trees found on the reservation. The first type, which he labeled "Merchantable Yellow Pine," was located in an area of 255,500 acres. He calculated that there were 850,000,000 board feet of merchantable timber in this area with a healthy underground of Black Jack (young trees) to replace it when it was harvested. He recommended that the mature timber be sold as soon as a good market became available. He felt that this mature timber could remain a few years before much deterioration set in. He also reported that logging this "type" of yellow pine would not be difficult due to the fact that the ground was level. However, he did note that it would be necessary to construct a railroad to the timber (65 miles from Gallup to the north end of the timber) in order to put it on the market at a reasonable rate. He also reported that a portion of this type of timber was inaccessible at that time.

The second type of yellow pine he labeled "Scattered Yellow Pine". These pine trees were located in a 490,000 acre area, only 50 percent of which was covered by such trees. The remainder of this area was covered with open grassland, pinon, juniper, young poplar and scrub oak. Gutches reported that this 490,000 acre area was very rough mountainous country with small scattered merchantable areas. He felt that these topographical conditions would necessitate costly logging roads and the use of small mills. Some of the scattered area could not be considered merchantable. Gutches reported that there would be approximately 700,000,000 board feet of this yellow pine that should be sold as soon as a market became available.

One problem Gutches did note in his report was that the current reproduction rate for yellow pine trees on the Reservation was very poor. He attributed this problem to excessive sheep and goat grazing. The Indians apparently allowed their stock to enter the forest and graze on the pine saplings, thereby destroying most of them. Due to this problem, Gutches believed that grazing supervision would be necessary whenever large areas of yellow pine were cut over to ensure perpetuation of the forest.[11]

---

11. The court notes and the record indicates that up until this time and beyond there was no expression of interest from the Indians themselves concerning the development of their forests and entrance into the timber business.

Prior to Gutches' report, Congress passed an Act (1910 Act), which in pertinent part provided:

Sec. 7. That the mature living and dead and down timber on unallotted lands of any Indian reservation may be sold under regulations to be prescribed by the Secretary of the Interior, and the proceeds from such sales shall be used for the benefit of the Indians of the reservation in such manner as he may direct: * * * [Pub.L.No. 313 § 7, 36 Stat: 855, 857, 25 U.S.C. § 407 (1983)] [12]

Through this Act, "Congress * * * sought to provide for harvesting timber 'in such a manner as to conserve the interests of the people on the reservation, namely, the Indians.'" *Mitchell II, supra,* 463 U.S. at 220, 103 S.Ct. at 2969.

"From the outset, the Interior Department recognized its obligation to supervise the cutting of Indian timber." *Id.* In June of 1911, the Secretary of the Interior issued regulations promulgated by the Office of Indian Affairs. These regulations provided in pertinent part:

Section 1. The superintendent of each reservation will be expected and required to do *all in his power* to secure a wise and advantageous use of forest resources. * * *

Section 2. * * * [Officers in charge of forests on Indian Reservations among other things] shall thoroughly familiarize themselves with all phases of forestry work * * * including a knowledge of boundaries, of the number of acres of timberland, of the total stand of timber, of the relative quantity, rapidity of growth, seeding qualities, character of reproduction, adaptability to location, etc. of the different species found. They must also acquaint themselves with the cost of logging and manufacture under different systems, local markets and the possibilities of developing the same, and all other practical and technical work

which will aid the office in so managing the Indian forests as to obtain the greatest revenue for the Indians consistent with proper protection and improvement of the forests.

Section 3. Forest guards shall * * * patrol their districts to prevent and report trespass, fires, violations of agreements by those conducting timber operations, [and] the commission of waste by Indians or others * * *. Under the direction of the forest officer in charge, or the superintendent, [the forest guards] shall perform the duties of line riders and stockmen in exercising a proper control of grazing * * *.

Section 9. Large sales of timber will be made from unallotted lands *as occasions arise.* Such sales will receive special consideration, and a regular contract will be executed, accompanied by a bond when necessary. However, small operations should be allowed in order to meet the needs of the Indians or to satisfy the requirements of white persons living upon reservations or of settlers living in the vicinity of the same.

Where the amount of timber available is no greater than is needed by the Indians, no sales should be made. All expenses connected with the sale of timber from unallotted lands may be paid from the proceeds of the sale, but the net proceeds shall be deposited as "Indian Moneys—Proceeds of Labor. [Emphasis added.]

These regulations were promulgated pursuant to the 1910 Act and had the force and effect of law. *See Barclay v. United States,* 166 Ct.Cl. 421, 436, 333 F.2d 847, 856 (1964).

Prior to the issuance of the above regulations, the Office of Indian Affairs had already begun to take action pursuant to the directives in the 1910 Act. In a letter dated February 23, 1911, the Assistant Commissioner brought the 1910 Act to the

---

12. Section 8 of the 1910 Act allowed an Indian allottee to sell timber on his allotment with the consent of the Secretary of the Interior. The court notes that this statute indicates that, prior to 1910, the Indians were not generally permitted to cut and sell timber without congressional approval for such action. *United States v. Mitchell,* 463 U.S. 206, 219–20, 103 S.Ct. 2961, 2969–70, 77 L.Ed.2d 580 (1983) (*Mitchell II*).

attention of Peter Paquette (Paquette), Superintendent of the Navajo Indian School. Regarding the Act, the letter stated in pertinent part:

Indian timber lands should be so managed as to afford a constant revenue which may be utilized for the benefit of the Indians. If the tribal forest lands are of limited extent, large sales cannot be made, but by judicious management a small return may be derived from products which are ordinarily allowed to waste. If the tribal forests are extensive, sales of timber should be made *whenever a market is available and the conditions of the forest will not be injured by cuttings.* [Emphasis added.]

The letter concluded by urging Paquette to make every effort to protect the Navajo forest and to report to the Office of Indian Affairs when he felt timber should be sold and a market was available.

The court also notes that this February 23, 1911 letter mentioned a Comptroller ruling which concluded that "Indian Moneys, Proceeds of Labor" derived from sales under section 7 of the 1910 Act could be used to fund educational programs on the Reservation. The letter also cited a second Comptroller decision, dated September 15, 1910, which stated in pertinent part:

* * * the Secretary of Interior is authorized in his discretion to direct the use of "Indian Moneys, Proceeds of Labor" in the purchase of supplies or the payment of employees, which he thinks necessary for the benefit of the Indians on whose account the funds were collected and covered into the Treasury, where no appropriations are available for such purposes, and the Government is not bound by law, treaty or agreement to defray such expenses.

These references to Comptroller decisions indicates that a portion of the proceeds from any timber sales could be utilized to fund the timber operations themselves since the 1910 Act did not impose a duty on the government to fund the timber sales on the Reservation.[13]

After the issuance of the 1911 regulations in June of 1911, the Office of Indian Affairs received a July 21, 1911 letter from Mr. D.R. Johnson, presumably a lumberman, requesting information about a timber sale on the Navajo Reservation. At that juncture, the Assistant Commissioner responded in a July 29, 1911 letter that no large timber sales on the Navajo Reservation had been contemplated. He did state, however, that "if there is sufficient demand for a sale to make it probable that satisfactory prices can be received, steps will be taken to facilitate a sale." At that point, he indicated that in case of a sale it would be an advertised sale under sealed bids.

In an October 1915 report, Otis Goodall, Supervisor of Indian Schools, expressed the need for better homes for the Indians and his hope that the government sawmill would produce the necessary material. He reported that it was advisable to utilize lumber from the Reservation given the fact that estimates submitted by the Forest Bureau indicated that there were 3 billion board feet of merchantable timber on the Reservation. Such an estimate indicates that at least a cursory inspection of the Navajo forest had taken place.

In response to a letter from the Office of Indian Affairs regarding supplying the Indians with homes built from lumber milled on the Reservation, Superintendent Paquette expressed his concerns about the inability of the present government sawmill to meet the Indians' needs for materials for housing, schools and other Agency needs. It was clear at the time of Paquette's February 16, 1916 letter that the primary concern on the Reservation at that time was meeting the needs of the Indians and not producing revenue from large timber sales.

An April 25, 1918 letter from the Assistant Commissioner indicates that a sale of not more than 250,000 board feet was ap-

---

13. The regulations promulgated pursuant to the 1910 Act confirmed that the government was under no obligation to appropriate money to finance timber sales from the Reservation. Such moneys were to come from the proceeds of such sales. *See* section 9 of 1911 regulations.

proved to a W.D. Lovell. Lovell was required merely to execute an enclosed contract to close the deal. The contract required a payment of $5.00 per M.B.F. and required cutting and removal to be completed by April 30, 1919. The contract specified the size of trees to be cut, the use diameter at the top of the trees cut, as well as requirements for cleaning up after cutting. There is no evidence in the record whether or not this sale ever went through.

The record indicates that through the approximate period of 1911 to 1921, sales of lumber produced by the government's sawmill on the Reservation were being made to Indians, whites, and missions. However, the record indicates that poor bookkeeping was conducted, and thus the extent of the sales is unclear. The evidence does indicate that most of the lumber being provided or sold by the mill to both Indians and non-Indians was being provided or sold below the cost of production. Paquette was directed to increase the prices to reflect more accurately the costs incurred. The record indicates that although Paquette tried to supervise the sawmill's operations, his efforts were less than exemplary.

On June 11, 1924, the sawmill and a great deal of lumber and logs were destroyed by fire. The record indicates that Paquette and the Office of Indian Affairs acted quite quickly to replace the sawmill so that the lumber needs of the Indians could again be met. Paquette also proposed the purchase of a second used sawmill to meet the needs of the Indians in a July 29, 1924 letter to the Commissioner of Indian Affairs. The record does not indicate whether this sale went through, or what funds were utilized to purchase this equipment.

In September of 1925, E.M. Pryse (Pryse), a forest examiner for the Office of Indian Affairs, spent several days on the Navajo Reservation inspecting the forest. He filed a report, dated March 3, 1926, setting out his observations. Pryse found about 450,000 acres of forest containing at least 1,500,000,000 board feet of timber, principally yellow pine. He observed that most of the merchantable timber (yellow pine) was located in a 185,000 acre section of the Reservation on the Fort Defiance plateau. Regarding this timber, he stated:

A good portion of this yellow pine is ripe for cutting. The amount of over-ripe timber is negligable [sic] and there appears to be no urgent reason why the timber should be placed on the market in the near future. * * * Timber like this of such great potential wealth and other values should have adequate protection, especially protection from destructive grazing and fires. I believe more study should be given to the Navajo forest resources.

\* \* \* \* \* \*

The yellow pine is the only specie that may be properly considered commercially important at present. The Navajo yellow pine is valuable chiefly as box and tie timber. * * * As a basis for comparison, the Navajo pine is about on par with the Jicarilla Reservation pine. Considering the inaccessibility of this timber, apparently it could not be sold for more than $2.25 to $2.50 per M feet, B.M. The nearest railroad point, Gallup, New Mexico, on the Santa Fe system, is approximately 35 miles. Wagon roads are poor.

Pryse reported no appreciable insect infestation problems in the forest, although he did observe substantial mistletoe (Razoumofskya Cryptopoda) and heart rot (Polyporous Sulphureus) parasite problems. He observed the very serious consequences of livestock overgrazing in the forest that had resulted in very little reproduction and a great deal of soil erosion due to a lack of undergrowth to hold the soil. He also observed the ravages of the 23,000 acre forest fire that occurred in 1922. He strongly urged that improvement of the fire protection program, which was lacking the needed equipment to function adequately.

Pryse also inspected the Agency sawmill while at the Reservation. His inspection came shortly after the fire that destroyed the mill, and he was impressed with the sawyer's efforts in rebuilding it. He rec-

ommended the acquisition of some additional equipment so that the mill could continue to meet the needs of the Tribe and the Agency. Pryse found the harvesting practices related to the Agency sawmill to be satisfactory, although he felt a few more mature trees could be left standing to produce seed.

Regarding timber sales, Pryse reported:

There is no timber sale in effect on the Navajo. Considering the distance from a railroad point and other economic factors, it will probably be a number of years before it is possible to make a sale of any size. Other than the need of tribal money for the Navajos' indusrrial [sic] development there appears to be no need of placing this timber on the market in the near future.

In a July 29, 1927 letter, apparently in response to an inquiry about a potential timber sale, the Superintendent of the Southern Navajo Agency advised a Mr. Cleaveland of El Paso, Texas, that "so far no effort has been made to market this timber." He then gave an estimate of the timber available in his jurisdiction (36,000,-000 board feet, 25 percent of which was ripe), but cautioned that it was only an estimate because it had never been cruised. The Superintendent explained that consent of the Tribal Council was needed for any sale, but if Mr. Cleaveland was interested, the Superintendent recommended that he contact the Commissioner of Indian Affairs.

In 1928, the sale of 500,000,000 board feet of timber to the McGaffey Lumber Company took place. *See supra* subpart A.1 of Part II of this opinion. It was clear in the case of the McGaffey sale that the company had contacted the government and not *vice versa*. Why such a sale did not take place earlier is unclear. The record indicates that the lack of accessibility and the comparative low quality of the Navajo timber may have contributed to the delayed sale. However, the record also indicates that the Navajo timber did compare with some of the timber sold earlier, and a sale of timber from the Fort Apache Reservation took place in 1919 that necessitated the construction of 70 miles of railroad as opposed to the approximately 35 miles of railroad needed to reach the edge of the Navajo forest. In any event, even though a timber sale finally materialized, as indicated earlier, the purchaser never did harvest the timber it was obligated to cut.

In 1930, Donald Harbison (Harbison), Deputy Supervisor of Forests, Department of the Interior, prepared a fire protection plan for the Navajo forest. The plan was dated May 1, 1930. In the plan, Harbison noted that due to livestock overgrazing of forest areas there was very little undergrowth to catch fire. Thus, the Navajo forest was not as great a fire hazard as might have been expected. At the time of the report, one fire tower was already in existence from which it was possible to observe the Fort Defiance plateau region. This tower was manned during the fire season, *i.e.*, May and June and sometimes in September and October. At the time of the report, the forestry force possessed two pick-up trucks for transportation and other tools necessary to fight fires. The major causes of fires were lightning, which generally caused smaller fires due to the sparser growth at higher elevations, and sheep herders, usually children, who started camp fires that spread and burned larger areas.

Harbison's recommendation included $2,500 in funding to purchase an 80-foot tower, a firetruck, and firefighting tools. Because logging operations were anticipated in the near future, the need for fire protection had become greater. In addition, he recommended an intensive education program to develop a "fire conscience" in the Navajo adults and children. Harbison also recommended a forest protection force chain of command to aid in fighting fires.

In the 1931 Annual Forest Report from the Southern Navajo Reservation, it was reported that a new fire tower had been purchased but apparently not yet installed. The report did point out the insufficiency

of the fire protection program and urged that more funds be provided to improve the system. The annual report also noted that over 1,300,000 board feet of lumber had been produced by the Agency sawmill and the Tohatchi portable mill. This lumber was produced at a loss, although Indians were employed in the process. The report also emphasized the overgrazing problem with its resulting erosion and lack of reproduction. Apparently, a grazing management plan had been developed to address the problem of overgrazing, the detrimental impact of which was not appreciated by the Indians, who thought "as long as there is green stuff on the ground the animals should thrive."

A September 15, 1931 report regarding the operation of the two sawmills on the Reservation reflected improved operation, improved cutting practices and effective use of the cut timber. The report recommended expanding the capacity of the Agency sawmill or adding additional portable mills to meet the expanding lumber needs of the Tribe. No source of funding was mentioned. The report also recommended scattering the limbs and brush, removed from the cut trees, on the ground to help reproduction and reduce the impact of grazing. The report did mention that the sawyers were doing the marking of the trees, and Indian contractors were doing the cutting. Apparently, the sawyers were not the best markers, and a letter from the Assistant Commissioner of Indian Affairs ordered that the trained foresters do the marking on the Reservation at all times subsequent thereto.[14] Although the report noted some problems, overall it indicated improvement and pointed out that many Indians were being employed in the process, which was an important goal of the development of a timber industry on the Reservation.

In an August 17, 1932 letter, John Hunter, Superintendent of the Southern Navajo Agency, requested a $12,000 appropriation to expand and modernize the Agency sawmill. The Tohatchi sawmill had been abandoned because no money had been appropriated for its operation, probably due to the high cost of production associated with portable mills. Part of the funds requested would also be utilized to purchase new harvesting equipment, i.e., a tractor and two trucks. Apparently, the demand for lumber on the Reservation was far outstripping the capacity of the Agency sawmill. The same demands for expanded sawmill capacity were expressed in the 1934 forestry report submitted by the Forest Supervisor.

"Over time, deficiencies in the Interior Department's performance of its responsibilities [use of Indian forests] became apparent. Accordingly, as part of the Indian Reorganization Act of 1934, C. 576, 484 Stat. 984 [25 U.S.C. § 461, et. seq.], Congress imposed even stricter duties upon the Government with respect to Indian timber management [as compared to the 1910 Act]." Mitchell II, supra, 463 U.S. at 220, 103 S.Ct. at 2970. In adding to the 1910 Act, Congress provided in section 6 of the Reorganization Act, 25 U.S.C. § 466 (1983), the following:

§ 466. Indian forestry units; rules and regulations

The Secretary of the Interior is directed to make rules and regulations for the operation and management of Indian forestry units on the principle of sustained-yield management, to restrict the number of livestock grazed on Indian range units to the estimated carrying capacity of such ranges, and to promulgate such other rules and regulations as may be necessary to protect the range from deterioration, to prevent soil erosion, to as-

---

14. Apparently due to a manpower shortage, the use of the trained foresters did not commence immediately. In a May 2, 1935 letter, H.I. Nettleton (Nettleton), Forest Supervisor, stated that he had talked with the Navajo Forest Supervisor regarding sawyers marking the trees and the supervisor had assured him that he would do the marking personally. That marking problem was the only criticism Nettleton had regarding the logging operations on the reservation. Nettleton noted the improvement in the operation of the Agency sawmill.

sure full utilization of the range, and like purposes.

This provision was intended " 'to assure a proper and permanent management of the Indian Forest' under modern sustained-yield methods so as to 'assure that the Indian forest will be permanently productive and will yield continuous revenues to the tribes.' 78 Cong.Rec. 11730 (1934)." *Mitchell II, supra,* 463 U.S. at 220–21, 103 S.Ct. at 2970 (citation omitted). It is to be noted that the Navajo Tribe voted against application of the provisions of the 1934 Act to the Navajo Reservation. The parties disagree on the applicability of the sustained yield provisions of the 1934 Act to the Navajo Reservation as a result of the above vote. Resolution of this disagreement is not vital since, in any event, defendant was obligated to manage the Navajo forest prudently in a manner consistent with the economic, social and technological constraints of the times and circumstances. Nonetheless, it appears as if the provisions of the 1934 Act were not applicable. *See Kerr-McGee Corp. v. Navajo Tribe of Indians,* —— U.S. ——, 105 S.Ct. 1900, 1902, 85 L.Ed.2d 200 (1985) ("the terms of the IRA do not govern tribes, like the Navajo, which declined to accept its provisions. 25 U.S. § 478.").

Perhaps partially in response to the Indian Reorganization Act of 1934, the Office of Indian Affairs developed a "Navajo Policies and Program" paper dated May 1, 1935. In addition to dealing with roads, livestock reduction,[15] land management,[16] health, education and other issue areas, the paper addressed forestry management. The forestry portion of the paper stated in pertinent part:

> The basic principle of the forestry policy on the Navajo Reservation is to make it possible for the Navajos to use their timber perpetually. This will only be possible if the forests are used in moderation. The essential elements in the program are: (a) Strict cutting regulations enforced on all employees and work agencies; (b) Purchase and operation of portable sawmills with which to cut the lumber needed by the Navajos; (c) Management of all logging operations necessary to supply logs to the sawmills in a way which will not damage the forest; (d) Keeping out all livestock except horses from areas recently cut over; (e) Establishment of community forests for those communities which have forest lands, from which local timber and fuel needs may be met, but only in a way which will not damage the forests. * *; (f) Protection of all forest land from fire and overcutting; * * * (h) The training of Indians to handle the conservation of their forests and range.

One of the primary means through which the government hoped to obtain the goals it had for the Navajos was an Extension Program. Such a program would educate the Indians regarding problems that they often did not perceive existed. The extension programs would include informing the Indians about stock reduction, *see supra* note 15, improvement of herds, and farming techniques as well as forest management.

> The special functions of the Soil Erosion Service were to secure the essential facts regarding range-management, forest management, soils, erosion, game, agriculture and other land-resource factors; to formulate land-use plans; to supervise erosion control, revegetation, and flood-water spreading activities; to administer demonstration areas; to cooperate with the General Superintendent of the Navajo in preparing material for education, demonstration; and to disseminate information. The overall goal of the land management policy was to instill in the Indian a perception of the need for land management and eventually to turn over the responsibility therefor to the local levels.

---

**15.** Because the amount of livestock on the Reservation exceeded the carrying capacity of the land, a program of stock reduction was developed that would, as quickly as possible, reduce the number of animals while ensuring that the burden of reduction was distributed where it could be borne, *i.e.,* the owners of smaller herds were not to bear an inequitable portion of the reduction burden. Such a plan was designed ultimately to improve the quality of the herds and promote regeneration in the forests that were being ravaged by overgrazing. *See, infra,* subpart D of Part II of this opinion.

**16.** The land management policy was to be formulated by the Soil Erosion Service and the Indian service working with the Tribal Council.

The record indicates that by the end of 1936, the economic ravages of the Depression had begun to subside, and the demand for lumber had begun to increase. Even the Lutcher and Moore Lumber Company, which had failed to meet its obligations under the timber sale contract assigned to it in 1929, expressed an interest in harvesting timber from the Navajo forest in a July 27, 1936 letter. The company pointed out that economic conditions were improving while the Navajo timber deteriorated due to its maturity. These two factors again made harvesting the Navajo forest attractive to Lutcher and Moore.

The record also indicates that plans for a forest survey (inventory) were underway in 1936. Upon completion of the inventory, a forest management plan was to be developed. The Regional Conservator of the Soil Conservation Service stated in a March 27, 1936 letter to the Director of Forestry, Office of Indian Affairs, that the office should consider "operating this timber on a sustained-yield basis, although it does not necessarily follow that sustained yield should be practiced."

Perhaps reflecting the increased concern regarding the Reservation forests demonstrated by Superintendent E. Reeseman Fryer (Fryer), the Tribal Council passed a September 15, 1935 Resolution authorizing the use of $15,000 in Tribal funds for the purpose of forest fire suppression to be used when fires were in progress. Also reflecting increased Indian interest in the Navajo forest and its potential source of income are the statements made by the Chairman of the Indian Council, Henry Taliman, at the September 15, 1938 meeting:

Now the Government has made statements such as the timber. Now up to this time they don't know how much timber there is. They do not know how much timber is to be cut and used. In the past the Government forest men who were heads of the departments at Fort Defiance in the time of Mr. Hunter until last year, they have told us that we have so much timber that should be cut. Now, we understand that they do not know very much about it. It seems like the study that they had in the past they could tell us from that how much timber should be cut. Such things like this are discouraging. * * *

In 1939, plans for developing the Navajo forest were progressing. In an August 1939 letter from the Commissioner of Indian Affairs to Senator Morris Sheppard, the Commissioner responded to a request for information regarding the use of the Navajo forest as a source of timber for a lumber manufacturing plant. The Commissioner stated:

For many years the Navajo Indian economy has been intimately concerned with grazing to the extent that the reservation has been heavily overgrazed. The grazing area embraces a large portion of the timbered area and excessive grazing in the past has resulted in preventing or retarding forest reproduction.

Land management plans have been developed for the Navajo Reservation and they are being placed in operation as rapidly as conditions will permit. A phase of these plans contemplates a reduction in the use of the timbered area for grazing livestock so as to permit satisfactory natural reproduction of the forest. Until natural reproduction can be assured and the forest can be developed in accordance with the sustained yield management plan, it is not desirable to consider cutting a large volume of timber. As the condition of the forest improves, we believe that so far as practicable the Navajo Indians should develop their own forest resources so as to improve their economic condition. Plans are now under way to develop a tribal lumbering and sawmill enterprise on an area of the forest which can be safely developed. In the circumstances we do not consider it advisable to encourage the sale of a large volume of timber on the Navajo Reservation at this time.

During 1939, an inventory of a portion of the Navajo forest was completed. Only 160,000 acres of the 450,000 acres of potentially commercially viable forests were in-

ventoried. Although not entirely clear from the record, the evidence indicates that only this 160,000 acre area, made up principally of the Fort Defiance plateau and the Tsaile unit,[17] was inventoried because it was considered the only commercially viable portion of forest due to its mild terrain as compared with the remainder of the forest topography. Apparently, the rough terrain where the remainder of the forest was located was comprised of steep slopes over which the vehicles of that day had difficulty travelling. There was also concern that logging such steeply sloped areas would cause a great deal of erosion.

After the inventory data was assimilated, a forest management plan was developed. The plan, dated January 24, 1940, established an annual net allowable harvest of 13,000,000 board feet. This figure was applicable only to the 160,000 acres inventoried. The introduction of the plan pointed out the circumstances that necessitated the forestry program proposed. The introduction stated in part:

> Due to the overmaturity of the present stand of saw timber, one of the purposes of this plan is to provide for removal of the most decadent portion of the merchantable timber before further serious losses in volume occur. It should also be realized that the Ponderosa pine stands of the Defiance and Tsailee Units have little or no reproduction. The plan, therefore, provides for leaving an adequate number of seed trees which will, it is hoped, with necessary grazing con-

trols, assure the eventual establishment of reproduction.

> A stand of sufficient volume will be left to allow a future cut to be made at an undetermined time. The major purpose of this plan is to provide over a 25-year period for salvage of overmature timber and perpetuation of the stand by the establishment of satisfactory reproduction. When reproduction is obtained further surveys should be made and a long-time management plan prepared by the Indian Service.

Such a program can be viewed as "sustained-yield management" as that term was defined by the Society of American Foresters in 1958. The Society defined the term as follows: "Management of a forest property for continuous production with the aim of achieving, at the earliest practicable time, an approximate balance between net growth and harvest, either by annual or somewhat longer periods." K. Davis, *Forest Management: Regulation and Valuation* 6 n. 1 (2d ed.1966).[18]

The primary aims and guidelines of the management plan were to: (1) harvest the overmature timber as rapidly as possible [19] consistent with economic conditions and highest land use values; (2) cut for the period of the plan no more than 55 percent of the total gross volume of all tree classes; and (3) apply proper silviculture measures to the Ponderosa pine stands. The plan was designed to provide the greatest possible return to the Indians while maintaining and perpetuating the for-

---

**17.** Both the Fort Defiance plateau and Tsaile unit, which is located 50 miles due south of the intersection of the Utah, Arizona, Colorado and New Mexico state lines, were highly accessible with well-established roads and relatively level smooth terrain.

**18.** The plan does point out that due to the overmaturity of a great deal of the timber as well as the general lack of reproduction, it was not desirable to utilize a sustained yield plan establishing a rotation and cutting cycle. However, the goals of the plan were entirely consistent with sustained-yield management as defined above.

**19.** The cutting period of the plan was to be as short as possible consistent with economic de-

mands. However, the period was to be long enough to allow for depreciation of any sawmills installed. Ideally, a 25-year cutting cycle was to be used.

The lack of a long-term plan was necessitated by the forest conditions, *i.e.,* overmaturity and lack of reproduction. As the Regional Forester, William Zeh stated in a January 3, 1940 letter to the Soil Conservation Service:

"The lack of reproduction makes it practically impossible to plan on future increment and until reproduction can be established, it is possible to work out only a plan of harvesting the timber that will be both practical and has for its purpose the establishment of reproduction."

est.[20] The plan designated certain areas that were in need of early harvesting, while adjusting cutting practices to accommodate seasonal grazing practices. The management plan also dealt with the issue of grazing control and set out a program designed to improve herds while aiding forest regeneration.

A new Agency sawmill was installed in 1939–1940 that was designed to meet the needs of the Indians as well as produce some additional lumber for sale by the Indians off the Reservation.[21] The mill ran into early problems due to the inadequacy of the loan received to meet the costs of equipment, which apparently soared after the loan was issued. The mill was therefore make-shift in design and not as efficient as possible.

In 1941, the demand for lumber increased dramatically due to the war effort. The Agency sawmill was unable to meet this demand, and a request was submitted for a $300,000 appropriation to improve the mill. Instead of an appropriation from government funds, the government permitted the Tribe to utilize $165,000 of its own funds on deposit for the purpose of improving the mill.[22]

Although output continued to improve and cutting was occurring in the forests, by 1944 the Reservation sawmills had still not sold any lumber in the open market. Sales up to that point had been either local to residents on the Reservation, to the Navajo Service or to other Indian Agencies or box shook sales to box factories. Contract sales of lumber also took place, but were apparently considered surplus sales to the above two types of sales. In 1949, however, the Tribal sawmill began selling its products on the open market. At that time it became a member of the Western Pine Association.

Harvesting and manufacturing continued on the Reservation. However, due to changing forest management concepts and the Forest Service's conclusion that "Ponderosa pine stands could not be realistically managed for sustained yield in 50 percent or higher volume removal as had been done in the past," a new comprehensive inventory of the entire 450,000 acres of commercial forest on the Reservation was conducted by photogrammetric means. Utilizing this 1951–1952 inventory, a "Master Plan for Timber Management" for the Reservation was completed in 1953. The new plan called for an annual allowable cut of 28,000,000 board feet based on a 35 percent cut of net volume and a 25-year cutting cycle, 1953–1977. This allowable cut only included Ponderosa Pine.

In 1956, a forest management consulting firm inspected the Navajo forest region and reported that the timber was predominantly overmature and that mortality was nearly equalling the growth rate. The firm recommended that the Tribe construct a new lumber manufacturing facility with the capacity of processing 34,000,000 board feet annually. Subsequent reports suggested that the Tribe own and operate such a facility by creating an entity separate from the Tribe. A plan along these lines was approved by the Commissioner for Indian Affairs in 1959. Construction of the Navajo Forest Product Industries (NFPI) plant began in 1960 and was completed in June of 1962. In 1963, the Tribal sawmill,

20. As part of the return to the Indians, the plan was designed to provide more wages to the Indians through increased employment opportunities.

21. The old mill that was installed in 1935 or 1936 had begun to produce a profit by 1940. The old mill, combined with a planer and dry storage shed provided by the government in 1937, produced a profit of $11,500 for the Indians as of January 1, 1940. It also provided $91,323 in wages to the Indian workers as of that date.

22. Plaintiff refers to this $165,000 as a loan from the government. The court does not characterize it that way. Although no government funds were appropriated, there is no indication that plaintiff was obligated to pay back to defendant that $165,000 made available to the Tribe. It is true that the government did loan the Tribe $50,000 previously to help finance the 1939—1940 sawmill, but the $165,000 allowance was not a loan.

opened in 1940, was closed down and its crew transferred to the new plant.

The 1953 Management Plan was revised in 1960. The 1960 plan called for an allowable cut of 34,000,000 board feet per year to the end of 1977. This figure was subsequently revised upward to 39,000,000 board feet due to substantial undercutting from 1953 to 1959. This annual allowable cut was to end in 1977. In 1965, logging on the Fort Defiance plateau was completed, 25 years after the 1940 plan was instituted. Logging operations were then moved to the Tsaile unit. There, harvesting continued, and the timber was then processed in the NFPI plant.

Based on this history of harvesting timber on the Navajo forest, or the lack thereof, plaintiff contends that it is entitled to damages due to defendant's failure to ensure that the proper amount of timber was cut. One of the bases for plaintiff's claim for damages under its general Failure to Cut claim is lost Tribal income due to undercutting of timber from 1921 to 1962.

Plaintiff contends that the 1910 Act and the regulations promulgated thereunder imposed a duty upon defendant to utilize the most up to date technology to conduct harvests that would produce the greatest revenue for the Indians. Section 7 of the 1910 Act did permit, presumably for the first time on a general basis, the sale of "mature living and dead and down timber" on unallotted Indian lands in a manner consistent with regulations to be promulgated by the Secretary of the Interior. In promulgating the 1911 regulations to carry out the directive of Congress, the Secretary directed the officers in charge of the Indian forests to "familiarize themselves with all phases forestry work," including what appeared to be a directive to: (1) survey their respective forest; (2) determine reproductive capacity; (3) estimate costs of logging and manufacturing; and (4) investigate development of local markets. The regulations generally directed forest officials to acquaint themselves with the practical and technical work that would contribute to "managing" the Indian forests as to obtain the greatest revenue for the Indians consistent with proper protection and improvement of the forests. (Section 2 of 1911 regulations.)

Plaintiff maintains that by 1920 the use of forest inventories to determine annual allowable cut was well established. The record supports such a contention. The record indicates that the Forest Service had established regulations for the national forest working toward a sustained-yield system by 1915. However, the record indicates that such regulations were far from perfected, and in 1931 one author wrote: "As each [national] forest perfects its markets, roads and silviculture, the final phase of regulation [looking toward sustained-yield management] will be entered on." M. Chapman, *Forest Management* at 457 (1931). In any event, the basic technology regarding inventories of forests had been established by 1920, although the record indicates that as of 1931 management of forests had still not been perfected.

Plaintiff argues, however, that no later than 1920–1921, defendant had a duty to conduct a "state of the art" inventory of the entire Navajo commercial forest, *i.e.*, all 450,000 acres. Based on this inventory, plaintiff asserts that, using the data acquired therefrom, defendant could have, and had a duty to, prepare a management plan along the lines of the plans developed in 1940 and 1953 for the Navajo forest. If such a plan had been developed in 1920 from an inventory of the entire Navajo forest, plaintiff claims that an annual allowable cut of 28,000,000 board feet would have been established. Such an allowable cut was the same one arrived at in the 1953 Master Plan utilizing technology that plaintiff contends was available in 1920.

Plaintiff's next contention is that, beginning in 1921, defendant had a duty to cut 28,000,000 board feet each year or at least to contract with a private company to sell that much timber each year. Section 9 of the 1911 regulations did require large sales of timber from unallotted Indian lands *"as occasions arise."* [Emphasis added.] Plaintiff argues that if the 28,000,000

board feet had been harvested by defendant and sold, or sold to a lumber company that subsequently did the harvesting, the Tribe would have received a great deal of revenue. The record preponderates in favor of a finding that a market did not exist for disposal of a yearly cut of 28 million board feet of Navajo timber during the period 1920 to the late 1930's. Indeed, it should be noted that plaintiff in its computation in support of its claim discussed in Part II, subpart A.1, *supra,* contended that its timber had a zero market value in 1933, suggesting that a cut of 28 million board feet for that year would not have been marketable.

In support of its contention that defendant had an obligation to conduct an inventory of its forest and then to harvest or sell the allowable cut, plaintiff points to defendant's activities on the Fort Apache Reservation located south and slightly west of the Navajo Reservation. Apparently in 1909, an inventory of a portion (64,000 acres) of the Fort Apache forest was conducted. The thoroughness of this inventory is not indicated in the record. The timber on this area was then advertised, presumably by defendant in 1911, but the single bidder was unable to finance the operation and forfeited its deposit. In 1913, the timber was readvertised, and again the sole bidder was unable to acquire the necessary financing.

Finally, in 1917, after an advertisement of the timber, A.B. McGaffey, whose company purchased the Navajo timber in 1928, bid on the Fort Apache timber, received the contract and commenced harvesting the timber. McGaffey organized the Apache Lumber Company, which constructed 70 miles of railroad into the forest and began cutting the timber at a purchase price of $3.00 per M.B.F. Operations commenced in 1920 when the railroad and company sawmill were completed. Total production from 1920 to 1939 when the first Fort Apache sale was completed was 490,381,-000 board feet, returning $1,580,880. However, the record indicates that such a cut did not equal the annual allowable cut for the entire Fort Apache forest. There is also no indication whether anything approaching sustained-yield management was practiced on that reservation from 1920–1939.[23]

Plaintiff contends that defendant should have cut 28,000,000 board feet of timber on the Reservation from 1921 to 1962. Such cutting would have totalled 1,176,000 M.B.F. over that time period. Plaintiff claims that all that was actually cut was 311,991.4 M.B.F. during this same period. Defendant does not dispute these figures. The difference between the plaintiff's alleged "proper" cut and the actual cut is 864,008.6 M.B.F.

From plaintiff's "proper" harvest figures and the actual cut figures, plaintiff deter-

**23.** Another point that somewhat limits the weight to be attributed to defendant's Fort Apache Reservation forestry efforts in assessing defendant's work on the Navajo Reservation is the potential difference between the two cultures. Defendant was dealing with two different Indian tribes, one of which may have been more willing than the other to adapt to another economic way of life. Although the same general duty may have been owed by defendant to the property of both tribes, in dealing with two different cultures, defendant cannot always be held to the same standard of performance that it achieved on another reservation. *Cf. Nevada v. United States,* 463 U.S. 110, 127–28, 103 S.Ct. 2906, 2917, 77 L.Ed.2d 509 (1983).

The same reasoning limits the persuasiveness of plaintiff's comparisons of defendant's efforts on the Navajo Reservation with its work in the Southwest National Forests. Those forests were apparently inventoried to some extent by 1908. At that time, defendant had no statutory duty to manage the Indian forests. Therefore, it is clear that the Forest Service was acting under another statutory directive. The record also indicates that the National Forests were not occupied by peoples of varying cultures with whom the Forest Service was required to deal in order to implement forestry management plans. The record further indicates that the National Forests were grazed only to a fraction of the extent that occurred on the Navajo Forests. Finally, the record indicates that the timber in the southwest National Forests may have been of a slightly better quality. All of these factors persuade the court that little weight should be given to plaintiff's attempts to compare defendant's efforts in the National Forests with those of defendant on the Navajo Reservation.

mined the financial loss incurred by the Tribe due to undercutting. Plaintiff utilized a stumpage rate of $3.00 per M.B.F. for the period 1921—1947, and a rate of $13 per M.B.F. from 1947 to 1962. The total loss claimed by plaintiff for the 1921—1962 period is $4,520,486 without interest.[24]

The court does not agree entirely with plaintiff's assessment of defendant's duties under the 1910 Act and 1911 regulations, and thus the court does not find all of the damages claimed by plaintiff to be warranted.

The 1910 Act did permit the sale of mature, down, or dead Indian timber. Prior to that Act, the Indians had no such general right to sell timber from reservation lands. *Mitchell II, supra,* 463 U.S. at 219, 103 S.Ct. at 2969. However, the Act was very general and directed that any timber sales should be conducted pursuant to regulations to be promulgated. It is therefore the 1911 regulations to which the court must look to determine defendant's obligations regarding the cutting and sale of Indian timber.

Section 1 of the 1911 regulations directed the Superintendent of each reservation "to do all in his power" to ensure that the forests were used properly. The individuals in charge of the forests on the respective reservations were charged under section 2 of said regulations with acquiring the current foresting know-how as well as working to acquaint themselves with "local" markets so that they could manage the forests to obtain the greatest revenue for the Indians while acting to preserve the forests.

Plaintiff reads such regulations as requiring by at least 1921 that defendant perform an inventory of the Navajo forest and then commence to cut and sell the allowable cut each year or find a lumber company willing to harvest and purchase

the same amount of timber each year. The court does not read the regulations as going that far.

■ The court agrees that some sort of inventory of the Navajo forest should have been completed prior to the partial inventory performed in 1940. Although the record indicates that general surveys of the forest were done, nothing approaching a complete inventory, which the regulations seem to call for, was performed. The court, however, does not read the regulations as requiring such an inventory over the entire 450,000 acres determined much later to be the extent of a viable commercial forest. In 1939, when the first inventory was performed, only the Fort Defiance and Tsaile units were inventoried. The remainder of the Navajo forests were perceived as inaccessible because of the steep slopes and the potential for damaging the fragile ground cover and thereby potentially causing erosion. Such areas also contained fewer trees, thus raising the costs of logging due to more transportation costs. In working to obtain the greatest revenue for the Tribe in 1921 or 1940, the defendant had a duty to consider costs and to act "consistent with proper protection and improvement of the forests." (Section 2 of 1911 regulations). Given this directive, the court finds it was reasonable and consistent with the regulation for defendant to inventory only the 160,000 acres in 1940 and that was all that it had to inventory in 1921 as well.

■ If defendant had inventoried that 160,000 acres of Navajo forest in 1920 or 1921, the court finds it reasonable to presume that the annual allowable cut would have been the same as in 1939—1940, *i.e.,* 13,000,000 board feet. The next question that the court must address is whether defendant was obligated to cut that entire amount of timber, or approximately that amount, every year. The court determines that defendant was not so obligated.

**24.** This figure of $4,520,486 is made up of $2,013,512 (756,000 M.B.F.—84,829.4 M.B.F. = 671,170.6 M.B.F. at $3.00 per M.B.F.) for the 1921–1947 period, and $2,506,894 (420,000 M.B.F.—227,162 M.B.F. = 192,838 M.B.F. at $13.00 per M.B.F.) for the 1947–1962 period. Plaintiff concedes that the above damage claim figure subsumes the damage claims proffered by it in subpart A.1. of Part II, *supra.*

The regulations speak in terms of obtaining the greatest revenue for the Indians (Section 2 of 1911 Regulations), and also refer to giving special consideration to large timber sales as occasions arise. (Section 9 of 1911 Regulations). Obviously, one of the requirements for obtaining revenue is the availability of a market in which to sell the products. Plaintiff assumes that because the Fort Apache Reservation was able to sell its timber to a lumber company and because the southwest national forests were selling timber, that a market existed for the Navajo timber.[25] The court is not persuaded, as indicated earlier, that this was necessarily the case.

For example, on the Fort Apache Reservation the record indicates that there were three advertisements regarding the sale of its timber that only attracted one bidder for each proposed sale. In two of those instances, financing could not be acquired. It was not until the final proposed sale that a purchaser with sufficient resources to build the needed railroad and finance the logging operation came along. It appears that the development of a market takes time and also that the demand for timber over and above that already being supplied may not have been as great as plaintiff assumed it was.

The record does show that defendant made very little effort to attract a large purchaser, and in fact it was contact from the purchasers themselves in the late 1920's that ultimately led to the ill-fated 1928 sale to the McGaffey Lumber Company. This lack of any effort from 1911 to 1928 to attempt to attract outside interests appears to be inconsistent with defendant's regulatory duties. However, defendant's failure to attempt to interest lumber companies in the Navajo timber does not eliminate the problem of a potential lack of a substantial market for the Navajo timber, which was apparently of lower quality. Even if a lumber company had contracted to harvest timber on the Reservation, there is no way of knowing whether it would have been capable of harvesting 13,000,000 board feet per year or able to sell that amount of timber or lumber on the market.

Since defendant did not find a purchaser or assuming it would have been unable to do so, it would have been defendant's obligation to work with the Indians to achieve the goal of obtaining the greatest revenue for the Indians while protecting the forest. The court does not find that defendant would necessarily have been obligated to harvest the entire allowable cut. An allowable cut is the yearly cut of timber in a commercial forest aimed at a sustained production of timber products. *See supra* note 10. Therefore, cutting the allowable cut on a forest each year is essentially the maintenance of a sustained-yield management plan. Such a cutting program was not required by Congress until 1934 when it passed the Indian Reorganization Act. *See* 25 U.S.C. § 466 (1983). As indicated earlier, plaintiff, by choice, was not subject to the provisions of this Act. Further, it is clear in the record that the allowable cut is not a required cut but a permitted cut. There is discretion involved in harvesting relative to an allowable cut. As observed earlier, while plaintiff harvested 34 million board feet of timber in 1982, it harvested only 26.6 million board feet in 1980. Various factors affect whether the allowable cut will become the required cut in any given year. In short, plaintiff has shown no basis in the statutes or regulations, or elsewhere, for holding that defendant's fiduciary duty obligated it annually to harvest the allowable cut. Therefore, the

---

**25.** The National Forests in New Mexico, it is noted, comprised more than 57 percent of the commercial forest lands in the state. The volume of timber cut each year in the National Forests in Arizona and New Mexico when compared with the total amount of lumber produced and sold from those states during the years 1920–1940 reveals that production from the National Forests averaged 35 percent of the total during the 1920's, 53 percent during the 1930's and 56 percent during the first half of the 1940's. Plaintiff draws from these facts an inference that competition from the National Forests unfairly affected the development of the Navajo Forests. Such an inference is unwarranted on this record. *See Nevada v. United States, supra,* 463 U.S. at 127–28, 2917. Defendant properly wore its "two-hats" in this regard.

court concludes that defendant was not *required* to cut the allowable cut each year on the Navajo forest from 1920—1962 and that the amount of actual cut was a matter within defendant's discretion and could vary from year to year.

While defendant was not required to establish a sustained-yield management plan under the 1934 Act, *supra*, it was obligated to use all reasonable efforts to produce the greatest revenue for the Indians while protecting the forest. Clearly, that goal could have been achieved by harvesting the allowable cut, but there were several factors that weighed against the possibility of such a cut. One factor was funding. Neither the 1910 Act nor the regulations promulgated thereunder required defendant to fund Indian logging operations or lumber manufacturing efforts. Therefore, Indian funds were necessary to finance any such full harvest operations, and the record does not indicate whether such funds were available in the 1920's. Indeed, the record suggests no such funds were available.

Another factor that would have limited the cut somewhat was the need to train the Indians in many aspects of logging and lumber manufacturing. The Navajo Indians were basically a culture of livestock raising people whose interest in forestry production was limited to the cutting of timber for their own housing and fuel needs. Clearly, it would take time to educate such a group of people to impress upon them the potential for earning Tribal income from forest products. The Indians would also have to be trained in certain silviculture and cutting techniques as well as the art of producing lumber from the cut timber.

Another factor that the record indicates made foresters hesitant to harvest the entire annual allowable cut in 1940 and presumably would have produced the same hesitancy in the 1920's was the almost total lack of any regeneration in the Navajo forest. Many factors, including soil conditions and climate, but primarily livestock overgrazing contributed to this tree reproduction problem. (*See infra* subpart D of Part II of this opinion.) Although an allowable cut would undoubtedly take into consideration regeneration problems, it seems that a total lack of reproduction is entirely inconsistent with any type of sustained yield management plan that envisions the annual cut equalling the amount of new growth.[26]

The final factor that weighs against requiring defendant to harvest annually the allowable cut, as discussed earlier, was the variation in market conditions from year to year. The record indicates that there were years from 1921—1962 (plaintiff's claim period) that were economic disasters for the lumber industry. The primary example would be the Depression years. Defendant could not have been reasonably expected to harvest timber that could not have been either used by the Indians or sold on the market. The court finds that the economic conditions in any given year were definitely a factor to be considered in determining the quantity of timber defendant could be held reasonably responsible for harvesting in that year.

All of the above factors must be considered within the context of defendant's overall obligation to the Navajo Indians regarding the timber resources. The 1911 regulations referred to "obtaining the

---

**26.** As was pointed out regarding the 1940 Management plan, and as was mentioned in the 1953 Master Plan, which plaintiff would essentially have the court adopt for the year 1921, in order to achieve the desired allowable cut while perpetuating the forest, a reduction in the livestock grazing in the forest was necessary in order to stimulate regeneration. Without regeneration, clearly a sustained-yield management plan cannot meet its desired goal, *i.e.*, balancing the amount of timber cut with the quantity of new growth. The problem, however, was educating the Indians regarding the importance of stock reduction and grazing management so that forest regeneration could take place. This education effort along with actual stock reduction would take time, and until then large harvests of timber would have to be limited. Harvesting large amounts prior to ensuring that the necessary regeneration would occur would be contrary to defendant's general duty to preserve plaintiff's trust property. *See* II A. Scott, *Law of Trusts* § 176 (1967).

greatest revenue for the Indians consistent with proper protection and improvement of forests." (Section 2 of the 1911 Regulations.) This regulatory duty can be further fleshed out by considering the standard of care to which a private fiduciary is generally held. The general rule is that defendant is held to the standards of a private fiduciary in administering Indian property. F. Cohen, *Handbook of Federal Indian Law* 226 (2d ed.1982). A private trustee must "exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property." II A. Scott, *Law of Trusts* § 174 (1967). Given all of the above factors, the court finds that an ordinary prudent man (*Id.* § 176) would not have cut the entire allowable cut in the Navajo forest each year from 1921 to 1962, and therefore defendant cannot be held to be required to have cut that amount. On the other hand, the court is of the view that there was a "reasonable" harvest figure for each year and that defendant abused its discretion, *i.e.*, acted unreasonably, by not seeing that this amount was harvested.

The question, therefore, is what amount up to the allowable cut defendant should have cut in any given year. In arriving at the yearly amounts, the court notes that plaintiff's claim period is from 1921—1962. However, a duty to begin establishing a program of harvesting timber at least for use by the Indians began no later than 1911. From 1911 to 1921, defendant certainly could have been working with the Indians, teaching them forestry methods. Defendant could have also made efforts to inventory the timber or a portion thereof and advertised its sale. Such advertisement could have produced some sales of timber for the benefit of the Indians. Clearly many of the factors weighing against *requiring* defendant to harvest the

allowable cut annually could have been dealt with from 1911 to 1921.

One of the factors that certainly should have pushed defendant to work toward harvesting more and more timber was the early perception, as indicated by the record, that the forest was maturing rapidly. Despite the lack of regeneration, certain trees had to be cut or their volume would eventually be lost altogether. The record demonstrates that the harvesting of such trees, however, was more difficult than a standard unit sustained-yield type cut in which the forest is divided into a number of units depending on the cycle of the plan, *e.g.*, with a 120-year plan the forest is divided into 120 units, and each unit is harvested, leaving only a few trees for seed purposes. The units are then permitted to regenerate, and at the end of the cycle the first units are ready to be cut again. With no regeneration, but with over-mature timber, a cutting program that selects individual trees to be cut all over the forest must be utilized. Such a program is more difficult and increases production costs.

The use of such a selective cutting method, which the court finds a prudent trustee would have been obligated to utilize due to the total lack of regeneration on the Reservation and the existence of overmature timber, would have required more funding. Since defendant had no duty to provide such funding directly, plaintiff would have been required to fund a gradually expanding operation. Due to what appeared to be a limited source of funds, it would appear that a full scale assault on a selective cutting program of mature timber would have to be tempered to a gradual build up. Training of the Indians could have accompanied such a build-up and improvement of the Agency sawmill and perhaps the addition of portable mills could also have taken place.[27] In addition, selective cutting often

---

27. The court notes that the capacity of the sawmills on the Reservation was directly related to the amount of timber harvested each year. Unless a direct sale of the timber, as opposed to green or dried lumber, had been made, any timber cut by the Indians and defendant would have to have been processed through an Agency or Tribal mill. Until the mills were able to

reach greater capacities, it would have been unreasonable for defendant to have cut timber that could potentially rot before it could be run through the mill. The importance of the role played by the sawmills is evidenced in plaintiff's claim. It terminated its undercutting claim in the year (1962) the Navajo's new sawmill came into operation. It was at that point, plaintiff

necessitated transporting cut logs longer distances to the sawmills. As technology improved, *i.e.*, trucks became more durable and able to haul greater loads, the quantity of timber capable of being harvested could increase. All of this would point to a gradual increase in the quantity of timber that should have been cut starting in the 1910's and moving forward, such cuts eventually achieving close to the allowable level.

Given all the factors considered and discussed above, the court finds it reasonable to conclude that by 1921 (the beginning of plaintiff's claim period) defendant should have been harvesting at least 6500 M.B.F. of timber. The court also finds it reasonable to conclude that that amount should have increased by 500 M.B.F. per year until 1929.[28] The total for 1928 should have been 10,000 M.B.F.[29]

In calculating the amount defendant should have cut from 1921 to 1962, there exists within that period the time during which the McGaffey Lumber Company and then the Lutcher and Moore Lumber Company had contracted to cut approximately 25,000 M.B.F. (25,000,000 board feet) per year originally from around 1929 to 1950 and eventually revised to run from 1933 to 1953. Such cutting would have taken place in the Fort Defiance plateau, and clearly the cut would have exceeded the allowable cut for that area. However, if the lumber companies had performed, they would have had to comply with the General Timber Sales Regulations that would have required them to operate in a manner which would preserve the forest.

In subpart A.1 of Part II of this opinion, the court awarded plaintiff contract damages due to Lutcher and Moore's failure to perform its contract obligations. Such damages were designed to place plaintiff in the position it would have been in if the contract had been fulfilled. McCormick, *Law of Damages, supra,* at 560. Placing plaintiff in the position it would have been in had the contract been performed means that, after the award of contract damages, the situation is treated as if the harvesting had been performed in accordance with the contract by Lutcher and Moore. Clearly, there is an overlap of plaintiff's contract claim and its claim based on the undercutting of its timber.[30] Having already awarded the contract damages, the court cannot now allow plaintiff to recover on its undercutting claim for the same period as well. Otherwise, such an award would amount to a double recovery.

However, the court will not preclude all recovery on plaintiff's undercutting claim for the 1929 to 1953 period due to the manner in which the contract damages are calculated. The court will not allow any recovery due to undercutting for 1929 to 1933. The court finds that while Lutcher and Moore conducted no logging from 1929 to 1933, it did have the contractual right to harvest timber off that land. It would have been inconsistent with that right if defendant had gone into the same area during the contract period, or extension thereof, and harvested timber. The contract referred to *"all* merchantable yellow pine timber in a specific area" (emphasis added), which indicates that the purchaser

---

claims, that a sawmill had sufficient capacity to handle the amount of timber plaintiff claims should have been cut.

**28.** The court acknowledges that such an annual figure may have been well below the amount harvested yearly on the Fort Apache Reservation. However, that was a different reservation (*see supra* note 23) being harvested by a private company with sufficient financing to build a railroad and a new mill. Clearly, the circumstances are not significantly comparable.

**29.** The yearly figures that the court finds reasonable are: 6,500 M.B.F. for 1921, 7,000 M.B.F.

for 1922, 7,500 M.B.F. for 1923, 8,000 M.B.F. for 1924, 8,500 M.B.F. for 1925, 9,000 M.B.F. for 1926, 9,500 M.B.F. for 1927, and 10,000 M.B.F. for 1928.

**30.** The discussion of contract damages here does not include the damages awarded to plaintiff on account of defendant's failure to collect the $25,000 "extension payment" promised by Lutcher and Moore. *See ante* pp. 355–56. There is no danger of overlap or double recovery regarding that damage item.

had an exclusive right to that timber.[31] Section 5 of the General Timber Sales Regulations allowed sales of timber not sold in a previous sale in an area covered under the previous sale if the subsequent cutting of timber would not interfere with the previous purchaser. In this case: (1) arguably the contract with Lutcher and Moore covered almost every tree on the Fort Defiance Plateau (contract was for 500,000,000 board feet to be cut over 20 years, and the estimated Fort Defiance stand was 500,-000,000 board feet) and (2) certainly a substantial annual cut by defendant in the same area would have interfered with the substantial cuts anticipated by the Lutcher and Moore contract.

For the period from 1933 until 1937, when the court determined that the contract price ($3.00 per M.B.F.) was greater than the value of the timber, there would clearly be a damage overlap. Therefore, the court will not allow any damages for the undercutting of timber during this time.

As of 1938, however, defendant had cancelled once and for all the Lutcher and Moore contract. At that point, defendant should have recommended harvesting on the Reservation.[32] The economy at that time was rebounding; technology had improved. The court finds a cut of 10,000 M.B.F. in that year (1938), which would have been a period for starting up again, to be a reasonable cut. The court finds an increment of 1,000 M.B.F. for the years 1939, 1940, and 1941 to be reasonable, arriving at 13,000 M.B.F. in 1941, the allowable cut on the area determined to be accessible and commercially viable in the 1940 Management Plan. The court finds

that such a 13,000 M.B.F. cut should have been maintained through 1946.

The court finds that it does not have jurisdiction over any claim for damages based on undercutting after 1946. Although the actual cut in that year (11,948 M.B.F.) was slightly below the desired harvest level of 13,000 M.B.F. set by the court, the court finds that the evidence indicates that defendant was working up to a sustained-yield management plan with a 13,000 M.B.F. allowable cut. It fell only 1000 M.B.F. below that level in 1946, and it exceeded that cut substantially in 1947 and 1948 with harvests of 16,238 and 16,558 M.B.F., respectively. This evidences a course of conduct that cannot be considered wrongful. Although defendant's failure to cut close to the allowable cut prior to 1946 can be labelled "wrongful," its efforts after the early 1940's demonstrated an admirable effort to achieve a sustained-yield program, given the conditions on the Reservation.

Absent a showing of continuing wrongful conduct that commenced prior to 1946 and continued after that date, the court has no jurisdiction over plaintiff's post-1946 claim for damages. *See Navajo Tribe v. United States,* Nos. 69 & 299, slip op. at 60–64 (Cl.Ct. Sept. 6, 1985); *Navajo Tribe v. United States,* 218 Ct.Cl. 11, 30, 586 F.2d 192, 204 (1978). Defendant's wrongful conduct ended prior to 1946, thus stopping any continuous course of wrongful conduct and cutting off any claim based on a *"continuous* course of wrongful conduct." *Id.* 586 F.2d at 204 (emphasis added). *See also Minnesota Chippewa Tribe v. United States,* 229 Ct.Cl. 666 (1981).[33]

**31.** The contract set out a specific area reserved for Agency sawmill use. The court presumes that this area was intended to provide timber for use by the Indians and government on the Reservation and not for sale on the market.

**32.** Theoretically, the calculation of contract damages actually carries over the entire period of the contract, but since the actual possibility of recovering any additional damages under the contract ended in 1937 due to the manner in which such damages are calculated and because of the fact that the contract was finally can-

celled no later than early 1938, the court finds it proper to end any overlap of damages as of 1938.

**33.** The court notes that under its view of the proper allowable cut (13,000 M.B.F.) and its conclusion that by 1946 defendant was acting in a proper manner consistent with a sustained-yield management plan, defendant was clearly conducting itself properly in 1946–1948. Such a conclusion precludes any finding of a continuous wrongful course of conduct by defendant.

Based on the court's view of the proper cut for the years 1921 through 1928 and 1938 through 1946, the court finds that defendant should have ensured that 177,-000 M.B.F. of timber were cut. Prior to determining how much revenue this would have produced for the Tribe, it is necessary to subtract from the court's perceived figures of the proper annual cut the actual amount harvested in those years. The amount of timber that would have been used on the Reservation for the benefit of the Indians should also be subtracted from the court's annual harvest figures because that timber would not have been available for sale on the open market. However, since there was very little evidence in the record setting out the precise Reservation need for timber as opposed to the actual amount cut, the court will assume that the actual cut equalled the quantity required for Reservation uses.[34]

The amount actually cut for the years 1921 through 1928 and 1938 through 1946 is 74,263 M.B.F. as set out by plaintiff's expert and as agreed upon by defendant's expert. Subtracting the actual cut of 74,-263 M.B.F. from the determined proper cut of 177,000 M.B.F. leaves a difference of 102,737 M.B.F. Utilizing the stumpage rate of $3.00 per M.B.F. as presented by plaintiff and not opposed by defendant, the total damages due to defendant's undercutting for the years 1921 through 1946 are $308,211. No interest is allowed on this amount, a matter to be addressed *infra*.

3. *Failure to Cut—Loss of Mortality (1910—1953)*

As another portion of the damages claimed by plaintiff under its general claim regarding defendant's Failure to Cut, plaintiff asserts that it suffered damages due to a loss of mortality. Plaintiff contends that because defendant failed to manage the forest properly, overmature trees that died in the forest were not salvaged, and thus the volume of those trees was lost to the Tribe forever. As a result of these losses, plaintiff is claiming $4,406,400 in damages.[35]

Plaintiff maintains that Congress first authorized the salvage of mortality (dead trees) in 1889 with the passage of the Act of February 16, 1889 (1889 Act), 25 Stat. 673, 25 U.S.C. § 196 (1983). The 1889 Act stated in pertinent part:

That the President of the United States may from year to year in his discretion under such regulations as he may prescribe authorize the Indians residing on reservations or allotments, the fee to which remains in the United States, to fell, cut, remove, sell or otherwise dispose of the dead timber standing or fallen, on such reservation or allotment for the sole benefit of such Indian or Indians. But whenever there is reasonable cause to believe that such timber has been killed, burned, girdled, or otherwise injured for the purpose of securing its sale under this act then in that case such authority shall not be granted.

Plaintiff makes no claim for lost mortality based upon the 1889 Act until 1910 when the nearby Coconino National Forest began selling timber, thus evidencing a southwestern market for timber products. It was also in 1910, plaintiff asserts, that studies of the extent of the Navajo forest first occurred indicating the availability of

---

**34.** Arguably, if the quantity of timber needed on the Reservation exceeded the actual cut, the Indians would have been required to purchase the timber off the Reservation at market rates. Such purchases would have resulted in a reduction of Indian revenues as a direct result of defendant's failure to harvest proper quantities of timber. At oral argument, plaintiff claimed, with respect to its Sawmill Mismanagement claim, that lost profits were a reasonable method of approximating the damages suffered by the Tribe by not having lumber available for use by its members. The court believes that this approach can be utilized here and therefore makes no further adjustment in the figures.

**35.** Plaintiff conceded at oral argument that this claim was an alternative to its Failure to Cut—Undercutting claim for years after 1920. Since the court previously awarded damages on that claim, there can be no recovery here for the post-1920 period. Notwithstanding plaintiff's concession, the court deems it prudent to set out this claim in full and explain why it is duplicative in nature.

a great deal of timber. Plaintiff's claim ends in 1953, the year of the first "Master Plan" for the Navajo forest. It was in that year, plaintiff contends, that defendant recognized the existence of losses due to mortality.

The 1953 Master Plan prepared by the BIA estimated the annual loss due to mortality at 51 board feet per acre in the virgin stands of the Navajo Forest. Based upon the evidence in the record, the court finds that figure reasonable for virgin stands. In its claim, plaintiff multiplied the mortality loss figure of 51 board feet per acre by 450,000 acres, the entire Navajo commercial forest. This resulted in a total claimed mortality loss of 22,950,000 board feet per year. The total claimed mortality loss for 1910 through 1947 was 872,100,000 board feet (22,950,000 board feet × 38 years). This total figure was multiplied by a stumpage rate of $3.00 per M.B.F., yielding $2,616,300. For the period 1948 through 1953 the mortality loss claimed was 137,-700,000 board feet (22,950,000 board feet × 6 years). This 6-year figure was multiplied by $13 per M.B.F., the increased stumpage rate for that period, arriving at a dollar amount of $1,760,100 for the 6-year period. The total damages claimed because of the mortality loss is, as set out earlier, $4,406,-400.

The court does not agree that the 1889 Act placed a duty upon defendant to remove all of the dead or dying timber. The Act merely authorized the President in his discretion to permit the Indians to cut, remove and sell dead timber. The onus was on the Indians to perform the work if permitted to do so. The only duty placed on defendant by the Act was to determine when such cutting should have been permitted and to ensure that the Indians were not purposefully killing the timber in order to sell it. The Act cannot be read as requiring defendant to remove all of the dead trees from the Reservation, a reading reflected by plaintiff's damages claim. The Act was an effort to grant general permission to cut and sell dead wood that they previously had not been able to do.

The 1910 Act did, however, permit the sale of mature living trees and dead timber on Indian lands. The regulations promulgated pursuant to the 1910 Act arguably included within them a directive to utilize the forests in a manner that would protect and improve the forests. This indicated the preference for utilizing certain silviculture techniques. The use of basic silviculture cutting, i.e., cutting the dying and overmature timber first, would have eliminated, as much as was reasonably possible, the mortality in the Navajo forest. G.A. Pearson, a leading silviculturist who did extensive studies of the southwestern forest, and who was relied on by both parties stated:

As may be expected, mortality in virgin stands is generally much higher than in cut-over stands. This relation is attributed less to the larger volume in virgin stands than to the presence of a greater proportion of highly susceptible trees—decadent, defective and very large trees—which would be more or less completely removed in any kind of silvicultural cutting. G.A. Pearson, *Management of Ponderosa Pine in the Southwest* 70 (1950).

Based on the 1910 Act and the 1911 regulations, the court finds it reasonable to presume that the type of cutting required by the regulations, i.e., designed to "obtain the greatest revenue for the Indians consistent with proper protection and improvement of the forests" (Section 2 of 1911 Regulations), was the kind of silviculture cutting Pearson referred to above. Therefore, if defendant had performed the cutting that the court prescribed in the previous subsection of this opinion (discussion of damages due to undercutting) it would have done all that was reasonably required of it under the 1910 Act, the 1911 and 1918 regulations and even the 1934 Act to eliminate mortality.

The court realizes that the cutting prescribed by this opinion does not always equal the annual allowable cut. However, the court finds that the annual harvests set out were reasonable and all that was re-

quired of defendant from the perspective both of earning revenue for the Indians and of performing silviculture cutting. The court also realizes that the cut prescribed by it only covered 160,000 out of 450,000 acres of the Navajo forest whereas plaintiff is claiming a mortality loss on the entire 450,000 acres. Due to the topography of the remaining 290,000 acres, the Indian funding available, and the technical means of cutting from 1910 until 1946, the court finds that defendant had no duty to enter onto that additional 290,000 acres selectively to eliminate all of the mortality. Such an effort would have been costly, and contrary to the fiduciary obligation of a prudent trustee. Such cutting would have detracted from defendant's efforts in the more accessible commercially viable area and accordingly would have been violative of the regulatory directive to acquire the greatest revenue for the Indians. It is easy after years of study to sit back and assess defendant's practices, which in hindsight may not have been ideal. However, viewing defendant's fiduciary obligation at the time when the cutting was to be completed, which is the relevant inquiry, *see, e.g.* G. Bogert, *Trusts and Trustees* § 541, p. 103 (rev. 2d ed. 1978), the court finds that defendant had no obligation to eliminate mortality by harvesting overmature timber on any area but the 160,000 acres inventoried in 1939–1940.

Having determined that the annual harvests the court prescribed in subpart A.2 of Part II of this opinion, *supra*, were all that defendant was required to do in an effort to produce revenue for the Indians and preserve the forest, *i.e.*, eliminate mortality, and promote new growth (to be discussed *infra* ), the court finds that plaintiff is entitled to no additional damages for the period 1921–1946 beyond those awarded for undercutting because of any loss in mortality. In sum, the prescribed cuts were all

that defendant was responsible for; any additional mortality that was not eliminated by those cuts was the result of natural process for which defendant was not responsible. Further, plaintiff's expert (Dr. Minor) conceded that a prudent manager would not have been able to capture all available mortality during the claim period in any event. Notwithstanding this, plaintiff's damage computation (mortality rate of 51 board feet per acre × 450,000 acres from 1920–1953) seems to be based on capturing all mortality, clearly an unreasonable approach under the existing circumstances.

■■■ Essentially, plaintiff's claim for loss of mortality damages is a classic case of attempting to pyramid damages for the same actions of a defendant. If defendant had cut all that plaintiff contended it should have cut, *i.e.*, 28,000,000 board feet, in a manner as set out in the regulations there would have been very little mortality. The court has already awarded plaintiff all that the court deems was required for its Undercutting claim. Now to award damages for the failure to eliminate the mortality that such cutting would have eliminated, to the extent the court would have required of defendant, would result in the double counting of damages under different labels. The award of damages based on defendant's breach of its duty to cut a certain amount of timber placed plaintiff in the position it would have been in if the obligation had been fulfilled. If the cutting had been completed, there would be no loss of mortality claim today, and thus plaintiff is entitled to no damages from 1921–1953 [36] on its claim.

There remains for consideration the period 1910 through 1920 for which plaintiff made no claim regarding undercutting but for which plaintiff has claimed damages

---

36. Based on the court's view regarding the propriety of defendant's cutting practices in 1946—1948, the court finds that the continuing claim theory is not applicable under this claim for Loss of Mortality since the proper cuts in 1946 —1948 would have eliminated all of the mortality defendant was obligated to cut in those years. Therefore, the court finds it has no jurisdiction over plaintiff's post-1946 claim for Loss of Mortality on the same basis that it rejected plaintiff's continuing claim theory under its Undercutting claim in subpart A.2 of Part II of this opinion.

due to loss of mortality. There is no pyramiding or repetition of claimed damages for this period.

Because the 1910 Act was directed at mature and dead timber and because the 1911 regulations required silviculture-type cutting to an extent, the court will presume, as it has throughout Part II of this opinion, that any cutting which should have been done would have eliminated some mortality. Since the period from 1910 through 1920 included the early years of any cutting program under the 1910 Act, the court finds a total cut for that period of 32,000 M.B.F. (approximately 3 million board feet per year) would have been reasonable and in compliance with defendant's regulatory and fiduciary obligations. The record indicates that the approximate actual cut for the 1910–1920 time period was 3,415 M.B.F. The difference between the amount defendant should have cut and what it actually ensured was harvested is 28,585 M.B.F. If that amount had been cut, presumably the loss of mortality would have been reduced *pro tanto*. Using the stumpage rate of $3.00 per M.B.F., the court concludes that plaintiff is entitled to $85,755 for the loss of mortality from 1911 through 1920 that defendant should have eliminated. The court readily acknowledges that the figure falls into the category of a somewhat rough "jury verdict." [37]

4. *Failure to Cut—Loss of Growth (1910–1953)*

Plaintiff's final claim for damages under its general claim relating to defendant's

alleged failure to cut an adequate quantity of timber is its contention that it is entitled to the value of the loss of new growth that plaintiff maintains would have resulted if defendant had harvested the Navajo commercial forests properly. Plaintiff's expert, Dr. Charles Minor, stated that if one removes overmature, decadent and slow growing trees in a virgin forest, the younger faster growing trees develop more quickly with the overall result being a net gain in timber growth, in this case, for the Tribe.[38]

The 1953 Master Plan indicated that the Navajo forest was overmature with an overall negative growth or net loss in timber, *i.e.*, mortality was exceeding growth each year by 9 board feet per acre in 1953. Plaintiff's expert contended that if the forest had been properly managed by harvesting the mature and dead timber, the net annual growth rate could have been 33 board feet per acre. Although plaintiff's expert did not specify, presumably proper forest management meant cutting 28,000,000 board feet per year, harvesting the mature timber first.

The damages calculated by plaintiff due to the lack of new growth begin in 1910, the year plaintiff contends some form of harvest program should have started. The damage calculation used by plaintiff runs through 1953, the year the Master Plan was adopted. Plaintiff contends that the Tribe lost a total of $2,247,750 due to defendant's failure to cut adequate amounts of mature timber.[39]

---

37. The court acknowledges the somewhat arbitrary nature of this damage amount and the other damages awarded in the Undercutting claim. However, the court finds any such arbitrariness to have been necessitated by the nature of the claim and the manner in which it was presented. The court has exercised its best judgment based on the evidence in the record in arriving at what the court deems to be a reasonable damage determination that is fair, honorable and just to both parties.

38. Although the court accepts this principle generally, it does note that plaintiff's expert gave no reasons for the resulting increase in growth. Presumably, the increased growth would occur once the older trees were removed because the .

younger trees would have more light and would no longer have to compete with the larger, older trees for water and soil nutrients.

39. This damage figure is comprised of two elements. The first is the net growth loss damage element. Utilizing the net loss figure of 9 board feet per acre established in 1953 for the entire 1910—1953 period, plaintiff determined that there was an annual loss of 4,050 M.B.F. (450,000 acres x 9 board feet). Plaintiff then multiplied 4,050 M.B.F. by 38 years at $3.00 per M.B.F. and arrived at $461,700. Plaintiff multiplied the 4,050 M.B.F. by $13.00 per M.B.F. for the final 6 years of the period arriving at $315,900. The total dollar amount of the net loss in growth, as asserted by plaintiff, is $777,600.

Assuming *arguendo* that everything regarding plaintiff's claim for damages due to lost growth is true, the court must reject the claim. In subparts A.2 and A.3 of Part II, *supra,* the court set out the amount of timber defendant had a duty to harvest. The court has awarded plaintiff damages based on defendant's failure to cut the proper amounts. If those amounts had been cut in the fashion mandated by the 1910 Act and 1911 regulations, *i.e.,* to preserve the forest and obtain revenue, defendant would have performed its obligation as to cutting timber, reducing mortality and promoting new growth to the extent required of the government. Having awarded plaintiff damages due to defendant's undercutting, the court has placed plaintiff in the situation it would have been if the forest had been cut properly to the extent required by the court. To award plaintiff damages for lost growth would be seemingly the repetition of damages under another label for the 1910–1953 period. Such a pyramiding of damages is not supported by the law or the facts in this case. Therefore, the court rejects plaintiff's claim of damages for the alleged loss of growth.

Moreover, in order for plaintiff's claim to be valid, there must be young growth in existence that can benefit from the removal of the older trees. As is discussed, *infra,* there was a serious lack of regeneration in the Navajo forest. Absent any young trees, the fact that older timber was not removed would not seem to matter.

Finally, defendant's expert, Dr. Latham, suggested, with a degree of persuasion, that old growth trees are oftentimes more valuable than young growth trees. Accordingly, the old trees cut in the period of the 1950's and 1960's produced more revenue for the Tribe than if they were cut during the 1920–1940 period. The record indicates that there was no great market for young trees at any time. While there was conflict in the record on both of these points, the court believes these facts, to some undetermined degree, weigh against acceptance of plaintiff's lack of growth claim.

In summary, plaintiff is entitled to recover under its Failure To Cut claim, discussed in subparts 1 through 4 of Part II.A, the sum of $468,966.

### B. *Unpaid Stumpage—Claim Period 1880–1935*

Plaintiff's second claim category involves the value of Tribal timber harvested and processed by government sawmills between 1880 and 1935 for which no stumpage payments can be documented. The claim period, *i.e.,* 1880–1935, was established by plaintiff based on when defendant's first sawmill began processing Reservation timber into lumber in 1880 and ended in 1935, the year before defendant sold its mill to Tribe. Evaluating this claim involves four issues: (1) the amount of lumber involved; (2) the uses to which the lumber was put; (3) whether those uses were proper, *i.e.,* the extent, if any, to which the government was entitled to harvest and use timber "free of charge;" and (4) how much is owed to the Tribe for timber the use of which cannot be justified by the government. The Tribe claims that the value of the stumpage harvested but not paid for between 1880 and 1935 is $57,522, but contends that it is entitled to damages far in excess of this figure under two alternative theories, discussed *infra.*

The experts for both parties agree that 19,174 M.B.F. is a reasonable estimate of

---

In addition to net loss, plaintiff contends that there also would have been a net gain in growth of 33 board feet per acre if a regulated harvest had been performed. Plaintiff argues that the acres harvested in 1910 would have accumulated 44 years of growth and the acreage harvested in 1953 would have accumulated no new growth. Plaintiff averages the accumulation of new net growth over half the 44-year period (1910–1953) or 22 years. Multiplying 22 years by the net growth figure of 33 board feet equals 726 board feet per acre. This figure times 450,000 acres equals 326,700 M.B.F. of lost net growth for the entire period. The lost net growth times $4.50 (average price per M.B.F. for the 44 years period) equals a total dollar loss of $1,470,150 due to a lack of net growth. Totalling this figure with the net loss dollar amount of $777,600 equals $2,247,750.

the amount of Tribal timber harvested during the relevant time period. Although the court is not completely certain regarding the methodology used in arriving at this figure, it nonetheless finds that plaintiff has satisfied its burden regarding the amount of stumpage at issue. The court therefore accepts the figure of 19,174 M.B.F. as the amount of timber cut between 1880 and 1935.[40]

Unfortunately, there is no agreement regarding the uses to which the cut Tribal timber was put. Defendant appears to contend that all of the timber was used in a manner ultimately benefitting the Indians, while plaintiff contends that there is sufficient evidence of sales to third parties and use of lumber for governmental purposes not benefitting the Tribe, i.e., to fulfill Agency requirements, that the burden should be on defendant to put forth evidence showing that all of the lumber wasn't used for the government's own purposes. It is these contentions that the court will now address.

The government's broad contention cannot be sustained. The record contains ample evidence of sales or "gifts" of lumber to third parties. For example, a letter dated November 11, 1894 to the Office of Indian Affairs requesting that free lumber be granted to the Episcopal Mission to allow it to build a hospital was approved; a letter to the Superintendent of the Navajo Indian School dated November 30, 1912 recited that lumber was being sold to non-Indians and asked that the price be raised and a stumpage fee be added; a 1915 report from the Supervisor of Indian Schools stated that a small amount of lumber "has been sold to Missionaries, Traders and others under authority from the Office," but noted that "nearly all" of the lumber was used for building purposes on the Reserva-

tion; a sawmill report covering the years 1916–1918 reflected sales to "Whites." Finally, the Logging and Sawmill Records for the years 1924–1932 show sales to other than Indians. In light of this evidence, and the record as a whole, it is indisputable that a not insignificant amount of lumber was transferred to "third parties" without the payment of stumpage therefor to the Tribe.

On the other hand, it is also clear that large amounts of timber were either given to members of the Tribe or used for their benefit, e.g., to build schools.[41] It appears from the 1889 Report of the Navajo Agency that very nearly all of the lumber at that time was going to members of the Tribe for use by them in building houses. The 1906 Report of the Superintendent of the Navajo Agency stated: "Most of the lumber and shingles have been used in making agency and school improvements." A letter dated February 7, 1916 from the Superintendent estimated that 60 percent of the sawmill output was "required for the schools and Agency." The 1925 forestry report on the Navajo Indian Reservation spoke of lumber being used "for Government and Indian use on this reservation * * *." Plaintiff conceded at oral argument that some amount of timber was properly used for the benefit of the Indians.

These multiple uses continued throughout the years as is evidenced by the report of a 1928 meeting of the Navajo Tribal Council at which the Superintendent gave the following reply to a question regarding lumber availability:

> The Government building program for the last two years has practically used the entire output of the sawmill. Last year we built [two hospitals]. This year [we built another hospital, three build-

---

40. The court refuses defendant's request that the figure be rejected for lack of documentation. Given the agreement of defendant's own expert, Latham, with the figure and the lack of cross-examination of Minor, plaintiff's expert witness on the subject, regarding the basis for the information, this argument or objection merits little attention. In any event, the ultimate blame for lack of information must rest with the govern-

ment as, for example, it was its agent, Paquette, the Superintendent, who ignored "frequent requests" for sawmill information.

41. The propriety of using the timber in this manner without payment therefor is discussed infra.

ings for students,] an ice plant * * * and a cottage.

Finally, but without implying that no other examples exist, the Logging and Sawmill record for the fiscal year ending June 30, 1933 shows that almost 30 percent of the lumber used in that year went just to improve, repair or create culverts and bridges, presumably on the Reservation's road system.

Given the complete lack of records for many years and the general lack of specificity in the records that do exist, it is impossible to ascertain definitely what portion of the lumber went for which purposes during the years at issue. In fact, defendant's expert, Latham, noted that it was not possible from the record at hand to apportion accurately the percentages of timber usage for schools, Agency, third parties, *etc.* Nevertheless, the court believes it just, fair and honorable under the existing circumstances to attempt some estimation of the respective amounts involved inasmuch as it finds the alternatives, *i.e.,* finding that all of the timber went for Indian purposes (defendant's position) or all for government purposes (plaintiff's position), unacceptable on this record.[42] The court therefore finds, upon careful consideration of the record and mindful of the fact that others might construe the relevant material differently and thus reach a different conclusion, the following figures to be a reasonable approximation of the manner in which Tribal timber was used during the relevant period: distributed free to Indians —15 percent; used for construction and maintenance of schools and buildings associated therewith—25 percent; used for other projects directly benefitting Indians on the Reservation, *e.g.,* hospitals, road maintenance—15 percent; used for Agency purposes—35 percent; and sold or given to third parties—10 percent.

The court now must address the propriety of using Tribal timber in the above described manner.

The court has no trouble in concluding that no stumpage payment was required with respect to timber distributed to Indians, and plaintiff conceded as much at oral argument. The record shows that virtually all of this timber was used for constructing dwelling houses or buildings appurtenant thereto. Section 9(a) of the 1911 and 1918 regulations specifically provided that "[n]o charge should be made to Indians for dead or living timber taken from unallotted lands for personal use." The court considers this to have been "a wise and advantageous use of forest resources," as required by Section 1 of the 1911 and 1918 regulations. In short, the court can find no basis

---

**42.** Plaintiff cites a line of cases and a treatise as authority for the proposition that in cases where an allocation needs to be made, the burden is on the defendant to show what parts went for which purposes. *Sioux Tribe v. United States,* 105 Ct.Cl. 725, 797, 802, 64 F.Supp. 312, 329 (1946), *vacated and remanded per curiam,* 329 U.S. 685, 67 S.Ct. 364, 91 L.Ed. 602 (1946), *on remand,* 112 Ct.Cl. 50, 78 F.Supp. 793 (1948) (affirming and reentering 1946 Court of Claims opinion), *cert. denied,* 337 U.S. 908, 69 S.Ct. 1046, 93 L.Ed. 1720 (1949) ("The primary duty to so classify and report as to the nature and amount of disbursements rested on defendant."); *Blackfeet and Gros Ventre Tribes v. United States,* 32 Ind.Cl.Comm. 65, 108 (1973); *Three Affiliated Tribes of the Fort Berthold Reservation v. United States,* 39 Ind.Cl.Comm. 446, 455 (1977); *Minnesota Chippewa Tribe v. United States,* 41 Ind.Cl.Comm. 102, 104 (1977); *id.,* 249, 259 (1978); G. Bogert, *Trusts & Trustees* § 962 (2d rev. ed. 1982). Plaintiff does not, however, cite the most recent case involving this principle: *Yankton Sioux Tribe v. United States,* 224 Ct.Cl. 62, 623 F.2d 159 (1980). Although the court there quoted from some of the cases cited *supra* to the effect that the burden was on the defendant to show which disbursements were proper, it based its holding, as a factual matter, upon its conclusion after reviewing the relevant records "that it is likely that all of the expenditures for the two year period * * * which plaintiff excepts to here were for agency rather than tribal benefit." *Id.* at 101, 623 F.2d at 179. Here by contrast, the court is convinced, as a factual matter on the record, that a significant amount of timber was used in a "permissible" manner. The court feels that defendant has satisfied its burden, in a general manner, viewing the record as a whole. To the extent the court's decision here departs from "strict" accountability, the court is of the opinion that it is counterbalanced by the court's acceptance of plaintiff's decadal averages for years for which no production figures could be found. Overall, the result reached herein is believed to be a fair, just and honorable conclusion.

for charging the government stumpage with respect to lumber used by members of the Tribe.

The propriety of using Tribal timber in ways directly or indirectly benefitting the Tribe turns upon whether the government was responsible for the item at issue. The general rule with respect to expenditures is set forth in *Sioux Tribe v. United States, supra,* 105 Ct.Cl. at 793, 64 F.Supp. at 327, as follows:

> An expenditure by the Government, in order to be a gratuity or a legal or equitable offset chargeable against the Indians, must be one with respect to which the United States has not assumed any obligation, direct or incidental, as a party to the treaty or in its sovereign capacity pursuant to the intention of the treaty.

*See also, e.g., Yankton Sioux Tribe v. United States, supra,* 224 Ct.Cl. at 101, 623 F.2d at 179 (disbursement of funds for government's benefit is improper; tribal trust funds may not be used in satisfaction of administrative expenses of Indian Agency). Inasmuch as the Tribal timber is as much of an asset to the Tribe as a trust fund, the court concludes it is appropriate to apply the principle of *Sioux Tribe* to the issue at bar.[43] That is to say, to the extent Tribal timber was used in fulfillment of the government's obligations, the defendant was responsible for stumpage payments. Notwithstanding the obvious importance of the 1868 Treaty, 15 Stat. 667, II Kappler 1015 (2d ed. 1904), to these issues, both parties have inexplicably failed to discuss the government's obligations thereunder.

▮ With regard to timber used for schools and other buildings associated therewith, the court finds that these were not the responsibility of the government during the period at issue. Article III of the Treaty required the government to build an initial schoolhouse as "soon as a sufficient number of children can be induced to attend school." In addition, the government was required under Article VI to build an additional schoolhouse "for every thirty children between [the ages of six and sixteen] who can be induced or compelled to attend school."[44] However, Article VI also stated that its provisions might be terminated after 10 years. In an earlier opinion in these actions, the Court of Claims held that the government's obligations regarding education terminated at the end of the 10-year period. *Navajo Tribe v. United States,* 224 Ct.Cl. 171, 197–99, 624 F.2d 981, 995–96 (1980). Accordingly, the court holds that defendant is not responsible for stumpage charges allocable to educational buildings.

▮ Additionally, it does not appear that the government was obligated, except for the small number of miscellaneous buildings described in Article III, to construct hospitals, trading posts or other buildings on the Reservation, or build and maintain a road system. To the extent lumber was used for other than Agency buildings, its processing at the sawmills was a governmental gratuity that benefitted the Tribe. Similarly, the court feels the government was entitled to use timber free of charge for improving the trust *res, i.e.,* the Reservation. *See* II A. Scott, *Law of Trusts* § 176, p. 1419 (1967). That is to say, the government was under no duty to use its own funds to preserve the trust

---

**43.** The court views defendant's contention that the 1918 regulations permit free government use of Tribal timber as valid only insofar as it pertains to gratuitous, beneficial uses on the Reservation; it is clear to the court that an administrative agency cannot *ipse dixit* appropriate property the beneficial ownership of which is in the Tribe without paying for it. Similarly, *Cherokee Nation v. United States,* 102 Ct.Cl. 720, 760–61 (1945), only supports defendant to the extent the timber was used for Tribal, not governmental, purposes. To the extent that the regulations were interpreted to permit unlimited free use of stumpage by defendant, such an interpretation would be contrary to the spirit and intendment of the 1910 Act, which the regulations were to implement and under which defendant was to manage the forest to provide, *inter alia,* revenue for the Tribe. Permitting defendant unlimited rights to stumpage without charge would not further the purpose or intendment of the 1910 Act and therefore cannot possibly be sustained.

**44.** The government also bound itself to provide a competent teacher for each of the schools.

property. *See id.* pp. 1423–24. Under these circumstances, the court can find no basis for holding the defendant responsible for timber used for these purposes.

■ With respect to lumber used to meet miscellaneous Agency requirements, Article III of the Treaty provided that the government would construct certain buildings. More importantly, however, it appears relatively clear from an historical standpoint that the burden of establishing and maintaining Indian agencies has rested primarily with the government. *E.g., Sioux Tribe v. United States, supra,* 105 Ct.Cl. 783, 793, 64 F.Supp. 322, 327; *Yankton Sioux Tribe v. United States, supra,* 224 Ct.Cl. at 101, 623 F.2d at 179. Given this general principle of law and the lack of evidence in the record establishing a different situation with respect to the Navajo Tribe, the court holds that the defendant is responsible for lumber used in connection with Agency projects or needs.

■ With regard to lumber given or sold to third parties, there does not appear to be, nor could there be, any dispute that the Tribe was entitled to stumpage with respect to that timber ultimately used for private purposes. Defendant, however, contends that no stumpage charge, or at least a reduction in charge, was justified when the lumber was to be used for purposes ultimately benefitting the Tribe. *See, e.g.,* letter of December 19, 1927 to Superintendent of Southern Navajo Agency (recommending that only 50 percent of commercial stumpage rate be charged for timber to be used by "Rev. F.G. Mitchell * * * for educational and social activities for the benefit of the Navajo Indians").

■ The court cannot agree. Defendant seems to maintain that it should be entitled to use Tribal property as it sees fit in administering an Indian reservation and that it is entitled to reimburse itself from Tribal funds for administrative expense incurred in the absence of some understanding to the contrary. These arguments and others asserted by defendant are subsumed by defendant's fiduciary obligations and responsibilities to the Tribe. The record in this case does not support these arguments raised by defendant, which fly in the face of defendant's fiduciary obligations owed the Tribe. To the extent a trustee, as is defendant here, reimburses itself out of trust funds or property for its out-of-pocket expenses in the administration of the trust, the trustee is obligated to document specifically such out-of-pocket expenses vis-a-vis the beneficiaries' property which it used. Furthermore, defendant's arguments are based on the erroneous position that, as a trustee, it could utilize the trust property as it saw fit, *i.e.,* utilization of plaintiff's stumpage without payment therefor under all circumstances. Such a program ran counter to defendant's duty, as expressed in Section 2 of the 1911 and 1918 regulations, of "so managing the Indian forests as to obtain the greatest revenue for the Indians * * *." In the court's view, the proper approach for the government would have been to seek the consent of the Tribal Council prior to undertaking such projects.[45] Accordingly, the court holds defendant liable for timber sold or given to third parties.

In sum, the court has found that the government is required to compensate the Tribe for 45 percent of the stumpage cut between 1880 and 1935—the 35 percent used for Agency purposes, and the 10 percent sold or given to third parties. Again, these percentage figures are in the nature of jury verdicts.

The final issue relative to the Unpaid Stumpage claim involves determining the proper measure of damages suffered by plaintiff Tribe. The parties seem to be in agreement that the total value of the stumpage cut during the relevant period was roughly $57,522.[46] Plaintiff, however,

45. Assuming *arguendo* the correctness of defendant's contention, the court finds it impossible to apportion further the 10 percent it con-

cluded was used by third parties and therefore still holds against the defendant on this issue.

46. The record indicates that $1,403.56 was paid to the Tribe for stumpage, thereby leaving the

claims that the proper measure of damages is in excess of $300,000 under either of two alternative approaches.

Plaintiff's first approach to its unpaid stumpage damage claim is premised on the contention that the government is obligated to pay interest on the unpaid stumpage fees. Interest on the amount of $56,139, which plaintiff designates as lost earnings, covering the period 1880–1935 computes out to $183,606. In addition, plaintiff seeks to recover $60,864.38 as representing "savings" to defendant in not having to purchase processed lumber. Accordingly, plaintiff's total claim under this damage approach is $301,911.

■ As discussed below, the court holds that plaintiff is not entitled to interest on unpaid stumpage fees.

■ The "savings" portion of plaintiff's first damage computation is premised on an allegation of self-dealing on the part of the government. The argument is that defendant breached its duty of loyalty to the Tribe by harvesting timber without making payment therefor and consequently should account to the Tribe for the profits it made on the transaction, measured in this case by the savings generated by not having to purchase processed lumber. The court does not accept this argument. The essence of the wrong in a self-dealing case is the government's seizing of an opportunity that should belong to the Tribe. *See Navajo Tribe v. United States*, 222 Ct.Cl. 158, 164, 610 F.2d 766, 768–69 (1979); *id.*, 176

Ct.Cl. 502, 508, 364 F.2d 320, 324 (1966); *see also Ottawa Tribe v. United States*, 166 Ct.Cl. 373, *cert. denied*, 379 U.S. 929, 85 S.Ct. 324, 13 L.Ed.2d 341 (1964). Here, the sawmills were owned and operated by the government until 1936. Thus, all the government needed was stumpage. Furthermore, the court is of the opinion that the government did not deprive the Tribe of any profit opportunity. At best, it only deprived the Tribe of the payment of stumpage fees. The court finds, viewing the record as a whole, that the timber at issue, if not processed by the Government sawmills, would not have been processed at all since the Tribe lacked the resources and ability to operate the mills in a commercial manner.

■ Plaintiff's second theory of damages rests on the contention that defendant converted plaintiff's timber and is therefore liable for its market value as processed lumber. However, given the relationships between the parties, the court finds that it was reasonable, albeit incorrect, for the government to feel privileged to use the Indian timber. The court does not view the unusual facts of this case as giving rise to the tort claim of conversion. Rather, the court feels that the proper and just approach is to compensate, in appropriate instances, the Tribe for unpaid stumpage.[47]

In short, with respect to both theories of damages, the court holds that plaintiff will be fairly compensated by the payment of

---

amount of $56,119 as reflecting unpaid stumpage. Although plaintiff's requested finding 133 does not reflect this payment, the court finds it clear that it should be offset against the amount ultimately due the Tribe.

On the other hand, defendant claims that plaintiff waived its right to accrued stumpage payments in connection with its acquisition of a loan in 1939 for the construction and operation of a sawmill. *See* letter of June 14, 1939 to General Superintendent of Navajo Agency. The court rejects this contention. First, the amount of accrued stumpage fees to be waived was only $15,253.20, not all amounts theretofore owed. Second, and most importantly, the court feels that this waiver was only applicable to stumpage cut during 1936–1939, as prior to that time

it does not appear that separate stumpage records were kept.

47. Even if the court were to find a conversion, it would still adopt stumpage value as the proper measure of damages as it does not view the government's conduct as intentionally wrongful. The record and the regulations support the view that defendant honestly believed that it could utilize the stumpage without charge in managing the Reservation if the lumber derived therefrom was for the benefit of the Tribe or was for a government purposes. While the court disagrees with this view, it cannot say defendant was intentionally wrongful or capricious in holding it. *See, e.g., E.E. Bolles Wooden Ware Co. v. United States*, 16 Otto 432, 434, 106 U.S. 432, 434, 1 S.Ct. 398, 27 L.Ed. 230 (1882).

stumpage. To hold otherwise would be to require the government to pay the Tribe for efforts expended at government expense on government equipment not in competition with the Tribe. The court does not believe that such a result is required under the "fair and honorable dealings" standards.[48]

To summarize, the court has found that the government is responsible for payment for 45 percent of the timber cut between 1880–1935 and must compensate the Tribe therefor. The court has also concluded that the proper measure of damages is the stumpage value of such timber, i.e., $57,-522; thus the Tribe is entitled to recover $25,885 (45 percent of $57,522) on its unpaid stumpage claim less $1,405.56 previously paid the Tribe for stumpage, leaving a claim figure of $24,479.

The court thus holds that plaintiff is entitled to recover $24,479 on its Unpaid Stumpage claim. As stated above, plaintiff is not entitled to interest on this amount as will be discussed, infra.

### C. Logging Waste—Claim Period 1880–1946

Plaintiffs' third claim category seeks to recover the value of timber wasted, i.e., left in the woods and not billed as stumpage,[49] allegedly as a result of improper government supervision or practices relating to harvesting operations from 1880–1935, together with interest thereon. Plaintiff contends that 18 percent of the amount actually harvested and brought to the mills is a "conservative" estimate of the amount of waste. Applying this 18 percent factor to timber cut during the period results in a total claim for waste of 13,483.7 M.B.F., with a corresponding stumpage value of $40,449.30 at a stump-

age rate of $3.00 per M.B.F. When the interest claimed thereon of $110,297.84 is added thereto, plaintiffs' claim for Logging Waste totals $150,747.14.

For its part, defendant maintains that although the practices may have been wasteful when viewed under present standards, there is no evidence that the practices on the Reservation were inferior in comparison to those of comparable forests in the southwest during the relevant time period, so defendant should therefore suffer no liability. Such an argument is not persuasive. Defendant does not deny that waste occurred on the Navajo forest during the claim period. Defendant is held liable to some extent under this claim category.

Defendant disputes plaintiff's use of the 18 percent factor. It also claims that any amounts found due should be offset by the additional forest costs necessary to eliminate the waste. Defendant further denies the availability of an interest award.

Once again, the court finds that it cannot accept either party's position en toto and therefore must strive, with little assistance from the parties, to reach a just result upon its own review of the facts and the law. The court deems it most expedient to approach this problem from an historical viewpoint, after setting forth some general principles.

Defendant, as noted previously, had a fiduciary duty to fulfill relative to its management of the Tribe's timber. See Navajo Tribe v. United States, 224 Ct.Cl. 171, 187, 624 F.2d 981, 989 (1980). See also United States v. Mitchell (Mitchell II), 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). There is no question but that defendant, under the circumstances of this case, was required to confront the question

---

**48.** Relative to timber sold to third parties, it does not appear that plaintiff is challenging the prices charged, except insofar as they exclude full stumpage charges. Presumably, all profits derived from such sales were properly accounted for. Thus, payment of stumpage will compensate plaintiff for such timber.

**49.** The record indicates that logging waste occurs when the stumps of trees are cut too high or the tops too low, or when cut merchantable timber is otherwise left in the woods, thereby resulting in a "loss" of merchantable timber. To the extent plaintiffs' Logging Waste claim is based upon improper marking or brush disposal practices, it fails here for lack of proof of damages and explanation.

of waste in an adequate manner during the claim period. *See Menominee Tribe v. United States,* 101 Ct.Cl. 22, 39–40 (1944). Defendant's conduct relative to this claim should be measured generally by the standards applicable to private trustees. In managing the trust, a trustee is required to use "the care, skill, prudence and diligence of an ordinarily prudent man engaged in similar business affairs and with objectives similar to those of the trust in question." *See, e.g.,* G. Bogert, *Trust and Trustees* § 591, at 157 (rev. 2d ed. 1978). Essentially, this is a negligence standard. Under the circumstances of this claim, the court would reach the same result using an arbitrary or capricious standard. That is, the court would consider needlessly wasteful logging practices to be arbitrary and capricious treatment of the forest.

■■ Defendant places great weight on the fact that plaintiff failed to prove that harvesting practices on the Reservation were inferior to those generally followed in the southwest during the relevant period. In essence, defendant claims that wasteful cutting practices were the norm or custom between 1880–1946. For example, the report of Latham, one of defendant's timber experts, states that "it was quite common throughout the west to have wasteful practice, especially on private land." Nonetheless, in negligence actions, proof of custom is only evidence of the proper standard of care; it is not conclusive. *See* Prosser and Keeton, *The Law of Torts* § 33, pp. 194–95 (5th ed. 1984).

Prior to 1905, the record is devoid of evidence that could form a basis for finding that defendant failed to act as an ordinarily prudent man similarly situated would have. Accordingly, the court holds that defendant is not liable for logging waste during the period 1880–1905.

In 1905, however, *A Primer of Forestry,* written by G. Pinchot, was published by the Department of Agriculture and presumably available to defendant. In the *Primer,* Pinchot recommended cutting stumps low as "[h]igh stumps needlessly waste the best timber in a sound tree." *Id.* at 43. The book cited a Bureau of Forestry study showing the savings to be gained by cutting at proper stump heights. *Id.* at 44. No mention is made of proper top utilization, however. Although the issue is close, the court does not feel that a private trustee would necessarily practice the method urged by Pinchot without further evidence of its efficacy.[50]

A General Report—*Forest Conditions* on the Moqui and ·Navajo Reservations, dated December 12, 1910, documented logging waste at the Navajo (165 B.F./tree) and San Juan (178 B.F./tree) mills due to high stumps and under-utilization of tops. The report recommended that stumps generally not be cut higher than 18 inches and that the tops "be utilized more closely." The court views this report as persuasive evidence of a need to consider implementing more appropriate lumbering methods.

■■ In any event, defendant promulgated "Regulations and Instructions for Officers in Charge of Forests on Indian Reservations" in 1911. Section 26 of the 1911 regulations reads as follows:

The allowable height of stumps should usually be fixed at 10, 12, 14, 16, or 18 inches and should never exceed the diameter of the tree at the top of the stump, unless the trees are excessively swell-butted or both badly and generally affected with shake. Where the trees are small the maximum stump height may be fixed at less than 18 inches. The maximum diameter of the base of tops should be fixed so as to utilize all timber which may be taken without loss by the use of methods of logging and utilization which are economical and feasible. Wherever the market conditions and the

---

**50.** The study indicated that proper stumpage cutting would produce additional stumpage revenue of 15 cents per acre.

kind of timber being cut will permit, all trees should be utilized to a diameter of 6 inches in the tops. If still smaller timber is merchantable the purchaser should be required to take it and pay for it.[51]

Although Section 26 only applied by its terms to contract sales of timber, the court finds that it is an appropriate standard against which to measure the government's conduct herein. The superintendent of each reservation was charged by Section 7 of the 1911 regulations "to do all in his power to secure a wise and advantageous use of forest resources." In fulfilling this responsibility, defendant can easily be expected to look to its own regulations when determining or evaluating the harvesting practices of its agents or employees. The court finds that the standards set forth in 1911 regulations would generally have been followed by ordinarily prudent persons engaged in the supervision of timber harvesting.[52] Consequently, the court holds that for years after 1910 defendant violated its fiduciary duty to the Tribe to the extent logging methods used on the Reservation failed to approximate the standards of the regulations.

An inspection report dated May 27, 1912 by the author of the 1910 report noted that conditions hadn't changed since that report, stating: "The Indians are sent into the woods and they cut as they see fit. The cutting at this mill is a disgrace to the service." The report also pointed out that a forester sent to the reservation had initially been put to work as a carpenter, but included a copy of a letter from the Superintendent now directing the forester to "take charge of timber matters on the Reservation." The forester's duties were to include ensuring that the cut trees were "fully utilized."

The forester submitted his own report dated November 28, 1912. In this report, the forester documented reductions in stump heights and improvements in utilization. In addition, the forester reported that 18,730 B.F. of lumber had been salvaged from the tops complained of in previous reports.

Unfortunately, this improvement either didn't continue or wasn't made known to other officials in the Department of the Interior. A memorandum of May 28, 1918 denied a request for the purchase of two portable sawmills for the Reservation apparently on the basis that conditions hadn't improved since the 1910 report of "the great waste that occurred in the leaving of merchantable material in the woods." The memorandum also stated that the Superintendent "seemed to oppose the accomplishment of any improvement in conditions at the mill" and "has never exhibited a cooperative spirit * * *." In light of this seeming conflict, the court is unable to say conclusively whether harvesting practices between 1913 and 1918 were poor or good; viewed separately, the evidence could rationally support either position, but the court is convinced neither is completely accurate. *Cf. Seminole Indians of Florida v. United States*, 197 Ct.Cl. 350, 361, 455 F.2d 539, 545 (1972) (Nichols, J., concurring) ("[T]he fact finder is not required to choose between swallowing an expert's report whole, or rejecting it utterly, and usually, neither course is right."). *See also Marconi Wireless Telegraph Co. v. United States*, 99 Ct.Cl. 1, 50 (1942), *aff'd in part*, 320 U.S. 1, 63 S.Ct. 1393, 87 L.Ed. 1731 (1943); *United States v. Pollard*, 171 F.Supp. 474, 478 (S.D.Mich.1959). As a result, the court concludes that the most just result is to find that the propriety of de-

---

**51.** The 1918 regulations contain an identical provision. Section 15 of the 1920 General Timber Sale Regulations provide that waste, *inter alia*, in high stumps or low tops will be "charged against the purchaser."

**52.** The court would still hold defendant generally to the standards set forth in the regulations even if it concluded that those standards represented exceptional prudence, *i.e.*, were more conservative than generally practiced. *See, e.g.*, G. Bogert, *supra* § 541 at 171. ("On principle it would seem that a trustee should be required to exercise all the skill and prudence which he actually has * * *.") (footnote omitted).

fendant's timber methods varied during this period and adjust the damages accordingly.

Whether or not the quality of logging was fair or poor between 1912 and 1918, it is apparent that it was rather poor sometime soon after 1918. An inspection report dated December 1, 1923 stated that logging work had been "very poorly done" in the past, with high stumps, low tops, and between 200 and 300 logs simply left in the woods. The report noted that conditions had improved since a new man took over at the mill, although stump heights still tended to be too high. The report specifically pointed out that the new man "has been making an effort to use up all of the old logs which were on the ground when he came to the mill, and he plans to cut in the future only what he will be able to saw into lumber during the next summer * * *." As regards logging practices, the report concluded by recommending that stump height instructions (14") be issued.

Judging by the 1925 Forestry Report on the Navajo Indian Reservation, the recommendations were followed. The report stated in pertinent part: "Timber cut on the Agency sawmill area has been satisfactorily utilized. Trees have been cut to a fair stump height."

Prudent logging methods appear to have been practiced during this period on at least some of the contract-cut areas of the Reservation. A July 30, 1929 inspection report noted, regarding timber cut pursuant to contract: "No complaint can be made of the stump heights [or] the utilization * * *." This report also noted, however, that stump heights at the Tohatchi mill area varied from good to poor and that too much timber had been cut with the result that some of it would be "spoilt" by the time the mill could process it.

Good harvesting practices apparently were followed for some time at the Agency mill. A September 15, 1931 inspection report stated with respect to the Fort Defiance mill: "The utilization of the trees is good and the stump height is satisfactory."

Regarding the Tohatchi portable mill, the report confirmed that poor logging practices had been utilized in earlier years due to a lack of supervision but also observed that conditions had improved under a new sawyer, who tries to get "full utilization of every possible log." In addition, a photo taken in the Tohatchi mill area had this caption: "Low stumps and good utilization are practiced this year at the mill." An inspection report of the Fort Defiance sawmill and associated logging area dated May 2, 1935 noted that "stump height and top utilization were both satisfactory."

Things apparently declined at both mills during 1936, as a Forestry Report (Land Management Unit 10) dated February 1, 1937 cited a problem of poor cutting practice due to the "leaving of high stumps and central stems," which was described as "quite characteristic Navajo practice."

Unfortunately, there does not appear to be any "hard" evidence in the record regarding cutting practices between 1937 and 1941 at the Fort Defiance mill. The Navajo Tribal Sawmill annual report for fiscal year ending June 30, 1945 notes that sound woods practices were not observed in the past at the portable mill, but states that conditions improved after 1936. This is the only reference to the 1937–1941 time period that the court was able to locate. Again, the court does not reach a firm conclusion with respect to timber practices during this period but rather views the uncertainty as an element to be considered in the damages calculus.

It is clear, however, that conditions were quite poor by 1942. An inspection report dated February 9, 1943, was very critical of timbering methods on the reservation. The report stated in pertinent part:

Stumps are entirely too high, and very poor practices are being followed with respect to utilization of top logs and observance of top diameter limits. Conservative estimates would place the loss of a thousand board feet for every 10 trees cut. Daily loss would be approximately 7 thousand board feet, operating

on a basis of 200 days a year the annual loss due to poor utilization practices would amount to approximately 1,400,00 [*sic*] board feet. Recently 2 million board feet of logs were picked up in the woods. These logs had been cut approximately 1½ to 2 years ago and had greatly deteriorated both in grade and volume. These logs, when milled, opened up heavily stained, with rot and defect high. The cost of milling these logs was greatly in excess of the normal run due to slick and loose bark.

Plaintiff seizes upon this report as proof of the lengthy period of waste. However, the last prior evidence of waste was the 1929 report. Plaintiff claims that the 1942 report establishes a factor of 18 percent as a "conservative average measure of losses sustained during the period from 1880–1946."

While the court is inclined to consider the 18 percent factor appropriate for measuring waste in "poor" years, it is clear from the above discussion that not all years can be so classified. Indeed, the court previously held that there is no basis for finding defendant liable for waste occurring prior to 1911. The court now finds that the wasteful practices described above were abandoned by the spring of 1943 and that no waste occurred during the remainder of plaintiff's claim period.

A letter dated March 11, 1943, written to the General Superintendent after receipt of the inspection report excerpted above stated that the conditions therein described seemed "to border on the scandalous" and that it was "imperative" that "an immediate change" be brought about in the practices. The Superintendent's response to this letter, dated March 25, 1943, pointed out that conditions were being improved prior to the inspector's arrival and "now," with a minor exception not here relevant, "have been completely remedied."

Finally, a 1944 Report on the Navajo Indian Mills observed that stumps were cut "very low" and contained no mention of top or log waste. The 1945 report cited above confirmed that practices deteriorated in 1941 due to forestry personnel "reaching a vanishing point," but concluded that "[p]roper woods practices were established in the spring of 1943 * * *. The stumps [are] cut according to proper utilization practices not exceeding fourteen inches above the ground * * *." The court can find no basis for finding that proper methods of harvesting were not continued from this point until the end of plaintiff's claim period.

Given this historical background, the court must now attempt to quantify the stumpage value of timber lost to wasteful logging practices. The court has approached this problem from a mathematical standpoint. That is to say, the court has broken down the overall time period for which it has found evidence of a breach of defendant's duty, *i.e.*, between 1911 and 1943, into various segments in light of the above discussion. For each segment, the court has determined a factor after a considered and careful review of the record as a whole that it feels fairly and justly estimates the percentage of harvest representing waste and then applied that factor to the amount of timber harvested during that segment to determine the amount at issue. The court is again mindful of the fact that other persons may reach differing conclusions upon their own review of the record, but nonetheless stands by its decision as having been reached in a conscientious, objective and fair manner. In situations such as this, the court "occupies the position of a jury under like circumstances; and all that the litigants have any right to expect is the exercise of the court's best judgment upon the basis of the evidence provided by the parties." *Specialty Assembling & Packing Co. v. United States*, 174 Ct.Cl. 153, 184, 355 F.2d 554, 572 (1966) (citation omitted).

The court's methodology yields the following table:

| Segment (MBF) | Factor[53] | Timber Harvested (MBF) | Waste |
|---|---|---|---|
| 1911–1912 | 18% | 406 | 73.1 |
| 1913–1918 | 12% | 1,649 | 197.9 |
| 1919–1923 | 18% | 1,254 | 225.7 |
| 1924 | 9% | 290 | 26.1 |
| 1925–1931 | 6% | 4,395 | 263.7 |
| 1932–1935 | 2% | 7,468 | 149.4 |
| 1936–1940 | 9% | 9,713 | 874.2 |
| 1941–1942 | 18% | 13,271 | 2,388.8 |
| 1943 | 18% | 1,930 [54] | 347.4 |
| | | Total | 4,546.3 |

At a stumpage rate of $3.00 per MBF, the value of the timber lost due to defendant's breach of its obligation to ensure that proper logging practices were followed during plaintiff's claim period is $13,638.60 (4,546.2 × $3.00).

The court's inquiry does not end here, however. Defendant claims that the above figure should be offset by the administrative costs necessary to eliminate the waste.[55] To the extent these costs could properly be associated with the sale of timber to third parties, the court would be inclined to agree. *See* 25 U.S.C. § 413 (1983); *Quinault Allottee Assoc. v. United States,* 202 Ct.Cl. 625, 485 F.2d 1391 (1973), *cert. denied,* 416 U.S. 961, 94 S.Ct. 1980, 40 L.Ed.2d 312 (1974); III *Scott on Trusts* § 244, pp. 2144–45 (3d ed.1967). *See also Choctaw Nation v. United States,* 91 Ct.Cl. 320, 383 (1940), *cert. denied,* 312 U.S. 695, 61 S.Ct. 730, 85 L.Ed. 1130 (1941). To the extent the costs would be associated with timber harvested for government purposes, the court would not be so inclined. The court tends to think that the scope of the government's duty required it properly to cut timber without reduction in the price thereof for such costs. *See* 1920 General Timber Sale Regulations § 15 ("Waste * * * will be * * * charged against the purchas-

er."); *Restatement (Second) Trusts* § 188, comment a (1959). The court need not and does not decide this issue, or make an allocation as between the two "classes," as defendant has failed, so far as the court is able to determine, to introduce any evidence tending to show what the cost of eliminating the waste would be.

Consequently, the court holds that plaintiff is entitled to recover $13,638.60 on its Logging Waste claim. As will be indicated, *infra,* plaintiff is not entitled to interest on this amount.

### D. *Lack of Regeneration—Claim Period 1910–1982*

In its fourth claim, plaintiff seeks to recover damages for the depletion of its commercial forest as a renewable asset. The basis of this claim is the alleged lack of regeneration present over a wide part of the forest, principally due, according to plaintiff, to an overgrazing of the forest by livestock (primarily sheep) owned by individual members of the Tribe. Plaintiff asserts that 127,560 acres of the forest require planting at a cost of $30,525,108 and that another 72,440 acres require site preparation at a cost of $3,875,540, for a total cost of reforestation for 200,000 acres of $34,400,648. In addition, plaintiff claims that it is entitled to $12,870,000 as compensation for losses due to delay in regeneration. This figure represents the reduction in the present value of future income of the forest because of the lack of regeneration in 44 percent of it. At trial, plaintiff offered an alternative approach based on the difference between the present value of new growing stock and the value of the trees that supposedly would have become available for harvest if proper regeneration had occurred. This approach yields a dam-

---

**53.** The court accepted plaintiff's factor of 18 percent for those periods where waste was common and steady. The court reduced this percentage figure for those periods where it was indicated by the record that waste was intermittent or sporadic or minimal. Admittedly, this process was somewhat arbitrary, but the court exercised its best judgment in an effort to achieve fairness to the parties. The court believes the totality of the record supports the factors arrived at by this process.

**54.** The record indicates that 7,718 MBF were harvested in 1943. However, since the record also indicates that poor logging conditions were "completely remedied" by the spring of 1943, the court has decided to apply the waste factor to one-quarter of the harvest for that year.

**55.** There does not appear to be any dispute that the waste generally resulted from a lack of supervision of woods workers, whether government, Indian or private.

age figure of $13,759,841, but since it was only offered as corroboration of the first method, plaintiff conceded at oral argument that it is only seeking the "original," lower figure as damages for the delay in regeneration. In total, plaintiff's claim for Lack of Regeneration seeks $47,270,648.

Defendant argues that the government's actions relative to this Regeneration claim were reasonable in light of the technical, social and other realities of the time, some of which extend to this day. Defendant also asserts that any liability of the government's was terminated in 1933 when it began efforts to control grazing by initiating a stock reduction program. In a somewhat related vein, defendant maintains that it should not be held liable with respect to areas first harvested after August 13, 1946, the jurisdictional cut-off date for claims under the Indian Claims Commission Act. 25 U.S.C. § 70k (1976). Defendant argues that its course of conduct prior to August 13, 1946, was not wrongful and *a fortiori* cannot constitute a "continuing wrong." Defendant further argues that there is no regeneration requirement with respect to a virgin forest so that the claim is limited in any event to the approximately 15,000 acres harvested prior to August 13, 1946. Finally, defendant takes issue with the manner in which plaintiff has calculated its damages.

Once again, the court deems the best approach to these issues to be an historical one since the matter is basically fact oriented.

As was briefly noted above, *ante* p. 343, Navajo involvement with livestock dates back at least to the sixteenth century. Spanish explorers, most notably Coronado in 1540, brought livestock with them that have grazed the southern plains intermittently ever since. It appears that the Navajo initially acquired sheep from the Spaniards by barter. In any event, livestock ownership became permanently established after the Pueblo revolt of 1680, when many livestock were lost or simply abandoned

during the Spanish retreat. This introduction of livestock was to have a profound effect on the individual Navajo's life and livelihood.

The Navajo viewed sheep as gifts of God. Sheep provided a ready means of subsistence in the form of food and clothing. Moreover, sheep were mobile and an effective means of measuring wealth. Thus, it is not surprising that sheep quickly achieved a high level of importance in Navajo life that continues to this day. J. Downs, in *The Navajo* at 114 (1972) states: "The basis of all wealth [to the Navajo] is livestock. * * * [A]nimals in and of themselves are wealth and visible symbols of wealth." The Navajo practice of "hogan-grazing," *i.e.*, grazing livestock near the family residence and corralling them nightly, evolved during the 1700's to protect these prized possessions from marauding intruders. Conversely, the Navajo practice of raiding their neighbors' herds was likely a strong factor behind events leading up to the 1868 Treaty, *supra*. Downs, *supra*, at 14, states the Navajo stole nearly 500,000 head of livestock between 1846 and 1860.[56]

Although many, if not most, of the Navajos' livestock were eliminated during the conflict with the United States, the Tribe did not lose its husbandry skills. Article XII of the Treaty of 1868, which established (in Article II thereof) the initial boundaries of the Reservation, provided that the government would supply the Tribe with "fifteen thousand sheep and goats," although the fiscal year 1953 *Navajo Yearbook* states that "30,000 sheep and 4,000 goats" were purchased for this purpose. The "Sketch History of the Navajo Grazing Situation," written in 1966, states that this was done since livestock raising was a "proven enterprise" of the Tribe and could thus fulfill the government's objective of making the Tribe self-sufficient. Pursuant to the annuity provisions of the Treaty, Article VIII, the government continued to supply additional sheep over the next 10 years.

---

**56.** Downs in *The Navajo* also notes that in contrast to other Apache bands that stole nearly as much livestock during the period, the Navajo still possessed most of "their" animals when finally defeated.

Plaintiff contends, with the support of the report and testimony of one of its experts, Dr. Fred Nicklason (Nicklason), that the Tribe's dependence on sheep was due primarily to the government's insistence and encouragement. In the view of plaintiff and its expert, the government is therefore responsible for overgrazing, and the deleterious effects thereof, on the Reservation. A review of the record, however, illustrates that the issue is somewhat more complex.

A letter dated December 8, 1869, reporting on the initial distribution of livestock pursuant to Article XII of the 1868 Treaty stated that the Indians were "very much pleased" and had said, somewhat prophetically, that they "will soon show us, what large herds they will raise." Although the government, in its discretion, distributed sheep at times in fulfillment of its annuity obligations under Article VIII of the Treaty, it is clear that this was perceived as in the best interests of the Indians under the circumstances then existing. A July 16, 1871 letter recommending an additional distribution of sheep noted that they were "considered one of the greatest sources of profit in the Territory" and that the Navajo "are a stock raising people and prize sheep above anything that is furnished them by the Government." A July 20, 1871 letter stated that the Indians generally "attach little value to most of the goods they get [pursuant to the annuity provision, *supra*] and in nine cases out of ten trade them for sheep at less than half their value." The letter also reported that it was "almost a certainty" that the Tribe could never be made self-sufficient raising crops, due to "the long droughts, early fall and late spring frosts." *Accord* Letter of August 5, 1871. *See also* 1872 Report of the Commissioner of Indian Affairs p. 53.

Notwithstanding the government distributions and natural procreation of the herds, not all members of the Tribe were initially able to partake of the benefits associated with flock ownership. A letter dated April 19, 1877 recommended the purchase of additional sheep for distribution to families without any so that they could thereby become self-supporting.

Moreover, it cannot be doubted that members of the Tribe benefitted from the re-introduction of sheep to their lifestyle. The 1872 Report of the Commissioner of Indian Affairs observed that sheep "supply them not only with subsistence but also with material from which they manufacture the celebrated, and, for warmth and durability, unequaled, Navajo blanket." (footnote omitted) The 1878 Annual Report of the Commissioner of Indian Affairs stated: "Within the ten years during which the present treaty with the Navajos has been in force they have grown from a band of paupers to a nation of prosperous, industrious, shrewd, and [relatively] intelligent people." F. Dobyns and R. Euler in *The Navajo Indians*, pp. 48–52 (1977), report that the people used wool and products made with wool "to acquire items for which they had acquired a taste * * *."

Thus, it cannot be gainsaid that the early decisions to supply the Tribe with livestock, particularly sheep, were reasonable and responsible ones under the circumstances. Furthermore, it is interesting to note that none of these early reports or letters mentioned the Tribal timberlands as an alternative means of support for the Tribe. In short, the court declines on this record to hold the government responsible for the overgrazing of the forest and whatever lack of regeneration may have resulted therefrom merely because it supplied the Tribe with livestock to replace those lost during the conflict between the Tribe and the United States.

This is not to imply, however, that there were no problems associated with the livestock-based economy of the Tribe. Overgrazing in general quickly became a problem, with the Tribe requesting enlargements of the Reservation as early as the 1870's. The government began adding to the Reservation in 1878 and continued doing so periodically thereafter until 1934, when the expansion essentially reached its limit on all sides due to strong opposition from adjoining landowners.

Also, the government urged the Indians to reduce the size of their flocks while improving the quality thereof, but met with no success. Such advice given during the mid-1880's was met with responses such as the following:

We would rather have more cattle and sheep even if they are not so good. We prefer the large herds of horses. We think it would be better to let our stock increase as we have in the past. We think the American advice᠈ to have few horses and sheep is not good; * * * I and my people do not want to reduce our herds. We prefer more cattle and sheep just as they are; * * * Our stock is our own, and we are proud to have so much; hence we watch it close. * * *

Excerpts from a letter from the Secretary of Treasury to 49th Congress at 13, 16, 17 (1886). *See also id.* p. 10. As a result, it can only be concluded that the high grade and quality stock given to members of the Tribe during this period was meant to improve, not increase, the overall livestock situation. Nonetheless, the issue in the instant case is not whether the government acted properly regarding grazing and livestock raising in general, but rather whether it prudently managed the Tribe's timber resources. Accordingly, with the foregoing serving as an historical background the court will now address the situation regarding the forest itself.

The earliest evidence cited by plaintiff regarding the damage done to forests by overgrazing is a 1904 report by the U.S. Geological Survey entitled "Forest Conditions in the San Francisco Mountains Forest Reserve, Arizona." The report contains a section on "Destruction of the Forest," which devotes about a page and a half to the problem of overgrazing. Although the parties dispute the applicability of the report to the Navajo situation, it is nevertheless clear that the report demonstrated that livestock grazing, particularly in the case of sheep and goats, could be deleterious to reproduction under certain circumstances.

Another "outside" report, this one from the Coconino Experiment Station 2 and *circa* 1910, cited an investigation done in the summer of 1908 which showed that the failure of western yellow pine to regenerate satisfactorily was "due primarily to the adverse climatic conditions which prevail in the Southwest, but that fairly good reproduction can generally be obtained by conservative cutting, a rigid exclusion of fires and a judicial control of grazing."

Apparently, the first report of poor reproduction in the Navajo forest came in the 1910 report of forester G.A. Gutches (Gutches). Gutches observed that yellow pine reproduction was "very poor and scattered" due to the grazing of sheep and goats in the forest. To achieve reproduction, he stated that the sheep and goats would have to be "carefully supervised" whenever large areas were cut; indeed, he recommended that sheep and goat grazing "be prohibited after cutting until the young growth is thoroughly established." Perhaps conversely, Gutches noted that livestock raising would be the "chief industry" of the Tribe "for some time to come."

In 1912, the reservation's forester, C.D. Faunce (Faunce), reported the following with regard to sheep and goats:

Although sheep and goats prevent the spread of fires by keeping down the undergrowth, they also eat off the greater percentage of the seedlings. It seems that the grazing of sheep and goats ought to be restricted on areas where cutting is being done. This would give some chance for a new stock of seedlings. On account of the unusually dry season this year, grazing is very poor. In the winter some herders are accustomed to cutting down 'black jacks' [small young trees] for their herds to feed upon.

Although the only stock-related benefit described in the report is the reduction of the fire hazard, this is not surprising given Faunce's profession. One would not expect a forester to look kindly on sheep grazing in the forest any more than one would expect a sheep herder to look kindly

on a forester precluding grazing in the forest.

In 1917, the government published the results of an intensive study performed on the Coconino forest relative to yellow pine reproduction by Robert R. Hill (Hill). The report documented the various ways in which grazing can have an adverse effect on regeneration and made several recommendations. The report, *inter alia*, advised that overgrazing "should be avoided by all means," that sheep be excluded from cut-over areas on which they are causing severe damage "for a period of from 15–20 years," and somewhat uniquely, that reproduction even be protected on areas "not to be cut over in the near future."

Hill, however, recognized the economic importance of grazing, beginning his report as follows:

> The best summer forage in Arizona and New Mexico is found among the open stands of yellow pine * * *. Every economic consideration requires that this forage, one of the region's most important resources, should be converted into meat.

Furthermore, Hill also noted that even with protection against grazing, there was no assurance of complete reproduction— "[U]nder the most favorable conditions it is only through the combination of a good seed year with two or more good growing years following that any considerable amount of reproduction becomes established."

The 1917 Sitgreaves National Forest and White Mountain Indian Reservation Forest Description and Site Report described sheep grazing as the "principal factor" responsible for areas of poor reproduction. On the other hand, the report observed that there were areas of light timber growth where it was "quite probable that this ground will continue being more valuable for its grasses than for any increased forest growth that might be encouraged."

In 1923, the Department of Agriculture published the results of an exhaustive study under the title *Natural Reproduction of Western Yellow Pine in the Southwest*. This study was done by G. Pearson (Pearson), one of the leading silvicultural experts of his time. Pearson summarized the relevant conclusions of studies done before 1918 as follows:

> Adverse climatic conditions dominate the situation to such an extent that no system of silviculture can hope completely to solve the reproduction problem in this region. Dense, even aged, stands of seedlings became established only at long and irregular intervals, when a good seed crop is followed by two or more years of favorable climatic conditions. * * * Sheep were known to do serious damage to seedlings, but it had not been proved that the damage was sufficient to preclude reproduction; moreover, it was surmised that certain adverse sites, especially bunch-grass lands, would not restock with any degree of certainty even if sheep were excluded.

Pearson concluded that there were eight factors "more or less directly related" to the success or failure of yellow pine reproduction. They were: (1) seed supply; (2) climate; (3) soil; (4) herbaceous vegetation; (5) cutting; (6) brush disposal; (7) grazing; and (8) miscellaneous enemies, including fire, insects, and rodents. Although neither party finished the court with a complete copy of the study, it appears from the materials at hand that Pearson regarded four of the eight factors as particularly important—seed supply, climate, rodents and grazing.

Pearson characterized climate as "perhaps the largest complex of factors affecting reproduction in the Southwest." Particularly important was the lack of adequate rainfall; Pearson thought it "safe to say that an addition of 2 inches to the normal rainfall during the month of June would practically eliminate the reproduction problem in this region." Under circumstances as they actually existed, good seed crops were sometimes lost "because of deficient or irregular summer rains." The other major climatic factor was the often severe winter temperatures, which resulted in "winterkilling," *i.e.*, freezing of the soil below the depth reached by the majority of the roots coupled with active transpiration, and "forest heaving," *i.e.*,

the pulling out or breaking off of the roots of young plants when the surface layers expand and lift as they are frozen.

Pearson viewed rodents as an "important factor" influencing regeneration. He noted that in years of light seed production, seed-eating rodents, generally mice and chipmunks, "apparently consume the great bulk of the crop." Also, "[t]he activities of these pests are undoubtedly the greatest factor in accounting for the failure of broadcast sowing." Even after seeds became established and grew, the forest wasn't free of rodent depredations— "Squirrels, rabbits, rats, gophers and porcupines are responsible for much damage by gnawing the bark." In the case of seedlings, rabbits "sometimes cut off the entire plant." Porcupines and gophers gnaw the bark around the central stem or trunk, a process known as "girdling," and thereby "kill or seriously injure great numbers of seedlings from 1 to 6 feet high."

Notwithstanding these factors, in Pearson's opinion improper sheep grazing was "the largest controllable obstacle to reproduction of western yellow pine," and he devoted a good portion of his study to describing the deleterious effects that can result therefrom. Plaintiff, in its presentations, seeks to portray overgrazing as the only major regeneration foe. This is not correct, as a reading of Pearson's work makes clear. Pearson says only that overgrazing was the largest *controllable* cause. Other major foes of regeneration discussed above were *uncontrollable* and could be expected to effect regeneration adversely, even in the absence of overgrazing. Pearson related the results of several experiments and studies of his own and others which showed that the exclusion of sheep from areas undergoing potential and actual reproduction was indisputably beneficial to the process. Although some areas with "optimum conditions" had the possibility for adequate regeneration, Pearson regarded this as "by no means certain." In his view, "under inadequately regulated

grazing the chances are decidedly against reproduction, even in a year like 1919 [a year of high prospects due to heavy seeding and favorable weather conditions]."

In addition, Pearson was unable to conclude that sheep would not cause excessive damage even under "normal grazing conditions." Thus, he recommended that sheep be kept completely off areas undergoing restocking for approximately 20 years. An alternative approach was to exclude sheep beginning 10 years before cutting on virgin stands to take advantage of their "prolific seeding" capability.

As this discussion makes clear, the problem of overgrazing was widely recognized and discussed by 1925. Nonetheless, before determining the sufficiency of defendant's actions in this regard, one additional consideration must be addressed—to wit, the importance of livestock to the social and economic lives of members of the Tribe.

As discussed previously, livestock, particularly sheep, were highly prized by the Navajo. The size of one's herd was a determining factor in the amount of status one received, and livestock served as part of Navajo family life. For example, Navajo parents customarily set aside part of the increase of their herds for their children as patrimony when they married, and considered sheep an integral part of their religious values. *See generally, e.g.,* D. Parman, *The Navajos and The New Deal* pp. 65–67 (1976).[57]

Livestock raising was also the economic foundation for the vast majority of Tribal members. The fiscal year 1916 Annual Report of the Navajo Indian Agency noted that the Indians on the Reservation depended "almost wholly on their livestock for a livelihood." An April 12, 1930 letter to the Commissioner of Indian Affairs reported the situation in this manner—"[T]he livestock business constitutes about 90 percent of the Navajos' income and livelihood. To maintain this industry is no doubt the most vital problem of the Navajos." Again in

57. E. Reeseman Fryer, who was Superintendent of the Navajo Reservation from 1936–1943 and extremely familiar with the Navajo situation, characterized Parman's book as "authoritative," and "the best thing done [on the subject]."

1933, a Report of the Conservation Advisory Committee for the Navajo Reservation stated: "Range is [the Navajo's] primary asset and frequently it is his only natural resource. Even the famed Navajo blanket, the principal product of his crafts, is a product of the range." Still other citations could be made, but they would not serve to make the point any clearer.

There is yet another factor that complicates an analysis of the situation. That is that the sheep are owned individually with the benefits derived therefrom flowing directly to the individual Indian owner, whereas the timber resources are owned by the Tribe as a whole, and thus the individual benefits indirectly from timber utilization, if at all.

The grazing area of the Reservation is composed of what are known as "traditional use areas," *i.e.*, the land upon which a family and its ancestors have regularly and traditionally grazed their animals. *See, e.g.*, J. Downs, *The Navajo* pp. 43–44 (1972). Although the precise boundaries of these areas are not easily ascertainable, individuals are generally able to identify the limits of their "holdings" and consider the land as their own. *See, e.g.*, J. Downs, *Animal Husbandry in Navajo Society and Culture* p. 83 (1964). This "ownership" is recognized and respected by the Tribe. *Id.*

▬ Thus, defendant was faced by the mid-1920's with a situation in which on the one hand it had ample evidence of the harm and/or costs associated with sheep grazing in the forest, while on the other it had the socio-economic values also associated with livestock. Defendant's regulatory obligations with regard to the forest, as set forth in 1911 and 1918 regulations, were, *inter alia*, "to secure a wise and advantageous use of forest resources [,] manag[e] the Indian forests so as to obtain the greatest revenue for the Indians consistent with a proper protection and improvement of the forests [and] exercis[e] a proper control of

grazing." In evaluating defendant's conduct, the court here utilizes the standard applicable to a private trustee, *see Navajo Tribe v. United States*, 224 Ct.Cl. 171, 187, 624 F.2d 981, 989 (1980); *see also United States v. Mitchell*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); to wit, whether defendant exercised "the care, skill, prudence and diligence of an ordinarily prudent man engaged in similar business affairs and with objectives similar to of the trust in question." *See, e.g.*, G. Bogert, *Trusts and Trustees* § 541, at 157 (rev. 2d ed. 1978).[58] However, "[t]he law does not hold a trustee, acting in accord with such rule, responsible for errors in judgment." *Id.* at 159 (quoting *Costello v. Costello*, 209 N.Y. 252, 261, 103 N.E. 148, 152 (1913)). Accordingly, a trustee is not an insurer or guarantor of the trust's assets. *E.g., Stark v. United States Trust Company of New York*, 445 F.Supp. 670, 678 (S.D.N.Y. 1978). *See* Annot., 104 A.L.R. 975 (1936). This proposition was accepted, without discussion, by the Court of Claims, this court's predecessor. *See Oneida Tribe of Indians of Wisconsin v. United States*, 165 Ct.Cl. 487, 494 (1964), *cert. denied*, 379 U.S. 946, 85 S.Ct. 441, 13 L.Ed.2d 544 (1964) (duty of care does "not reach the insurer's level"). Rather, "the status of the trustee's act is judged by conditions at the time he acted [; t]hat the act appears careless or imprudent in light of later circumstances is not material." *See, e.g.*, G. Bogert, *supra*, § 541, at 163. With these principles in mind, the court will now turn to an analysis of defendant's actions.

A May 18, 1928 report on 145,000 acres of Navajo forest by J.P. Kinney, then Chief Supervisor of Forests for the Department of the Interior, and two other men noted that a general lack of regeneration was due to "excessive grazing" that would have to be eliminated to obtain a "normal forest." In this regard, the authors of the report were of the opinion that it was "essential" that sheep and goat grazing be prohibited

---

**58.** The court would not reach a different result analyzing the situation under an arbitrary or capricious standard. Indeed, for purposes of this litigation, the court views the two tests as interchangeable since it can hardly be said that the government had discretion to act unreasonably.

for at least 15 years after timber was cut. They realized, however, that this would be difficult under the circumstances.

\* \* \* [T]he fact that the Navajo Indians secure their entire living from the stock industry makes it practically impossible to close the forested areas and eliminate this factor. The management of the forest will therefore probably have to be subordinated to the grazing problem and favorable results will not be possible of attainment until the herds are sufficiently reduced to eliminate overgrazing.

These feelings were reiterated in a June 8, 1928 letter by the same three men—

We appreciate fully the fact that the Navajos derive their principal income from the grazing of sheep and goats and because of their habits of self reliance, it will be exceedingly difficult to remove sheep and goats for a period of years from areas that are in urgent need of rest and revegetation; but we feel that some effort to this end is highly desirable from the standpoint of the Indians and that weeks and months of careful study should be given by competent and deeply interested men to the grazing and forest problems on Navajo lands.

We are not disposed to underestimate the advantages of grazing to the Navajos or put undue emphasis upon the production of [timber crops] \* \* \*.[59]

The dual concerns of forestry and grazing were addressed in the 1929 Annual Forest Report for the Southern Navajo Reservation. The report noted that a "very good plan" had been written for grazing control, but not yet put into effect. The reason given for this was as follows: "The very nature of the livestock industry, as practiced here, coupled with land ownership, forbids taking drastic measures which one believes would have a tendency to improve range conditions." The "traditional use areas" mandated that reform measures "of necessity, be slow and of doubtful success, for \* \* \* the range belongs to those who use it." Also, in light of the dependence on livestock, the opinion expressed in the report was that "drastic measures would very likely tend to promote forest fires in retaliation."

Although the report concluded that future plans would have to aim at a reduction of at least 50 percent in the number of stock grazing the range, with an exclusion of sheep from cut areas for 12 to 15 years and all timbered areas until summer and late summer, it recognized that "[n]o definite plan of management has been written nor is it likely that one can be written that will be workable until after years of effort spent in getting the users of the range to see the necessity of changing the present methods."

The 1932 Annual Forestry Report observed that action was required to protect the future of the forest. It seemed to call for a total exclusion of sheep and goats "for between fifteen and twenty years on the Defiance Plateau and Lukachukai Mountain, and Wheatfields-Whiskey Creek units." However, the report noted that this was "not feasible because we already have a seriously overstocked condition." Consequently, the practical conclusion drawn was that "[t]he number of stock must be reduced!" [Emphasis in original.]

The Navajo stock reduction plan began shortly thereafter in 1933 at the insistence of John Collier (Collier), who was appointed Commissioner of Indian Affairs in that year. Collier had wide ranging, broad based plans to improve life on the Reservation through funds available for various projects under the New Deal. Central to his plans was the reduction of livestock holdings. Despite presentations demonstrating the benefits to the Tribal Council of herd reductions, its members were not favorably impressed with the plan. Their consensus was that herd reduction should not be tied in to the other improvement plans, e.g., irrigation, but rather left to the Navajos as a local concern. Nonetheless, Collier was able to convince the Council

59. The bracketed words were supplied by defendant and are accepted by the court as reasonable in the given context. The actual words are illegible in plaintiff's copies of the letter. Given plaintiff's reliance on this letter in its findings, this problem is well nigh inexcusable.

that it should agree with the proposal, apparently through a combination of pressure and bargaining to seek an expansion of the Reservation.

Final arrangements resulted in a grant of $200,000 to purchase 100,000 sheep from members of the Tribe. The sheep were to be collected, transported to packing companies for processing, and then distributed (in the form of canned meat) to needy Indians. Although it was recommended that no poor quality sheep be purchased and that purchases be made on a graduated scale, *i.e.*, by taking proportionately more herd from larger owners, it appears that neither recommendation was followed to any great extent. In any event, the great hostility seen later regarding herd reductions was not evident in 1933, perhaps because the Indians viewed the government sales (approximately 90,000 head) as a substitute for the regular fall market that had failed. *See generally* D. Parman, *The Navajos and The New Deal* pp. 43–49 (1976).

Collier had a second herd reduction planned for 1934, involving 150,000 goats and 50,000 sheep. The emphasis on goats was ecologically sound as they have little value and graze too closely and quickly. Initial reaction by the Tribal Council was generally favorable, although a request was made, later formally granted, that small herds be exempted from the reduction. As first proposed, the plan called for the Tribe to supply the $225,000 for the purchases, but a grant from the government of $250,000 made this unnecessary.

Unfortunately, the 1934 reduction was beset with several circumstances that prevented it from going smoothly and perhaps doomed all future reduction attempts. First, employment in the various conservation projects and other wage work lessened the economic necessity of sales. E. Reeseman Fryer (Fryer), Superintendent of the Navajo Reservation, whose experiences will be related *infra*, testified that stock reduction in such circumstances was "offensive" to the Navajo and "expected people to do things which were in violation of [their]

values," although the government had "no alternative" but to go ahead.

Secondly, while the initial approach was to exempt herds of under 100, large herd owners opposed a graduated reduction and wanted a strict proportionate method. For reasons that do not appear in the record, the government did not interfere so long as the quotas were met, as they very nearly were. Consequently, due to their status in the community because of the size of their herds, the large owners were able to pressure the small owners into selling more sheep than they otherwise would have done, with the result that the large owners only "culled" their herds.

Finally, the extreme drought in the Southwest in 1934 made driving the herds to shipping points a rather difficult proposition. Many sheep and goats died during the drives or were slaughtered beforehand, and there is at least one credible account of a wholesale slaughter in a canyon of goats that were unable to complete the drive. Although the slaughter(s) were not typical of the second or any following herd reductions, the Navajos were convinced that they were and were incensed at the idea. *See generally id.* pp. 51–67.

A third stock reduction took place in 1935. Collier procured $400,000 of outside funds with which he intended to effectuate a herd reduction of some 200,000 head. This time, however, the government was to take no part in the process, merely reimbursing the traders who bought and marketed the stock. The plan met with strong Navajo opposition almost immediately after it was begun and resulted in sales of only 16,225 sheep and 14,716 goats, and those were mostly "culls." *See generally id.* 97–98.

Because of the Navajo antagonism and his own view that the reductions were being performed improperly, *e.g.*, not taking enough from the large owners, Fryer convinced Collier and the Secretary of the Interior "to hold off on any further pushed reductions" until further study of the issues could be made. Nevertheless, it can-

not be doubted that the reductions were beneficial to the range.

The root of the Navajos' distaste for stock reductions was, of course, their profound attachment to their sheep and goats. Although wage work was a source of income that could, to some extent, reduce the economic dependence on livestock for the time being, it was not perceived as nearly as dependable or desirable as a large herd of livestock. Indeed, the fact that the reductions centered on goats, a commercially undesirable species, did nothing to alleviate the problems as these animals were valued by the Navajo precisely because of their lack of extrinsic value—while a trader might take sheep to satisfy a debt, he wouldn't take goats, thus assuring goat owners a source of food and livelihood in times of debt. Moreover, those small herders without wage work often found their relative economic, and social, condition worsened as a result of the reductions. Although a more detailed study might have averted some of the problems, it does not appear that Collier was aware, until it was too late, that any existed.[60]

Also in 1934, the government began many demonstration projects and educational programs with the aim of instructing the Navajo in proper grazing and range management techniques. Fryer testified that approximately 100,000 acres were fenced at various locations throughout the Reservation, although due to the dependency on livestock the Navajos had a tendency to throw their sheep over the fences to eat the grass within said enclosures. The government sponsored attempts to change the Navajos' attitudes towards "hogan grazing," i.e., returning to home with the flocks each night, but people were opposed to "staying out at night in the dark" and had to be paid to take part in this effort. Periodically, the government would hold field days, at which a picnic would be held and the results of the projects illustrated and attempted explanations thereof made. Fryer testified that explanations were difficult because of Navajo beliefs dealing with the supernatural.[61] In addition, there was a slide series that traveled across the Reservation.

Fryer was appointed Superintendent of the Navajo Reservation in 1936 and served in that capacity until 1942, when the exigencies of World War II required that he accept another position. The court found Fryer's testimony regarding his first-hand experience on and knowledge of the Reservation to be extremely relevant and helpful relative to some of the difficult issues presented to the court. Moreover, the court found him to be an extremely credible witness—he was objective, with no axe to grind, and expressed his feelings and recollections with candor and without the imprint of the instant litigation specter, especially in comparison with some of the other witnesses in the trial, called both by plaintiff and by defendant.

The court is thus surprised that plaintiff apparently seeks in its proposed findings of fact to imply that Fryer's testimony should be discounted because of his age at trial and inability to remember the terms of the 1910 Act or the 1911 and 1918 regulations. Although Fryer was in his eighties at the time of trial and did testify that he was then not familiar with the regulations or the Act, he did remember the regulations. As an administrator, Fryer's primary guidance would be the regulations interpreting the Act, and therefore it is of little import that he was not familiar at trial with a statute that was then approximately 74 years old. Moreover, a lack of memory concerning legal matters oftentimes, as here, has absolutely no bearing on the rec-

60. D. Parman, *The Navajos and The New Deal* (1976), indicates at p. 65 that it was "only in recent years" that athropologists "clarified the important relationships between livestock and the Navajos' central social and religious concepts."

61. Parman, *supra*, pp. 81–89, reports on the demonstration days and relates that the Navajos found many of the ideas "strange and hard to accept" and that many accounted for the improved areas by saying it rained more there rather than credit grazing reduction for range improvement.

ollection of facts; indeed, this court stated during trial that Fryer had a "marvelous memory" given the time frame involved. In any event, Fryer had a sense of obligation at least as great, probably greater, as that imposed by law, for as he testified: "There was always an obligation, it seemed to me, on the part of the Government to provide every means possible for individual, for Navajo livelihood." In short, plaintiff's proposed finding is not well taken; the court sincerely hopes that time is as charitable to the rest of us as it has been to Mr. Fryer.

Shortly before the time Fryer began his tenure as Superintendent, the government completed basic studies of the grazing capacities of the Reservation. These studies were followed, or supplemented, by an in-depth study relative to the grazing capacity of each district on the Reservation and also included the "human dependency aspects" of the issue. Using these studies, range management specialists from the Agriculture Department developed grazing regulations in 1937 specifically for the Navajo Reservation. These regulations were approved, after adoption by the Navajo Tribal Council.

As discussed above, one of the problems with the initial stock reduction programs was that they ended up placing a larger economic burden on the small herd owners. It was Fryer's definite intention that all future plans be more equitable, taking a larger share of livestock from large owners. To achieve such an objective, however, accurage records were needed. These records were developed by observations made at the time of dipping sheep and goats for scabies and by rounding up and branding horses.

The reduction program was to begin with horses, which were generally of no value. Moreover, horses trampled and ate grass that could be utilized by the sheep. Notwithstanding Council approval of the regu-

lations, and adoption of a resolution limiting the number of horses an individual could own, there was still widespread opposition on the Reservation to any form of stock reduction. In 1938, Fryer was invited to and attended a gathering of "at least a thousand Navajos" at which Jake Morgan (Morgan), a somewhat demagogic Indian leader, whipped those present into a frenzy over stock reduction. Fryer was later told that "the strategy was to boil [me] up so that [I'd] get made and they could attack [me]. Fortunately, however, the meeting ended without incident or injury.

Tensions gradually moderated thereafter, and the government brought test cases involving the regulations in New Mexico and then Arizona and Utah. In such cases, the regulations were upheld, and the defendants involved thereafter disposed of their excess horses. *See also* Fryer, *The Government and the Navajo— 1936–1940* pp. 10–12.

With the validity of the regulations established beyond peradventure, the stage was set for beginning implementation of the permit system Fryer wanted to establish to control grazing. Permits were to be issued on the basis of the carrying capacity of the district and the amount of livestock contained therein.[62] Fryer testified that the purpose of the permit system was as follows:

> * * * [T]o reduce the number of livestock to the carrying capacity, but in such a way that the reduction, the greatest reduction would be borne by those best able to do it in a manner that the livestock, the man holding the largest livestock, and we had to set up very elaborate graphs to demonstrate this, which starting on the left of the chart say if you were charging grazing, you'd start, lay it out on this kind of charts and this would be horses, this would be

---

**62.** The studies indicated that the Reservation, as a whole, had a grazing capacity of approximately 560,000 sheep units and a grazing burden of around a million or more sheep units. A "sheep unit" is a method of measurement that attempts

to equate, *i.e.,* make comparable, the consumption tendencies of the various animals utilizing the range. A horse, for instance, is equivalent to 5 sheep units.

goats, and this would be cattle and down here sheep. And if you had that layed out you'd, the reduction line would go that way and stop, and what we call the maximum limit, then below the maximum there would be no reduction, but to the maximum limit you're getting at the people who could best afford it, so that the whole grazing permit system had two qualities; one the quality of carrying capacity to save the land itself and the other was to be sure that in doing that, you didn't place the burden of, the sacrifices because you were doing that on people who absolutely couldn't afford it.

Implementation of the permit system, which initially did not require reductions in productive livestock, *i.e.*, sheep, while not favored, generally took place without issue, although one district supervisor was "beaten nearly to death" in connection with the program.

In 1939, Fryer obtained loan funds totaling $125,000 to begin the Livestock Disposition Fund. The primary purpose of the Fund was to protect (support) the prices offered to the Navajos for their livestock. In order that the livestock so acquired weren't wasted, the Many Farms cannery was established with "gratuity," *i.e.*, non-Tribal, funds. Many Farms took the mostly "cull" animals acquired through the Livestock Disposition Fund, fed them up to market requirements, and then slaughtered and processed them into a form of stew. Most or all of the stew was then used in relief or welfare programs on the Reservation. Since most of the livestock sold to Many Farms were ones that traders wouldn't buy because of their lack of quality, the program operated to improve the quality of livestock on the range and reduce wasteful grazing. Another program to improve the quality of livestock was the government sponsored breeding program involving pure-bred Rambouillet sheep.

In 1940, the Soil Conservation Service promulgated a Navajo Timber Management Plan (the "1940 Plan"). The 1940 Plan recognized the harm caused to reproduction by overgrazing and recommended that a comprehensive grazing program, which was outlined therein, be implemented. Essentially, the 1940 Plan called for strict control of the number of animals grazing, exclusion of all of them from the forest until July 1 of each year and total exclusion if young seedlings were being killed or injured in excessive numbers. On the other hand, the 1940 Plan recognized that the production of livestock was a "major industry" on the Reservation and therefore concluded that "[a]ll grazing resources must be used to the fullest possible extent, consistent with proper range use, and the protection of related resources."

The basic issues raised by the 1940 Plan were considered by a "blue ribbon" planning conference that included Fryer, the regional director of the Soil Conservation Service, the chief forester of the Indian Bureau and others. The conference discussed the possibility of achieving "dual use" and the considerations involved therewith. Part of the problem was that the interplay between the recommended exclusions and the Tribal concept of "traditional use areas" would produce economic hardship that would need to be addressed in some manner. This was especially compelling in cases of total exclusion of sheep from forest grazing areas when one remembers that the generally recommended exclusion time was approximately 15–20 years.[63]

The judgment made by the conference was that "the highest use of the forest then, and the nature of the dependency of the Navajos on sheep, that its highest use was to provide grass for the sheep, and the

---

**63.** Plaintiff strongly maintains that the proper remedy for this reproduction problem was "control" of grazing for 5 years, not total exclusion for the much longer period. The great weight of the evidence, however, militates against such a finding relative to the time frame, *i.e.*, pre-1946, involved here. Trustees' acts are to be judged in light of the conditions, and practices, existing at the time of the action at issue. *See* Bogert, *supra*, § 541, p. 163. Ultimately, this argument is of little moment as the court finds a regime of controlled grazing no more possible, given the large number of animals and cultural factors, than one of outright exclusion.

living for the 10 thousand people [on the Reservation]." This conclusion was also expressed in Fryer, *The Government and The Navajo 1936–1940* at p. 23:

> It appears currently, at least, that the grazing value of the range to the long-time economy of the Navajos exceeds the commercial value of the timber stand. This is not necessarily a permanent and weighted consideration, but is based upon present range requirements and the general status of the range management program.

Accepting, *arguendo*, that the Tribe stood to make more money, on the whole, from utilization of the forest,[64] development of this resource would have had adverse effects upon the individual Indians whose "traditional uses areas" were encompassed in the forest area to be developed. Moreover, from the report of the conference, it does not appear that the individuals displaced could have been guaranteed employment in the timber operations. Although perhaps the Tribe could have paid "subsidies" to the affected parties, doing so would have meant a profound change in the Navajo lifestyle. As Fryer testified, the people were "dependent" on sheep "from the point of view of Navajo livelihood, and the point of view of Navajo value." He repeated these sentiments several times during his testimony.

> In any case, the difference between tribal income and the end of the livelihood of individual family, Navajos, was imperatively necessary, and in my [Fryer's] view much more important, no question about it [than] forest regeneration for the tribe. * * * [T]o force these people off that grass to save the forest would have put them into starvation except for the kind of relief that they really didn't want at that time.

Fryer stated the essence of the problem in the following manner:

> [I]t's like meaning more money for the United States Treasury if it sells a piece of forest versus * * * how I, as an individual, am affected.

Furthermore, the court considers it significant to note that Fryer testified that there was "[n]ever never never never" any opposition from the Tribal council regarding the decision to prefer grazing to reproduction, and there was "[n]ot a chance" that the council would have reached a different decision, even if presented with figures justifying a preference for forestry. Regarding the other members of the Tribe, Fryer's impression was the following: "As far as the trees were concerned the individual Navajos, on the whole, could care less." There is support for Fryer's views in the action taken by the Tribe with respect to the Indian Reorganization Act of 1934, 25 U.S.C. § 461 *et seq.* (1983). Section 466 (Act § 6) provided, *inter alia*, that the Secretary of Interior was to make rules and regulations to restrict the number of livestock grazed on Indian range units to the estimated carrying capacities of such ranges. The Navajo Tribe, pursuant to section 18 of the Act, 25 U.S.C. § 478, voted against application of the provisions of the Act to the Navajo Reservation. The record supports the conclusion that the Tribe voted against the Act because of the above grazing provision.

This attitude, reflecting the Navajos' deep attachment to their livestock, effectively made the 1940 Plan an idealistic one that was, in Fryer's opinion, "impossible, actually of enforcement from a realistic point of view." Fryer repeatedly testified that it would have been impossible to implement all of the recommendations of the

---

**64.** Fryer testified that he "was never convinced" that the value of timber was higher than that of grazing, and defendant had an expert report and testimony that supported this position. Plaintiff, of course, had expert analysis and testimony that pointed towards the opposite conclusion, *i.e.*, that timber harvesting was much more valuable. On the record as a whole, the court feels that strictly from a monetary standpoint,

*i.e.*, without ascribing a dollar value to way of life or the interests of individuals *versus* the interests of the Tribe, there was a greater potential for profit in timber operations. On the other hand, there was a greater potential for destruction of the Navajo way of life and livelihood for many persons by the exclusion of sheep from forest areas for 15–20 year periods.

1940 Plan during the 1940's. The following excerpts, while not exhaustive, are illustrative of the situation:

It would have been literally, absolutely impossible to have kept those people out [of the forest]. And it would have been immoral, in my view to have attempted, there would have been trouble, deep trouble. * * * It is really ridiculous to assume that Navajos voluntarily would have moved off their grazing land * * *. I don't think that it could have been done, and I doubt that it could be done now.

Fryer also stated that he felt that "any unbiased student of Navajo dependency" would agree with his opinion. Regarding the recommendation of the 1940 Plan that animals be kept out of the forest until after July 1, Fryer stated that "there isn't an army big enough to have kept those people back." In general, Fryer testified that the Navajo Service "went as far as it possibly could go, gone without open revolt almost," in implementing the 1940 Plan.

As the last statement should show, this discussion is not meant to imply that nothing was done as regards the overgrazing problem on the Reservation. The permit system was continued and expanded, and efforts were still made towards voluntary livestock reduction. Fryer left the Reservation shortly after Pearl Harbor to assist in the war effort. When he went to return to his position as superintendent in 1947, Navajo opposition was so strong that he asked not to be assigned there. Fryer was "sure" that this opposition was due to his development and enforcement of the permit system for grazing.

As there is apparently no evidence in the record showing that conditions materially changed between 1942 and 1946, the court finds no difficulty in basing its opinion of defendant's pre-August 13, 1946 conduct on the foregoing discussion. In its role as a trustee, the government had the obligation to manage the Tribe's timber resources in a prudent manner. Nonetheless, as discussed above, the responsibility of prudent management does not make defendant a guarantor or insurer. Further, the government's action cannot be evaluated under present standards but rather must be examined in light of the information and resources available and perceived options present at or during the relevant time.

Utilizing these considerations, the court cannot conclude that the Tribe did not receive the "fair and honorable" treatment to which it was entitled. As the historical material detailed and discussed above illustrates, the government was aware of the problem and took various steps to deal with it. It initially tried mandatory stock reductions, but postponed this approach when it became apparent that they had serious social and economic ramifications. The permit system, together with a gradual reduction of non-essential livestock, that replaced it was undoubtedly beneficial to the range as a whole, although it might not have been of the scope necessary to eliminate the problem completely. Finally, given the central place of sheep raising to Navajo culture and livelihood and the problem of individual *versus* Tribal benefit from the forest, the court declines to find the decision to prefer grazing to timber operations to be imprudent under the circumstances then existing.

The court's finding in this regard is strongly supported by the decision of the Court of Claims in *Oneida Tribe of Indians of Wisconsin v. United States,* 165 Ct.Cl. 487, *cert. denied,* 379 U.S. 946, 85 S.Ct. 441, 13 L.Ed.2d 544 (1964). In that case, individual Indians, probably without the support of a majority of the chiefs and other members of the Tribe, but with the encouragement, approval, or condonation of a significant portion, *see id.* at 495, wrongfully cut and sold tribal timber. Although the government knew of these depredations, the only actions it took against the practice were remonstrations by the agents and the institution of suits against the sellers and merchants who bought the timber, but these were insufficient to stop the practice. The alternatives were some form of Congressional action or the posting of the military to protect the

forests. Not surprisingly, the court did not require this, holding that defendant "did the minimum (at the least) it was called upon to do in the circumstances, to save the timber." *Id.* at 498 (footnote omitted). *See also Prarie Band of the Pottawatomie Tribe v. United States,* 215 Ct.Cl. 1, 6, 564 F.2d 38, 40–41 (1977) (no reason to believe government could have stopped depredation).

Here, the practice of grazing had virtually universal support from the Tribal members and the Tribal council; indeed, the first stock reduction programs were halted in part because of the intense opposition thereto expressed by members of the Tribe.[65] Moreover, the action involved here, *i.e.,* grazing, was not wrongful. Rather, the problem involved factors of economics, culture, and tradition. The court cannot find defendant liable for considering, or even acceding to, the desires and concerns of the Navajo people. As stated by the Court of Claims in the *Oneida* opinion, *supra:*

> The result is that [the court] cannot say that the defendant did less than it was required to do in the situation facing it on the [Navajo] reservation. What the government did was ineffective, but in view of all the circumstances it was not compelled to go further. The Tribe permitted * * * the wasting by its own members of the tribal assets; intervention by the Indian Agents * * * failed to end the practice; it could be stopped only by a more forceful or more far-reaching type of intervention which the United States was not obliged to invoke. [165 Ct.Cl. at 500.]

■ The court has found that defendant's conduct prior to August 13, 1946 (the "cut-off date") did not violate the trustee-like standards imposed by the "fair and honorable dealings" requirement of the Indian Claims Commission Act, *supra.* Since

defendant's conduct up to the cut-off date, the jurisdictional time limit for claims under the Act, 25 U.S.C. § 70k, 60 Stat. 1050, was not wrongful, it therefore cannot form the basis for "continuing wrong" jurisdiction. *See, e.g., American Indians Residing on the Mericopa Ak-Chin Reservation v. United States,* 229 Ct.Cl. 167, 180–88, 667 F.2d 980 (1981), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982). Accordingly, the court need not address events or the ramifications thereof occurring after the cut-off date.

Because the conduct of the defendant was not, for the reasons discussed above, wrongful during the relevant time period, the court concludes that plaintiff is not entitled to any recovery on its regeneration claim. This conclusion and the concomitant lack of "continuing wrong" jurisdiction would normally obviate any necessity for exploring the measure of damages claimed by plaintiff. Nonetheless, in view of the vintage of this case, its tortuous history, and its present posture, the court deems it prudent, in an effort to expedite final resolution of the case, to discuss the issue of damages, albeit in somewhat less detail than would obtain had the court found defendant's conduct wrongful. *Cf. Hatzlachh Supply Co. v. United States,* 7 Cl.Ct. 743, 751 (1985), *appeal dismissed,* No. 85–2501, 120–76 (Fed.Cir. Aug. 12, 1985).

■ Even assuming, *arguendo,* that defendant's conduct prior to the cut-off date could be found wrongful, the court feels any relief should be confined to the estimated 5,000 acres of "regeneration backlog" attributable to the approximately 15,000 acres harvested prior to said date. During this period, the great weight of authority only called for the exclusion of livestock after an area was cutover, perhaps with some pre-harvest exclusion, if possible.[66] Indeed, plaintiff appears to con-

---

**65.** The court in *Oneida Tribe* considered the fact that the parties involved were members of the Tribe to be "the most difficult aspect of the problem." Further, it is clear under that case that the level of support in the Tribe for the challenged practices affects the amount of effort

defendant is required to expend to curb or eliminate the practice. *See id.* at 498.

**66.** It is the state of the knowledge during the time at issue, not that subsequently developed, which is relevant in determining whether a

cede as much in its initial brief, as it states: "[P]rotection against overgrazing by sheep and goats was needed only on those areas harvested * * *." Plaintiff's brief at 46.[67] Thus, the wrong could only occur in connection with logged areas from which stock were not excluded. The corollary is, of course, that no present duty existed with respect to areas not cut over.

The Court of Claims surfaced the continuing wrong or continuing claim basis for this court's jurisdiction in Indian cases over events that occurred after the cut-off date in *Navajo Tribe v. United States*, 218 Ct.Cl. 11, 586 F.2d 192 (1978), *cert. denied*, 441 U.S. 944, 99 S.Ct. 2163, 60 L.Ed.2d 1046 (1979). This court, however, does not view the doctrine as properly applicable to the instant situation insofar as it is relied upon in connection with regeneration claims regarding post cut-off date harvesting.

Except possibly with respect to the 15,000 acres harvested, defendant did not fail properly to manage the balance of the forest concerning regeneration before the cut-off date. On this cut-off date, plaintiff had absolutely no basis for a regeneration claim involving non-harvested areas. Therefore, it cannot form the basis for a continuing claim with respect to events after this date. Nor can the court agree that any misfeasance with regard to the 15,000 cut acres bears a sufficient *nexus* to the other areas cut after 1946 to allow application of the doctrine. Rather, the court views this approach as an attempt at bootstrapping. That is, plaintiff is seeking to recover regeneration damages with respect

to 200,000 acres based on a cut-off date claim that could not have involved more than 5,000 acres. The court does not believe that the continuing wrong doctrine is strong enough to support this 39-fold increase. *See also Navajo Tribe v. United States, supra,* 218 Ct.Cl. 33–40, 586 F.2d 206–09 (Nichols, J., concurring and dissenting).[68]

The parties vigorously dispute the amount of forest in need of generation. Plaintiff claims that as of 1982–1984, 200,000 acres required some sort of treatment, while defendant asserts that the treatment area does not exceed 103,000 acres with no more than 5,000 of these being backlog acres attributable to pre-1946 harvesting endeavors. Experts testified in support of each figure. Given this fact, and the acceptability of the presentations of these experts, the court deems it reasonable, under such circumstances, simply to "split the difference" between these estimates. Splitting the difference is a familiar and permissible technique, especially where the determinations of qualified opposing experts must be resolved. *See Association of American Publishers, Inc. v. Governors of United States Postal Service*, 485 F.2d 768, 773 (D.C.Cir.1973). Thus, the court would likely conclude that 151,500 acres could be deemed in need of regeneration.

The parties also disagree with respect to the ratio of site preparation to planting, the plaintiff insisting that the proper mix is 64 percent planting—36 percent site preparation, and defendant urging 90 percent site preparation—10 percent planting. Since

---

trustee failed to meet its duty. *See* Bogert, *supra,* § 541, p. 163.

**67.** Plaintiff retreated from this position in its reply brief, and at oral argument, arguing that defendant was liable for failing to prevent overgrazing in the whole forest, with the harvest of an acre merely making it the proper subject for artificial reforestation techniques. While control of forest overgrazing in general would obviously have been an ideal solution, the court is of the opinion, viewing the historical material at hand, that the then recommended solution to lack of regeneration was, as outlined above, exclusion of animals from areas cut or likely to be cut.

**68.** Another "continuing wrong" issue concerns the impact, if any, of growth in the commercial forest after the cut-off date. There is evidence in the record supporting a finding of either 270,000 acres or approximately 450,000 acres as the size of the commercial forest before the cut-off date. If the 270,000 acre figure is adopted, adjustments would have to be made in plaintiff's damages. Given the nature of the court's conclusions above and the manner in which plaintiff has set forth its damages, the court does not attempt to resolve this issue, assuming, for purposes of discussion, that 450,000 acres is the relevant figure.

planting ($239.30 per acre) is much more costly than site preparation ($53.50 per acre), these contentions of the parties, each supported by their experts, are easily understandable. The court is of the opinion that the proper ratio should be the 90:10 one advocated by defendant. This view is based, in part, on the 1967 Bureau of Indian Affairs report that recommended remedial efforts in this proportion and similar material in the Tribe's own 1983 10-year Forest Management Plan, which calls for an initial ratio of approximately 90:10, increasing annually thereafter to a 40:10 ratio by 1992. Given the high cost associated with planting, the court does not feel it would have been prudent or necessary to use the higher planting figure. *Cf. Commonwealth of Puerto Rico v. S.S. Zoe Coloctroni*, 628 F.2d 652, 675 (1st Cir.1980) ("There may be circumstances where direct restoration of the affected area is either physically impossible or so disproportionately expensive that it would not be reasonable to undertake such a remedy.") (footnote omitted).

Fortunately, the parties do not dispute the reasonableness of the estimates supplied by plaintiff of $53.50 for site preparation and $239.30 for planting. Applying these figures in the ratio and to the area determined above would result in damages of $10,920,120 (151,500 × 0.90 × $53.50 + 151,500 × 0.10 × $239.30).[69]

The final issue the court would have to address concerns the delayed growth element of plaintiff's Regeneration claim. As an initial matter, the court views this element as largely speculative and conjectural. It was well known, as documented by Pearson in his 1923 study, *Natural Reproduction of Western Yellow Pine in the Southwest*, that a host of factors, in addition to overgrazing, affect the level of regeneration in the forest. Therefore, mere exclusion or regulation of grazing would not necessarily have ensured regeneration. *See Menominee Tribe v. United States*, 117 Ct.Cl. 442, 507, 91 F.Supp. 917, 931 (1950) (even with proper forestry techniques, reproduction is still subject to "the usual risks of nature"—defendant is not "an insurer of the perpetuation of the forest"). In any event, the court would view an attempt to combine these damages for "missing trees" with restoration costs as

---

69. From a damages point of view, plaintiff, in any event, may arguably not be able to recover the $10,920,120 in remedial work costs. The Court of Claims has stated the general rule that: "Where the expense of restoration [remedial costs requested] exceeds the diminution in the market value of the property caused by the lessee's nonperformance, the diminution in fair market value is the proper measure of damage." *Dodge Street Building Corp. v. United States*, 169 Ct.Cl. 496, 499, 341 F.2d 641, 644 (1965) (as quoted in *Gila River Pima-Maricopa Indian Community v. United States*, 199 Ct.Cl. 586, 596, 467 F.2d 1351, 1357 (1972). In this case, plaintiff made no attempt at all to establish the diminution in value to its Reservation lands caused by a lack of regeneration. The diminution in fair market value is the ceiling for restoration or repair costs. *Missouri Baptist Hospital v. United States*, 213 Ct.Cl. 505, 515, 555 F.2d 290, 295 (1977). Plaintiff generally has the dual burden of proving both diminution in value and repair costs. *Id.* at 515–16, 555 F.2d at 296. Having failed to prove the diminution in value, defendant argues that the court must consider that figure as zero. With zero as a ceiling on the cost of repairs, defendant argues that plaintiff is entitled to no recovery on its claim for remedial costs associated with the lack of regeneration. *See generally id.* at 515–21, 555 F.2d at 296–99.

Plaintiff responds that the above-stated general rule that reasonable costs of restoration damages should be limited to the diminution in the market value of the property should not apply in this case. Plaintiff argues that the personal value that its lands hold to the Tribe exempts plaintiff from the diminution rule. *See Commonwealth of Puerto Rico v. SS Zoe Coloctroni*, 628 F.2d 652, 674 n. 21 (1st Cir.1980). Plaintiff also asserts that because there is no market for its land, the reasonable cost of restoring the land to its prior condition is the proper measure of damages without limitation by the diminution rule. *See Feather River Lumber Co. v. United States*, 30 F.2d 642, 644 (9th Cir.1929). It may be that the circumstances of some Indian valuation cases would warrant the application of an exception from the general rule limiting restoration damages. However, in view of the court's ultimate conclusion that this portion of plaintiff's claim is either beyond this court's jurisdiction or that defendant acted in a manner consistent with its fiduciary obligations, the court finds it unnecessary to decide whether the diminution rule should or should not have application under the circumstances at bar.

an impermissible attempt at duplication of damages. Plaintiff simply cannot have the trees replaced and also recover for their value under any theory of damages of which the court is aware.[70] Given the entirely theoretical nature of this approach and the uncertainty these issues involve, the court would likely conclude that $10,920,120 would be a reasonable claim recovery figure for loss of regeneration, regardless of the damage methods used by plaintiff, if liability for the entire claim period were found to exist.

### E. *Sawmill Management—Claim Period 1910–1962*

The government's operation and supervision of the various sawmills on the Navajo Reservation from 1910–1962 is the focus of plaintiff's fifth claim. Plaintiff argues that defendant was obligated to operate the sawmills on the Reservation primarily in such a manner as to generate maximum revenue for the Tribe, *i.e.*, operate them as commercial sawmills. While plaintiff disavows that its position is that defendant was obligated to operate a "commercial" sawmill operation, its approach to this claim, its argument and its damage presentation clearly envision a commercial sawmill operation. One cannot read the reports of plaintiff's sawmill experts and not reach this conclusion. Plaintiff asserts that defendant's operation and supervision of the sawmills was not sufficient to satisfy its fiduciary duties relative to plaintiff's forest lands since defendant failed to realize some $30 million in profits over the claim period from sawmill operations. Essentially, it is this $30 million in profits that plaintiff seeks herein. The damages plaintiff seeks, it must be emphasized, are the profits that would have been realized had the sawmill operations been managed in the manner plaintiff believes defendant was required to manage them.[71] To quantify its profit damage claim, plaintiff's experts created a "model" sawmill, which they felt was a feasible undertaking at all times during the claim period, utilized certain assumptions, and then used the "model" mill and the assumptions to predict the amount of profits that could have been available to the Tribe under their view of prudent management. The profits actually realized during the claim period from actual sawmill operations during this time (approximately $2,500,000, most of which was made after 1946) were then subtracted from the computed hypothetical profits, leaving an amount for plaintiff's Sawmill Mismanagement claim of approximately $30,600,000, which amount plaintiff seeks to recover under its fifth claim. Thus, the claim is not that profits were not realized from the sawmill operations during the claim period but rather that not enough profits, in plaintiff's view, were realized from said operations.

For its part, defendant contends that it had no fiduciary obligation to establish and conduct a commercial sawmill operation for the Tribe pursuant to the 1910 Act or the 1911 or 1918 regulations promulgated thereunder. Defendant also argues that it had no general, non-statutory or non-regulatory obligation to do so. Finally, defendant asserts that the profit damages sought are too speculative, ignore the realities of the times and circumstances, and are based on too many unrealistic assumptions to allow for a profit recovery on the facts of this record.[72]

---

**70.** The "missing trees" measure of damages may also be subject to the diminution in value issue discussed *supra* n. 69.

**71.** According to one of plaintiff's experts on this claim, Dr. Jean Mater (J. Mater), only a "direct loss" of profit calculation was made. That is, no claim was made, for example, for lost wages or other costs. Other sawmill related claims, *e.g.*, Failure to Harvest and Processing of Overmature Timber, are separately stated. The extent to which these claims are duplicative is a matter of dispute between the parties and of concern to the court. The court addresses this concern as circumstances warrant. Generally, however, the court does not view this claim as duplicative of plaintiff's Failure to Harvest claim inasmuch as harvesting the trees and processing them into lumber involve two separated functions or opportunities for value, *i.e.*, stumpage and finished lumber.

**72.** Defendant maintains, for example, that the type of operation envisioned by plaintiff's experts "would not have been feasible from an

The basic history of sawmills on the Navajo Reservation is set out above, *ante* pp. 360–71 (*ff.*), and the various uses to which the lumber sawn was put during a good part of the relevant period are discussed in Part II, subpart B (Unpaid Stumpage), *supra.* Consequently, the court will only relate such additional historical information as is necessary to place matters being discussed in perspective.

As the foregoing introduction illustrates, there are two primary issues involved in this claim. The first centers on the existence *vel non* of an obligation on the part of defendant encompassing commercial development and operation of sawmills on the Reservation. The second concerns the acceptability of plaintiff's experts' calculation of profit damages, assuming the existence of such an obligation and the breach thereof. After review of an extensive record, and careful consideration of the parties' detailed proposed findings and arguments, the court concludes that plaintiff's fifth claim, as presented, must be denied. However, the record as a whole does support some recovery by plaintiff on its Sawmill claim, as discussed, *infra.*

■ An obligation or duty on the part of defendant is the *sine qua non* for jurisdiction under the "fair and honorable dealings" clause of the Indian Claims Commission Act, *supra.* The Court of Claims set out the criteria for a claim under the fair and honorable dealings clause in *Aleut Community of St. Paul Island v. United States,* 202 Ct.Cl. 182, 480 F.2d 831 (1973). The court there stated:

> There must be a showing that the United States undertook an obligation, a "special relationship," the obligation was to the Tribe, that the United States failed to meet its obligation, and that as a result the Tribe suffered damages. [*Id.* at 196, 480 F.2d at 839.]

economic or financial standpoint in the 1910–1946 period."

**73.** This was the rule followed by the Indian Claims Commission as well. *E.g., Blackfeet and Gros Ventre Tribes of Indians v. United States,* 32 Ind.Cl.Comm. 65, 77 (1973) ("Indian reserva-

The *Aleut* holding relied upon an earlier case, *Lipan Apache Tribe v. United States,* 180 Ct.Cl. 487 (1967), which noted that the United States is liable under the fair and honorable dealings clause when "by its own acts, it has undertaken special duties which it has failed to fulfill." *Id.* at 502. *Accord Fort Sill Apache Tribe v. United States,* 201 Ct.Cl. 630, 640, 477 F.2d 1360, 1365 (1973), *cert. denied,* 416 U.S. 993, 94 S.Ct. 2406, 40 L.Ed.2d 772 (1974). *See generally Northern Paiute Nation v. United States,* 8 Cl.Ct. 470, 479–80 (1985).

■ Although the government is generally held subject to a fiduciary duty in its management of Indian property, its trust obligations are not necessarily coterminous with those of a private fiduciary. *See, e.g., Navajo Tribe v. United States,* 224 Ct.Cl. 171, 185, 624 F.2d 981, 988 (1980). Thus, while a trustee is under a duty to make trust property productive, *see, e.g.,* G. Bogert, *supra,* § 611, the Court of Claims has held that the United States does not have a general obligation to maximize income from tribal resources. *Navajo Tribe v. United States,* 222 Ct.Cl. 158, 163, 610 F.2d 766, 768 (1979) ("There is no general obligation, as distinct from an express obligation imposed by statute, agreement, or the like, for the government to make the plaintiff's property productive * * *.").[73] The parties generally acknowledge these guiding principles. Both parties look to statutes and regulations in support of their positions. Plaintiff sees in the 1910 Act and the implementing 1911 and 1918 regulations, as well as the 1936 regulations, a duty or obligation on the part of defendant to make the Navajo forest a commercially profitable venture. Defendant does not see such an ambitious obligation or duty on its part in said Act or subsequent regulations. Accordingly, the court must determine whether there was some specific duty or obligation placed on defendant that in-

tions are not like apartment houses which a trustee is expected to keep filled with the paying tenants at all times. No general law requires the Government to administer Indian land for profit at all.").

cluded development and operation of a commercial sawmill operation on the Navajo Reservation during the 1910–1962 period. *Compare Northern Paiute Nation v. United States, supra,* 8 Cl.Ct. 480 (obligation found) *with, e.g., White Mountain Apache Tribe of Arizona v. United States,* 9 Cl.Ct. 32, 33–34 & n. 4 (1985) (no obligation found).

The 1868 Treaty, 15 Stat. 667, II Kappler 1015 (2d ed.1904), between the Navajo Tribe and the United States is silent relative to any form or manner of timber development on the Reservation. As related above, however, it was not long before Congress realized that Indian forests, as a general rule, could provide, *inter alia,* a source of revenue for the various tribes. This realization culminated in the 1910 Act, which provided, in pertinent part, in Section 7:

> That the mature living and dead and down timber on unallotted lands of any Indian reservation may be sold under regulations to be prescribed by the Secretary of the Interior, and the proceeds from such sales shall be used for the benefit of the Indians of the reservation in such manner as he may direct: *Provided,* That this section shall not apply to the States of Minnesota and Wisconsin.

The 1911 Regulations interpreting and implementing the 1910 Act called for the superintendent of each reservation "to do all in his power to secure a wise and advantageous use of forest resources," including managing it so as "to obtain the greatest revenue for the Indians consistent with a proper protection and improvement of the forests." The Supreme Court has stated that these relevant laws, including the Indian Reorganization Act, *supra,* and the regulations promulgated thereunder "clearly require that the Secretary manage Indian resources so as to generate proceeds for the Indians." *United States v. Mitchell, supra,* 463 U.S. at 226–27, 103 S.Ct. at 2973.

In interpreting the 1910 Act, the court bears in mind that "Indian legislation must be construed in light of the common notions of the day, the assumptions of the draftsmen and the policy which the legislation was intended to execute." *Logan v. Andrus,* 457 F.Supp. 1318, 1324 (N.D.Ok. 1978) (footnote omitted) (citing *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978)). In this regard, the court does not believe that the Congress intended the 1910 Act to require commercial sawmill development and operation. The 1910 Act does not mention any such development, referring only to sales of "mature living and dead and down timber." By contrast, the Act of March 28, 1908, 35 Stat. 51, authorized and directed the Secretary in Section 1 thereof, "to cause to be cut and manufactured into lumber" such mature living and dead and down timber as the forestry service designated (with certain limitations not relevant herein) on the Menominee Indian Reservation in Wisconsin. More importantly, Section 2 of the 1908 Act provided in pertinent part:

> That *the Secretary* of the Interior *shall,* as soon as practicable, *cause to be built, equipped, and operated suitable sawmills, equipment and necessary buildings for manufacturing into lumber the timber cut* under the provisions of this Act, and there shall be employed such skilled foresters, superintendents, foremen, cruisers, rangers, guards, loggers, scalers, and such other labor, both in the woods and for operating sawmills, equipment and necessary buildings as may be necessary in cutting and manufacturing logs and lumber and in the protection of the forests upon said Indian reservation. [Emphasis added.]

It is to be noted that Indian reservations in the States of Wisconsin and Minnesota were excepted from the provisions of Section 7 of the 1910 Act quoted, *supra.* Comparison of the 1910 Act at issue with other Indian legislation, such as the 1908 Act, especially if it is substantially contemporaneous, is a valid and helpful method of determining Congressional intent. *See Logan v. Andrus, supra,* 457 F.Supp. at 1329.

Further, the Act of May 18, 1916, 39 Stat. 123, dealing with the Red Lake Indian

Reservation in Minnesota, also supports the view that the 1910 Act did not contemplate the development and operation of commercial sawmills on the Navajo Reservation. That Act provided, in pertinent part, in Section 9:

[The Secretary of the Interior] is hereby authorized to sell and manufacture only such standing and growing pine and oak timber as is mature and has ceased to grow, and he is also authorized to sell and manufacture form [*sic*] time to time such other mature and marketable timber as he may deem advisable, and *he is further authorized to construct and operate sawmills for the manufacture of the timber into merchantable products* and to employ such persons as he shall find necessary to carry out the purposes of the foregoing provisions, including the establishment of nurseries and the purchase of seeds, seedlings, and transplants when needed for reforestation purposes: * * * *Provided further*, That no contract shall be made for the establishment of any mill, or to carry on any logging or lumbering operations which shall constitute a charge upon the proceeds of the timber, until an estimate of the cost thereof shall have first been submitted to and approved by Congress. [First emphasis added.]

As noted above, Minnesota Indian reservations were excepted from Section 7 of the 1910 Act.

Although subsequent legislation can be used to interpret prior acts, "the impact of such later Congressional expressions depends on their nearness, sharpness, and relevance to the statute or treaty being interpreted." *See Navajo Tribe v. United States, supra,* 224 Ct.Cl. at 198, 624 F.2d at 996 (citing *Securities and Exchange Commission v. Capital Gains Research Bureau,* 375 U.S. 180, 199–200, 84 S.Ct. 275, 286–87, 11 L.Ed.2d 237 (1963); *Waterman S.S. Corp. v. United States,* 381 U.S. 252, 268–69, 85 S.Ct. 1389, 1398, 14 L.Ed.2d 370 (1969)). The court is of the view that the 1916 Act is sufficiently related and relevant to the 1910 Act to be considered and given weight in the court's consideration of the intent and meaning of the 1910 Act.

In light of the 1908 Act and the 1916 Act, *supra,* and their relation to the 1910 Act, *i.e.,* exclusion of their subjects from the provisions of Section 7 of the 1910 Act, the court is of the opinion that the 1910 Act did not contemplate, much less mandate, the establishment and operation of a commercial sawmill operation on the Navajo Reservation.

Nor can plaintiff's effort to impose development and operation of commercial sawmill obligations on defendant be supported by the applicable regulations. As an initial matter, the court does not feel that the regulations can be fairly read as requiring such a full scale commercial sawmill operation. Sections 35–37 of the regulations deal specifically with the production of lumber and are captioned "AGENCY SAWMILLS." The most relevant provision, Section 35, reads, in pertinent part, as follows:

The agency sawmill has important possibilities as a means of training Indians in habits of work, as an incentive to improved housing conditions and other improvements on allotments, and as a source of revenue for the general uplift of the tribe. The gratuitous issue of lumber should be restricted to indigent Indians whose circumstances are such as to make it impossible for them to earn their own living. The cost of sawing timber, cut from allotments, should be paid by the Indians for whom the sawing is done and both the stumpage value and the cost of sawing should be covered by the price at which lumber cut from tribal lands is sold to able-bodied Indians. In lieu of paying cash, such Indians may be allowed to perform work as an equivalent of the stumpage value and the cost of sawing for all lumber which they receive. No profit for the mill should be expected upon timber cut from allotments and brought to the mill by the allottee, nor upon lumber cut from tribal lands and sold to the Indians for their personal use. Upon timber cut from tribal land, manufactured at the mill and

sold to persons other than Indians or to Indians for sale to others, a profit for the benefit of the tribe should be realized. In many instances it will be found most convenient to accept pay for sawing and for stumpage in the form of a toll of the lumber sawn. * * * If the timber is cut from unallotted lands, an additional toll should be taken to cover stumpage. If the Indians who bring in the logs aid in the sawing, an allowance should be made for their wages. However, the practice of requiring or allowing each Indian to aid in the sawing of the logs which he brings to the mill should be discouraged and a regular mill crew maintained as far as possible.

Section 36 provided that "net proceeds" and "any profits" "must be deposited to the credit of the tribe as 'Indian moneys—proceeds of labor.'" The section also contains a statement that:

"The office will recognize to the fullest extent the moral, educational, and general social results obtained through the management of an agency sawmill, but superintendents are urged to bear in mind that the amount of profit realized from the operation will be one test of the mill."

It is apparent, therefore, that the agency sawmills had several purposes. However, it clearly appears that while profit was hoped for, it was not the primary goal, as would be the case if a commercial type operation were envisioned. The agency mills were to issue lumber gratuitously to indigent Indians for personal use, allow others to exchange personal labor at the mill for lumber, and accept payment in kind, i.e., a "toll," from still others. In fact, it appears that a profit was to be realized only when lumber was "sold to persons other than Indians, or to Indians for sale to others." [74] In sum, the language of the regulations is not sufficient to support plaintiff's broad conception of the obligation involved. Rather, the regulations set forth guidelines for managing the generally small agency sawmills that were to be set up and operated at government expense primarily to satisfy the local government project needs on the Reservation and the local needs of the individual Indians. [75]

Assuming, arguendo, that the regulations are to be read as primarily requiring development and operation of a commercial sawmill, the court is forced to reject such a construction as inconsistent with Congressional intent. Since the question was not directly addressed by Congress in the 1910 Act, the question for the court is whether defendant's actions subsequent to 1910 relative to sawmill operations on the Navajo Reservation were based on a permissible construction of the statute. See Chevron, U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). As was discussed above, the court is convinced that the 1910 Act did not contemplate or require commercial sawmill operations of the nature envisioned by plaintiff. The court believes that the surrounding circumstances are such that the Congress would have rejected a construction of the 1910 Act imposing these obligations on defendant. If Congress intended the defendant to manage and operate sawmills on the Navajo Reservation in the manner and fashion advocated by plaintiff herein, it knew how to write such an obligation into a statute as is attested to by the pertinent provisions of the 1908 and 1916 Acts, supra. That Congress failed to utilize any such language in

**74.** Section 2 of the regulations required forestry officers "to acquaint themselves with * * * local markets and the possibilities of developing the same." The court construes "local" as referring to the area in the general vicinity of the Reservation and therefore declines to accept any contention that the sawmills were obligated to attempt to compete on a regional or national level.

**75.** There is not, nor could there be, any argument that the defendant failed to assist or prevented the Tribe from beginning a commercial sawmill operation on its own. At the end of 1910, the starting point of plaintiff's hypothetical mill analysis, the Tribe had less than $2,100 in its Treasury trust account, an amount clearly insufficient to fund a commercial sawmill venture.

the 1910 Act is significant in convincing the court that the 1910 Act placed no duty or obligation on defendant to operate a commercial type sawmill operation as envisioned by plaintiff on the Navajo Reservation during the claim period. Consequently, any regulations to that effect, if challenged, most probably could not have been sustained. The agency that drafted these regulations certainly indicated by its subsequent actions on the Reservation that development and operation of commercial sawmills on the Reservation was not the intent of said regulations.

After careful consideration of the language of the 1910 Act and subsequent regulations, as well as the spirited arguments of the parties, the court is convinced that the general duties set out in the 1910 Act and subsequent regulations, *simpliciter,* are not sufficient to find a specific obligation on the part of the defendant to establish a commercial sawmill venture of the scope envisioned and advocated by plaintiff.

Plaintiff also maintains that defendant was obligated to institute a sustained yield management plan on the Reservation in 1920, including the establishment of a sawmill operation to process into lumber the timber that wasn't sold as stumpage. The court has already held, however, that neither the 1910 Act nor the regulations thereunder set forth a duty to harvest annually the "allowable cut." *See supra* Part II, subpart A.2. Accordingly, plaintiff's sawmill claim cannot be premised on such a theory.

■ Since the government had no legal obligation to establish commercial sawmill operations on the Navajo reservation, the fact that it established "local service mills" cannot be used as a basis for imposing such a requirement. In *Gila River Pima-Maricopa Indian Community v. United States,* 190 Ct.Cl. 790, 798–800, 427 F.2d 1194, 1198–99 (1970), *cert. denied,* 400 U.S. 819, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970), the Court of Claims rejected the argument that the government could be liable for maladministration or failure to provide adequate

facilities merely because it took some actions in that regard. As the court stated: "Affirmative acts such as those allegedly undertaken in our case may lead to liability if they are indeed less than 'fair and honorable,' and if there is a duty owed; they do not, in and of themselves, create that duty." *Id.* at 800, 427 F.2d at 1199. Likewise, in *American Indians Residing on the Maricopa-Ak Chin Reservation v. United States,* 31 Ind.Cl.Comm. 384, 391–93 (1973), the Indian Claims Commission, citing *Gila River,* rejected a claim that because the government had undertaken to provide some irrigation for the Tribe and expressed intentions of doing more, that it therefore had duty to provide an irrigation system capable of maximizing the agricultural potential of the reservation—

> To argue that these gratuitous acts constituted the basis for a greater duty to plaintiff to maximize its economic potential is erroneous; defendant had no legal duty to do more absent any showing of a source of obligation. * * * In the absence of such a duty there could be no breach of any obligation to plaintiff."
> [*Id.* at 393.]

Accordingly, the government cannot be liable for failing to convert the Agency mills into a full-scale commercial operation beginning, at the very latest, in 1920 as contended by plaintiff.

However, the court, given the broad attack by plaintiff on almost every action of defendant relating to the Navajo forest during the claim period, must attempt to ascertain the boundaries of the government's responsibilities with respect to sawmill operations on the Navajo Reservation.

Since plaintiff's calculation of damages is premised upon essentially a commercial operation of the sawmills from 1910 and thereafter until 1962, it cannot be sustained in light of the above conclusion that there was no obligation to operate the mills in this manner. This conclusion would normally obviate the need for a discussion of plaintiff's damage methodology. However, the court feels it prudent to address the damage issue in an attempt to bring an end

to these cases, which have been described as "byzantine in complexity." *See Navajo Tribe v. United States*, 220 Ct.Cl. 360, 362, 601 F.2d 536, 537 (1979), *cert. denied*, 444 U.S. 1072, 100 S.Ct. 1016, 62 L.Ed.2d 753 (1980).

Plaintiff's claim is for the profits it believes would have been made had the mills been operated in the manner it argues was required of a commercial operation. Both this court and its predecessor court, the Court of Claims, have, however, viewed with cautious skepticism claims for lost profits, especially in the case of a new venture. In *Neely v. United States*, 152 Ct.Cl. 137, 146, 285 F.2d 438, 443 (1961), it was noted that lost profits were recoverable where, *inter alia*, "the fact that there would have been a profit is definitely established, and there is some basis on which a reasonable estimate of the amount of the profit can be made." The court also stated, however, that "almost always, in the case of a new venture, the fact that there would have been a profit, had there not been a breach [of contract], is too shrouded in uncertainty for loss of anticipated profits to form a reasonable measure of the damages suffered." *Id.* at 146–47, 285 F.2d at 443. These views were essentially reaffirmed by the Claims Court in *L'Enfant Plaza Properties v. United States*, 3 Cl.Ct. 582, 590 (1983). In that case, it was observed that a new business is "generally precluded" from realizing lost profits for a breach of lease because "its loss is too remote, contingent, and speculative." In 1910 and for some time thereafter, timber operations on the Navajo Reservation can reasonably be viewed as a new venture, especially in view of the financial, economic and social underpinnings of the operation. The Indian Claims Commission, in *Makah Tribe v. United States*, 40 Ind.Cl.Comm. 131, 134 (1977), noted that a tribe must show, *inter alia*, "a reasonable basis" for estimating the amount of damages to recover lost profits.

Two necessary elements for recovery of lost profits are, first, definite proof that they would have been realized and, second, a methodology that gives rise to a "reasonable estimate" of the damage suffered. *Petrovich v. United States*, 190 Ct.Cl. 760, 421 F.2d 1364 (1970), relied on by plaintiff, confirms this statement. The general proposition set forth in the *Petrovich* case, which is well established, is that " 'where the fact of damage has been established, absolute certainty or precise mathematical accuracy as to the amount of damages is not necessary.' " *Id.* at 766, 421 F.2d at 1367 (footnote omitted) (quoting *Dale Constr. Co. v. United States*, 168 Ct.Cl. 692, 729 (1964)). However, where lost profits are sought, both "the fact of damage" and the amount of damages must be well established in order to avoid the dangers of conjecture. Indeed, in the *Petrovich* case itself, the Court of Claims only awarded $10,000 "in the nature of a jury verdict" on a claim for $450,000 as it found that "the evidence falls far short of being satisfactory as to the amount of damages suffered" and thus made the claimed figure "speculative and unsupported." *Id.* 190 Ct.Cl. at 763, 768, 421 F.2d at 1365, 1368. Plaintiff's claim of over $30 million in profits on this record engenders in the court a cautious attitude that conjecture and speculation are real dangers to be reckoned with.

Both parties engaged experts whose projections, as one might expect, favored the party who sponsored them. *See Seminole Indians of Florida v. United States, supra*, 197 Ct.Cl. at 361, 455 F.2d at 545 (Nichols, J., concurring). Plaintiff's experts predicted profits in the sawmill operations they envisioned; defendant's expert predicted losses in plaintiff's envisioned sawmill operations. *Compare, e.g., Marconi Wireless Telegraph Co. v. United States*, 99 Ct.Cl. 1, 50 (1942), *aff'd in part*, 320 U.S. 1, 63 S.Ct. 1393, 87 L.Ed. 1731 (1943) ("party will present to the court only those [expert] witnesses whose opinions in general favor his case").

The court feels both sides were given to overstatement in setting forth their opinions. The presentations by both sides were less than clear and concise. Initial reports

by the plaintiff's experts were subsequently corrected, and the totality of the presentations tended more to confuse than to enlighten. The court merely summarizes below the profit (or loss) positions of the parties.

For the 1910–1919 period, plaintiff seeks to recover profits of $82,000. This figure was reached by plaintiff's experts adopting a profit figure of 15 percent of sales. Plaintiff further assumed that lumber sales of 2,766 MBF per year, except for 1918 when they assumed sales of 5,530 MBF, could have and should have been made from the sawmill operation. Defendant's expert, accepting *arguendo* plaintiff's assumed sales figures, projected a loss of $155,867 for this period. Defendant's expert injected labor and haul cost projections into his analysis, instead of the 15 percent of sales profit approach, and utilized Arizona-New Mexico lumber prices instead of the historical Western Pine statistics. The source for plaintiff's lumber prices was indeed higher than defendant's price source and embraced areas outside the Arizona-New Mexico area.

For the 1920–1946 (August) period, plaintiff seeks to recover profits of $8,737,350 based on a rather complex calculation involving depreciation, investment and other cost assumptions. Plaintiff assumed lumber sales during this period beginning at 9,540 MBF and increasing thereafter to a maximum production of 57,500 MBF, based on assumed double shift production between 1940–1945. Plaintiff also included profits from an assumed box-shook factory (crate boxes) operation. Defendant's expert, again accepting *arguendo* plaintiff's assumed sales figures, but differing with plaintiff's experts in other areas, *e.g.*, price, log recovery (overrun vs. underrun), and interest, ultimately projected a net loss of $4,396,646 for this same period.

For the 1946 (September)–1962 period, plaintiff seeks to recover profits of about $24,194,000. Defendant for the same period predicted a profit of $12,717,681. Again, the experts utilized different as-

sumptions and prices in arriving at these conclusions.

Plaintiff claims a profit of $8,819,350 for the period 1910–1946. From this figure, plaintiff subtracts the profit actually realized by sawmill operations on the Reservation during this period of $20,000, leaving a profit claim for this period of $8,799,350. Plaintiff claims a profit of $33,013,350 for the period 1910–1962. From this figure, plaintiff subtracts the profit actually realized by sawmill operations on the Reservation during this period of $2,416,837, leaving a total profit claim for the 1910–1962 period of $30,596,513.

The court will now address some of the problems it has found with plaintiff's hypothetical profit claim approach. This discussion is somewhat historical in nature and does not purport to cover each and every disagreement between the parties regarding assumptions or methodology. In addition, the discussion will tend to focus more on the situation as it was and less on plaintiff's conception of what it "should have been." This is done because the regulations clearly envision the possibility of making some revenue for the Indians from the operation of Agency mills. Construed in this manner, the regulations are valid inasmuch as they are neither unreasonable nor inconsistent with the 1910 Act as interpreted in this opinion. *See, e.g., Collins v. Donovan*, 661 F.2d 705, 708 (8th Cir.1981). As a result, they can form a basis for holding defendant liable to the extent its conduct falls short of being "fair and honorable."

The primary purpose of the Agency sawmills was to furnish lumber for government and Indian use on the Reservation. While not crystal clear in the record, the totality of the record supports the view that the sawmills were provided, for the most part, to save the costs associated with purchasing processed lumber. A reasonable reading of the 1910 Act and subsequent regulations shows it was intended that the government and members of the Tribe would generally have "first crack" at

the sawmills' output, with only the remainder available for outside sale.[76]

During the early years of sawmill operations after 1910, the record indicates that the overwhelming bulk of the lumber produced was used on the Reservation. The record also indicates that "local" demand during this period was so high that any increased output would have been similarly utilized. A September 15, 1922 Forestry Memorandum reported as follows:

> The Navajos are calling each year for as much lumber as can be manufactured by the Agency sawmill, to say nothing of the needs of the School and Agency. For the past three years with the great amount of building operations under way nearly all of the annual output has been required for that purpose.

A February 7, 1916 letter to the Commissioner of Indian Affairs noted that the annual output of the government was limited to 500 M.B.F., so that it would take 33 years at maximum output before enough lumber could be sawn to provide a house for each Indian family, without even considering other lumber needs on the Reservation. In addition, the letter alluded to the fact that funding for increasing sawmill capacity would not have been available.

A 1918 inspection report urged the purchase of "at least two portable sawmills" in order that the Indians could be provided lumber "with which to build homes." This request was refused based on prior reports of the inefficiency of the mills under, and the supposedly uncooperative spirit exhibited by, Superintendent Paquette. However, by letter dated May 27, 1912, Paquette had previously instructed the Reservation's forester, who was initially put to work as a carpenter, to assume primary responsibility for lumber operations. Thus, the record is

unclear as to whether Paquette's uncooperative attitude was of a short or long duration, or was an unwarranted charge brought about by lapses in subordinate employees to whom were delegated certain responsibilities. In any event, the loss was of timber for Reservation use, not for sale. That is, whatever shortcomings there may have been in the Superintendent's administration, they did not result in the Tribe being unable to participate in the commercial lumber market. Other obstacles, *e.g.*, capital, stood in the way of aggressive commercialization of the Navajo forest in these early years.

A February 25, 1924 letter stated that "there is a great demand for lumber throughout the entire San Juan jurisdiction." This demand came from two sources—the Indians, who wanted lumber for their irrigation projects and homes; and the Agency, "which need[ed] lumber for sundry purposes," including bridges and culverts on the Reservation's road system.

It is true that the government contracted out operation of the mill near Toadlena to a Mr. Bloomfield during 1919–1920. When the circumstances surrounding this are investigated, however, it again becomes clear that the Tribe was deprived of no commercial revenue thereby. Lumber was needed for highway construction pursuant to an appropriation. The Toadlena mill was near the construction area, but too far removed from Agency headquarters "to enable the Superintendent to give its operation the close supervision required to get out lumber promptly; furthermore considerable difficulty ha[d] been experienced in employing sufficient competent labor for this purpose." Although the contract was advertised, Mr. Bloomfield was the only bidder. Nonetheless, his bid was "cheaper than the

---

**76.** The court rejects any broad contention that the government usurped a Tribal opportunity by using manufactured lumber itself rather than selling it. To the extent the lumber was used for projects benefitting the Tribe, it is clear that such use was permissible. To the extent the lumber was used for strictly Agency purposes, the only compensation the Tribe was entitled to was for stumpage, an issue dealt with above,

Part II, subpart B, with respect to pre-1936 cutting, and to be dealt with hereinafter regarding stumpage cut after this date. The court simply refuses to hold that the government must pay a sawmill profit to the Tribe for timber manufactured at government expense on government equipment for Indian use or benefit or for purposes incidental to management of the Reservation.

Government itself can operate the mill." Another advertisement in 1920, which was "quite extensive," also resulted in a bid only from Mr. Bloomfield. The reason given for the absence of other bids was "the great distance [of the Agency's Toadlena mill] from the railroad." (Mr. Bloomfield lived in a close proximity to the Toadlena mill.) If outside concerns wouldn't even bid to operate the government mill to furnish lumber on the Reservation, it is difficult to conceive of how it could be operated profitably relative to the sale of lumber outside the Reservation. In 1924 it was noted that the Toadlena mill was generally left idle except when operated for government purposes. However, a suggestion was made that the mill be operated on a "toll" basis to supply the needs of Indians since they lacked the money to purchase lumber outright, and the mill was, *inter alia,* too small for efficient commercial operation. It is not clear from the record whether or not this suggestion was implemented.

The problem of rail access was mentioned in earlier and later reports as well. A 1910 General Investigation report observed that there was a large quantity of timber "of which no use can be made at present with any degree of profit except for local purposes on the reservation, owing to the lack of railroad facilities." It was also noted in an October 17, 1916 report that the Agency sawmill was so important because the cost of shipping manufactured lumber in "would be prohibitive." Although the court has been unable to find the original document in the voluminous record, one of plaintiff's exhibits, *History of the Navajo Commercial Forest* at 47, quotes a 1914 letter to the effect that a timber sale would probably not be possible in the near future for two reasons. First, "[t]he distance for [sic] the railroad to the Navajo Forest is about fifty-five miles and no means of transportation exist between the forest and a possible railroad outlet." Second, it was unlikely that a sale could be consummated "at an advantageous and attractive price" since three large sales were taking place near the Reservation in areas with superior transportation systems that were likely serving the local markets at a price against which the Agency couldn't compete. Again, in 1926 it was reported that there was then no timber sale in effect and "[c]onsidering the distance from a railroad point and other economic factors, it will probably be a number of years before it is possible to make a sale of any size." Also, Fryer, the former superintendent of the Navajo Reservation, testified that he didn't think that a Navajo mill "could have competed with the big mills on the railroad" during the 1920–1940 period.

Finally, when, in connection with a June 2, 1944 report on the new mill, an inspector questioned the practice of contract sales to a single purchaser, he was advised that "[t]he Navajo Indian Mills have no facilities for hauling the 52 miles from [sic] railroad and loading on cars."

There is conflict in the record as to whether or not the price used by plaintiff in its hypothetical profit computation, *viz.,* F.O.B. mill, was reasonable. Plaintiff claims that the use of average lumber prices took into consideration, on the whole, the increased expenses of transportation from any given location, while defendant claims that the easy rail accessibility of other mills in the area would have impeded the ability of plaintiff's hypothetical mills to compete. The court agrees with defendant based on the record as a whole. It is difficult to accept the view that buyers would purchase lumber from the Navajo mills unless the price charged accounted for their transportation disadvantage *vis a vis* the other area mills.

Another problem present during the claim period was a general lack of funds. Twice in 1925 the Superintendent had to make application for funds in order to continue operation of the mills. This problem is also reflected in a June 6, 1936 letter to then Superintendent Fryer as follows:

At the present time there is a considerable demand and dire need for lumber on the Navajo Reservation, but because of the peculiar financial set-up of the saw-

mill it is impossible to furnish lumber to anyone who has not sufficient money to pay in advance for an operation extending over a considerable period of time. At the present time there is a considerable amount of lumber at the mill which is owned and controlled by Government Agencies such as "ECW", "SCS", and "Schools". This lumber does not belong to the mill. It is owned, and was paid for, by the Government Agencies. We have no right to sell any of it to any Indian regardless of how badly he may need it; nor have we the available funds to operate the woods or the mill so that we can produce lumber which could be sold to the Indians.

The situation is that this mill can only be run when some one wants to put up the money for the operation. When some one wants lumber badly enough to advance money to put the mill in running condition, and pay wages, we operate.

Thus, in the period between 1910 and 1936 the situation was such that any reasonable increased output from the mills would most probably would have been used for Reservation purposes.[77] Also, it is doubtful that operations could have been enlarged for greater timber productivity because of the continued critical shortage of funds. As indicated in the discussion of the Failure to Cut claim, Part II, subpart A.2, *supra*, defendant was not obligated to cut the 28 million board feet of lumber per year from 1920 on. This 28 million board feet was a critical factor in plaintiff's profit calculation. Without this figure, plaintiff's profit damage computation falls. Further, any putative sales would have been difficult to consummate at an attractive price in light of the mills' locations and attendant transportation problems.

There are also two other major factors relative to consideration of the viability of plaintiff's profit computation that must be taken into account, *i.e.*, Indian worker efficiency and the southwest commercial timber market during the claim period.

Plaintiff's profit calculation rested on teh assumption that the Navajo workforce operated on the basis of an efficiency rate of 100 percent. That is to say, plaintiff argues it is proper to assume the Indian workers were as productive as average sawmill laborers. Defendant argues that the actual efficiency rate of Navajo workers was closer to 70 percent, *i.e.*, they were 70 percent as efficient as average sawmill laborers. The court finds that the weight of the evidence favors defendant's position. One of plaintiff's sawmill experts (J. Mater) based her opinion that there would be no relative inefficiency in plaintiff's hypothetical mill on her experience working with non-English speaking and untrained persons in relatively underdeveloped areas of the world. Further, to the extent that any inefficiency continued for more than a short period of time, J. Mater felt the blame therefor would rest on poor management. Fryer, who had a wealth of experience with the Navajo people, testified that:

> About 30 percent of the adult time of the male Navajo is spent in some activity related to ceremonies, which is an activity related to his religion. * * * Navajo workers are extremely industrious, but unavoidably and inescapably they had an obligation to ceremonialism *per se*, to their religion. And that explains why any notion that you'd have 100—I think I heard her [J. Mater] say 100 percent attendance; impossible.

The labor problem is reflected in more detail in the Navajo Annual Sawmill Report for the fiscal year ending June 30, 1945.

**77.** At oral argument, plaintiff claimed that lost profits were, in part, a reasonable method of approximating the damages suffered by the Tribe by not having lumber available for use by its members. While this may not be a completely unreasonable position, the court observes that the requirements of the regulations that this lumber be issued "at cost" or gratuitously would, as a matter of fact, affect the actual profitability of the mill and thus the amount of funds available for mill expansion. Moreover, the position cannot be sustained as regards lumber to be used for government purposes as there is no connection between these activities and the Tribe sufficient to support a profit recovery on the facts of this case.

This report made the following observations:

> It is not advisable to acquire this [proposed] tractor unless skilled operators are provided. The majority of the present tractor breakdowns are caused by the poor handling of the equipment by the operators. New equipment cannot cure this trouble.

> \* \* \* \* \* \*

> Indian labor is always plentiful in the early part of the summer. In the fall a scarcity of labor results in the abandoning of brush disposal work. The hourly wages start at 40¢ and are generally lower than in other mills. An effort has always been made to move Indian labor into more responsible and better paid jobs as much as possible. The lack of adequate skill as a result of this policy is frequently the cause of costly breakdowns and lower efficiency. Under these conditions it is not possible to pay as high wages as are generally paid in the southwestern sawmills.

> There is only a small group of about thirty Indians who make the sawmill work their primary occupation. The mill can more or less depend on these few for labor. The others work at the mill sporadically. Some 300 Indians get employment at the mill during a year, and yet no more than 150 are employed at any one time. Men leave the sawmill work for any reason whenever they are so inclined. At certain times of the year the majority of the Indians leave for celebrations, ceremonial dancing, pinon gathering, lambing, etc. This requires frequent closing of the mill for several days. Sometimes for many weeks the mill is operated only for two or three days a week due to the lack of labor. This

increases the cost of operations considerably and precludes the possibility of paying as high wages as other mills are paying. Higher wages have a tendency to reduce the number of work days per year per man and increase turnover.

Further evidence is found in a 1974 report on the Navajo Tribal Mill (NFPI), built in 1962, which noted the following:

> Much difficulty was experienced in an endeavor to operate the mill—it was a difficult job converting Navajo background—known today as "acculturalizations" to 8-hour day standards. Management was confronted with situations not comparable anywhere else in the United States. Also, Navajo (Indian ways) celebrations, squaw dances, rodeos, sings, healing ceremonies, deaths, marriages were problems no other sawmill operator in the United States was aware of and this necessitated extra crews on standby which was not normally encountered in the industry. This applied not only to the mill operations, but the wood operations also. These problems carried over to the new mill operations and are a bane of management.

As can be seen from some of the examples given in the above reports, the occurrences responsible for the absences were not of a type that could be easily predicted and scheduled, nor were they of the type that management could obviate by firing the workers, since the only available replacements were also Indians with the same proclivities.

In light of this evidence, the court concludes that an efficiency rate of 100 percent is unwarranted and that its use by plaintiff operated to overstate considerably the putative profitability of its hypothetical sawmill operations.[78] Simply put, the

---

**78.** This error is magnified and carried forward when one recalls that plaintiff's experts relied upon the profits produced during the early years of operation, *i.e.,* 1910–1919, to fund the major expansion of its hypothetical mill in 1920. In its hypothetical development of the sawmill enterprise, plaintiff's reinvestment of prior hypothetical profits further distorts the viability of the profit picture it was painting.

The Indian efficiency problem also makes it even less likely that the mills could, as plaintiff's expert (J. Mater) testified, cut at night and on weekends to supply the timber called for in plaintiff's profit calculation. Night work, the record indicates, was not a thing the Navajo worker was likely to do.

court, on this record, cannot find that the original mills, no matter how well set up, could produce merchantable timber, above and beyond the Reservation's needs, in the amounts and for the costs assumed by plaintiff in its claim. Moreover, the court does not believe the government was responsible for changing the social and cultural customs of the Tribe and therefore rejects the contention that acceptance of these customs and mores relative to mill operations can form the basis for wrongdoing charges.[79]

A close examination of plaintiff's profit approach shows that plaintiff's hypothetical enterprise could have lost some $8,572 between 1910 and the end of 1916, accepting all factors utilized by plaintiff in its profit computation other than efficiency, *i.e.*, that the lumber could be marketed and sold at the prevailing rate determined by plaintiff (no haulage discount), that 5 percent (not 7 percent) properly represents the costs of sale, and *without* taking into consideration the value of stumpage. Plaintiff offers no explanation as to how these initial operating deficits would be funded.[80] Although other calculations, utilizing different assumptions, showed a potential profit during the same period, there is no way, given the record in this case, to determine conclusively which of these approaches is correct, or even which is most likely to be correct. Consequently, they serve as an excellent illustration of the speculative nature of plaintiff's damages methodology. A virtually conclusive showing of the difficulty of arriving at acceptable profit figures regarding this claim occurred during oral argument when plaintiff's counsel stated that the record supported profit figures of between $11 and $33 million, and when plaintiff appeared to concede that it might also be reasonable to cut the profit predicted by the Maters in half, to $16.5 million.

The second factor to be discussed is the commercial timber market during the period 1910–1936. Plaintiff strongly asserts that there would be no difficulty in marketing the volume of timber produced by its hypothetical sawmill, although it suggests it might at times sustain some operating losses. Defendant vigorously disputes the point that plaintiff would be able to market the amount of timber envisioned by plaintiff.

At the beginning of 1910, the starting point of plaintiff's analysis, there were 99 sawmills in Arizona and New Mexico. By the end of 1913, however, this number had dropped to 42, and it did not reach 99 again until 1927. One of the founders of a large lumber company, James G. McNary, reported on a depression in 1921–1922 in the Southwest and its adverse affect on lumber operations in this area in his autobiography, *This is My Life* p. 156 (1956). An April 1, 1926 letter to the Commissioner of Indian affairs from the Jicarilla Indian Agency spoke of the "somewhat depressed market conditions" in the area. Indeed, the record indicates that in 1921 the price of lumber in Arizona and New Mexico began an almost continual decline until a low point was reached in 1933. During the early part of this period, *i.e.*, 1920–1923, the Fort Apache mill, an established enterprise, lost money and was bought out, apparently while in a

---

**79.** Plaintiff's simple approach that efficient management would have fired the inefficient worker or replaced Indian workers with non-Indian workers loses sight of one of the purposes of the sawmill operation, *i.e.*, to train Indians in the work ethic, a goal that would not be realized by firing them or replacing them. Such a sociological purpose subsumes a pure profit purpose in the sawmill operations. See the discussion, *supra*, on the purposes of the 1910 Act and subsequent regulations. More importantly, the record does not engender a belief that non-Indian workers, at the wages being paid, were readily available for mill work on the Reservation.

**80.** Still further evidence of plaintiff's tendency to overestimate productive capabilities is found in the trial record. An analysis by defendant's expert, Llewellyn Kazebee (Kazebee), of production by plaintiff's hypothetical mill at various times during the 1941–1962 period versus production by the Navajo's Tribal mill (NFPI) in 1965 indicates that the hypothetical mill would purportedly have produced 19 percent more lumber than the existing NFPI mill with only half the labor force. This is simply unrealistic and serves to cast further serious doubt on the viability of plaintiff's profit computations.

state of receivership, by the Cady Lumber Corporation. The Cady Corporation, which had made a veritable fortune lumbering in the Southeast, engaged in significant reconstruction of the Fort Apache Mill and imported experienced labor from back east. Nonetheless, this well established and experienced lumber company experienced difficulty in making a profit in the Southwest. The record also shows that the actual volume of lumber produced in New Mexico and Arizona dropped off quickly after 1927 until 1933, when it was at approximately 38 percent of the 1927 level. Moreover, of course, the somewhat lasting effects of the Great Depression cannot be overlooked in considering hypothetical profits in this period.

In short, the commercial lumber market in the Southwest area that would be served by the hypothetical mill that plaintiff envisioned during the 1910–1940 period was a rather fragile and risky one. The likelihood of making a profit from a commercial sawmill operation in this area during this period was not assured or even probable.

Plaintiff strenuously contends that its exemption from taxes and its ownership of its timber supply were major factors supporting its optimistic profit predictions. Plaintiff complains that defendant minimized or completely ignored these major factors in its analysis. While these factors undoubtedly would have operated in plaintiff's favor, they would have been counterbalanced to some extent by the requirements in the regulations of the mills providing lumber free to indigent Indians and the exchange of labor for lumber in other cases. Moreover, the court's discussion, *supra*, was not intended to prove that it would have been impossible for the mill to have performed and succeeded in the general manner predicted by plaintiff, but rather to show that because of the existence of other conditions, principally economic, financial and social, such success on the scale predicted by plaintiff was most improbable.

With the depression period behind, Fryer, as Superintendent of the Reservation, looked into the possibility of obtaining additional revenues from the Navajo forest. However, such an undertaking required capital—a commodity lacking to both the Agency and the Tribe. The existing Agency mills had been adequate in meeting most of the local lumber needs of the Reservation, but if additional jobs were to be obtained for the Tribe, larger mills would be required. Absent capital, Fryer had several small Agency mills consolidated to erect a larger sawmill, which, it was hoped, would enable the sawmill operation on the Reservation to test the commercial venture waters on a small scale. Before doing this, Fryer had searched the market area from Albuquerque, New Mexico to Flagstaff, Arizona and found that big sawmills were already established there. However, the timber and lumber markets were emerging from the doldrums of the 1920–1934 period, and expectations were promising in the forest industry by the mid and late 1930's.

Fryer recognized that competition might defeat his plan to enlarge sawmill operations but decided to go forward with it because such an enlargement of the sawmill operation would open up more jobs for the Navajo Indian and if a profit could also be made all the better. Fryer was genuinely interested in providing for the interests and welfare of the individual Navajo. Fryer also made concerted efforts to obtain capital by all possible means relative to enlargement of the sawmill operation. At this time, there still was no money available to construct a spur railroad to connect the Navajo forest with an established railway, and Fryer recognized that because of the economic times, past and present, he would not be able to obtain Agency funds to build such a rail spur, and the Tribe itself had no funds to do so. Without transportation access from the forest to a rail head, true commercialization of the Navajo sawmill operation would be most improbable.[81]

---

**81.** What effect the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 461 *et seq.* (1983) had on

Agency efforts to enlarge sawmill operations on the Reservation at this time is unclear on this

On or about July 1, 1936, the sawmill began operating on a "semi-commercial basis" as an activity of Indian Money, Proceeds of Labor. Funded in part through loans and grants, the mill produced lumber for both Reservation use and sales, although it appears that the majority of the lumber produced went for Reservation purposes. Notwithstanding the various sources of funds, including the use of Tribal monies, the mill suffered from a shortage of operating capital that forced it to cease operations at times.

The 1936 mill, as indicated above, was created by consolidating the remains of several old mills that had been operated on various parts of the Reservation. This equipment was near the end of its useful life, however, and by late 1938 the forester in charge reported that continued operation would be impossible because of the dilapidated condition of the sawmill and woods equipment. He recommended that the sawmill be liquidated, indebtedness paid off, and the worn out equipment junked. He also asked for a direct loan for the construction of a new mill. The 1936 mill ostensibly generated a profit of $11,500 between the start of semi-commercial operations and January 1, 1940.[82] The court questions whether this was a "true" profit in light of a later report questioning a claim of profit for calendar years 1938–39. In a January 22, 1945 letter to the Commissioner of Indian Affairs, Harlow E. Burt, accountant and auditor, expressed the following sentiments:

> record. As indicated previously, the Tribe voted against the applicability of the provisions of this Act to the Reservation, primarily the grazing provision (25 U.S.C. § 466). That provision also contained the directive to the Secretary of Interior to operate and manage Indian forestry units on the principles of sustained yield management. Fryer's testimony indicated he was under no statutory or regulatory duty to enlarge the sawmill operation to a semi-commercial basis. He was motivated to do so by his concern for the welfare of the individual Navajo Indian. See in this regard *Gila River Pima-Manicopa Indian Community v. United States,* 190 Ct.Cl. 790, 798–800, 427 F.2d 1194, 1198–99 (1970), *cert. denied,* 400 U.S. 819, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970); *American Indians Residing*

* * * It is my opinion formed, from an analysis of early expenditures, that the mill did not make any profit from manufacturing lumber during those years. Considerable quantities of lumber were supplied to government and Tribal activities at a very low price, other enterprises benefited as a result.

Profit and loss accounting was not possible under the circumstances. Stumpage and depreciation were not factors in sawmill accounting at that time. Slash disposal at the mill was a part of the [government financed] Land Management Program.

On the other hand, defendant does not dispute the amount, and even cites it itself, presumably as evidence of effective management. Since the regulations, *supra,* require that profits from the mill be deposited in the IMPL account, defendant is liable for this amount unless it has a satisfactory explanation regarding its ultimate disposition. The court is convinced that this explanation is supplied by a July 1944 report on the Navajo Tribal Sawmill Enterprise, which shows that all of the assets of the "semi-commercial" mill were made available and used for the construction and operation of a new Tribal mill.

In connection with the development of a new mill, the Tribe applied for and received a loan of $50,000. The terms of this loan required that the Tribe waive $15,253.20 in accrued stumpage fees, said amount to be used for construction of the mill, and that it also waive stumpage payments until the loan was paid back.[83] Combining this $50,-

*on the Maricopa-Ak Chin Indian Reservation v. United States,* 31 Ind.Cl.Comm. 384, 391–93 (1973).

**82.** Plaintiff claims that the actual profit figure for this period was $177,932. This "profit" figure embraced a host of factors. It contained a dollar factor for "benefits" to the Indians produced by the mill, savings to the government, employment salaries, and the value of the fixed assets, which wouldn't give rise to profit except upon liquidation. Of the $177,932 figure, only $11,500 can truly be characterized as profit.

**83.** Plaintiff appears to claim that the waiver of stumpage while this loan was outstanding benefitted the government, at the Tribe's expense, in

000 loan with the assets of the "semi-commercial" mill resulted in a total of $92,-997.16 available for development and maintenance of a new sawmill operation.

Purchase and installation of the equipment took place between November 30, 1939 and July 22, 1940; the mill opened formally on the latter date. The capacity of the new mill was estimated at 40,000 B.F. per single shift. Plaintiff claims that the mill was built without any previous study of the available water in the area. While this may be true, it does not appear that lack of water was raised as a major problem until late 1950, and even then it was stated that the "water shortage has not seriously affected mill production" and that the "situation has been looked into thoroughly and steps are being taken to improve the water supply at the mill." Consequently, the court fails to see how defendant's failure to study the issue resulted in meaningful harm to plaintiff.

Unfortunately, the new mill suffered, as did its predecessors, from a shortage of funds. Less than four months after the start of operations Superintendent Fryer had to ask for a deferment on some of the loan obligations due to a shortage of operating capital. This shortage resulted from two factors. First, "[t]he market for green lumber (direct from the green-chain) which existed when the loan application was made, and which made the amount included in the loan appliaction [sic] for operations seem feasible, had ceased to exist even before the mill was completed." As a result of this, considerable inventory, i.e., capital, had to be tied up while the lumber air dried. The second reason is set forth in Superintendent Fryer's November 8, 1940 letter to the Commissioner of Indian Affairs requesting the deferment, to wit:

some relationship to the approximately $179,-000 actually waived during the period. It appears reasonably clear to the court that this requirement was imposed to free capital for mill improvements and operations; there is no evidence that the waiver provision operated to generate benefits for the government in the form of lower lumber prices. Thus, the court

The portion of the loan set aside for construction was inadequate to complete the mill as an efficient unit. For instance, it was necessary to eliminate a slab slasher, lath machinery, resaw, boiler house and additional dry kilns. Construction funds were inadequate due to a rapid advance in cost of materials which occurred between the time plans were made and authority was granted by the Washington Office to go ahead. The original amount of funds requested was the minimum which appeared feasible for the type of operation to be undertaken. It was also realized that if a larger amount of money was requested, it was very doubtful if a loan would be granted.

Plaintiff does not appear to claim that defendant should have anticipated either of these problems, or that it was unreasonable for it not to have done so. Accordingly, defendant cannot be held liable for any damages flowing from these later developments. See Bogert, supra, § 541, at 163. Moreover, as regards the initial financing amount, the last sentence of the above quoted paragraph indicates that the highest initial level of financing had been acquired.

The penultimate paragraph of Superintendent Fryer's November 8, 1940 letter illustrates the difficulties faced by the sawmill and his desire and intention to see them overcome:

We have in the past, and are still trying very hard to make this mill stand on its own feet. However, we are attempting, on too limited capital, to meet commercial competition with untrained personnel, and at the same time, gradually build up to efficiency a mill which at the present time is inadequately equipped.

After Fryer consulted the Tribal Council, the Tribe applied for and received an addi-

views the requirement as a reasonable attempt to ensure the viability of the mill during its early years of operation. This conclusion is supported in a March 6, 1945 report on the sawmill which observed that "[s]tumpage money was used to build additions, and to improve the plant, as well as housing facilities for sawmill workers."

tional loan of $165,000 in 1941 to improve the mill and relieve the operating capital problem. Plaintiff asserts that the reason underlying Fryer's push for and the government's approval of the loan was a desire to secure lumber for the national defense, *i.e.*, self-interest, rather than so that the mill could be run for the benefit of the Tribe. This assertion cannot be accepted. While it is undoubtedly true that the defense effort stood to benefit from additional lumber, it is clear to the court that the primary motivation was to improve the situation for the Tribe. In his letter of March 22, 1941 in support of the application, Fryer listed eight categories of benefits to be realized from the loan. Of these eight benefits, five would favor the Tribe or its forest and two would favor individual Navajos. The other category was contributing to National Defense. It would seem that Fryer felt that "waiving the flag" at that time would not hurt the changes for getting the loan. The March 22, 1941 letter also stated: "The mill has been in operation for several years and has made a small profit each year. Most important, however, is the fact that it has provided work for a number of Navajo Indians who would otherwise be on relief rolls." Indeed, the list of benefits indicates that by far the largest factor was the employment of Indians.

Notwithstanding the influx of additional funds, plaintiff complains that the Tribe was unable to participate fully in the lumber market of the time and that the mill operated at much less than capacity. The record indicates, however, that the shortfall can primarily be attributed to a labor shortage during the war years, although there were other factors involved as well. On the other hand, there is no evidence that the mill was failing to fulfill its objective of providing employment; as of 1945, the mill was employing 150 men, or almost 75 percent of that projected under plaintiff's model.[84]

Plaintiff seizes upon a June 2, 1944 observation report by a Willis Shull (Shull), then manager of the Red Lake Indian Mills, as evidence that the government failed miserably in its management of the Tribal sawmill.[85] Shull's report was exceptionally critical of the prior mill manager, who was replaced on December 1, 1943, a man whom he felt "did not understand his job, and was entirely unfitted for it." On the other hand, Shull approved of the new management team. Shull pointed out various shortcomings in the mill, but generally characterized it as "a successful attempt to build a sawmill with practically no capital. * * * All the machinery is in good shape and well laid out." To be sure, there were problems at the mill, such as poor yarding practices and a failure to supervise some workers closely enough to prevent waste in operations. These and other problems doubtlessly resulted in an enterprise that was, during the period, less profitable than

---

84. At five different times during the 1910–1962 period, plaintiff's model mill operation switches from single to double shift operation to produce the lumber putatively sold during the respective year. It should be noted that a serious question is posed as to whether double shift operations would be compatible with the desire to provide steady employment for the Indians. Double shift operations for periods of time might conceivably have been followed by mass lay-offs during no work available periods. Moreover, double or single shift operations are management judgments that must be made under existing circumstances. Hindsight assumptions relative to profit calculations as to double shift operations when such operations were not conducted previously is clearly speculative. Moreover, according to Fryer, who was in a position to know such things, if double shift operations required night work, the Indian work force would balk at such work.

85. Plaintiff cited other reports and observations from various times in support of its proposition that mill management was, as a general rule, severely lacking. The evidence included a circa-1885 letter, the relevance of which is questionable, at best, complaining of the deterioration of the 1880 mill, some reports from the early part of the claim period regarding the poor condition of mill equipment, inefficient set-up of machinery, or personnel problems, some of which are addressed above, and later reports, *i.e.*, 1930–1946, also regarding poor equipment or incapable personnel, as well as poor location, some of which are, again, discussed above. These indications of fiduciary shortcomings are addressed *infra*.

it otherwise might have been. Mr. Shull was also critical of various pieces of equipment that had been bought with the loan proceeds and regarded some of them as virtually worthless. Nonetheless, one cannot properly characterize the $165,000 loan as "[w]asted" as plaintiff does, and the court finds it exceedingly doubtful that the sawmill operation could have survived without it.

In concluding his report, Shull noted "there is no simple solution of the problems confronting the operation, and the mistakes of the past will have to be corrected one by one * * *." He also observed that the present managers "both have discussed the present deficiencies of the sawmill, and [are] in general agreement on the corrections to be made, and have been making many improvements and corrections."

The final evidence cited by plaintiff is a January 20, 1946 government memorandum that contained the following sentiments: "The past history of [the sawmill] project is a rather serious reflection in the management of the enterprise by [the] Navajo Agency. The purchase of poor equipment cannot be justified. I am convinced that this project needs a competent manager." Although no other material with respect to this issue was presented by either party, it appears reasonable to the court to conclude that satisfactory steps were taken in this regard. Indeed, the crux of plaintiff's complaint for the post-1945 period seems to be that defendant failed to process annually an amount of lumber equal to the allowable cut. Plaintiff attributes this shortfall, in part, to the allegedly inadequate and inefficiently designed 1940 mill, but the court finds that the mill, while not necessarily representing a perfect utilization of funds, was, for the most part, an adequate facility, given the financial constraints under which defendant had to operate. Moreover, plaintiff's approach here is, in essence, a restatement of plaintiff's basic theory of recovery—*viz.*, that defendant had an obligation to construct a commercial sawmill for the Tribe. As previously discussed in detail, however, the court has held that defendant had no such

obligation. Accordingly, the court holds that plaintiff's sixth claim ended on or before August 13, 1946.

In sum, then, the court has held that defendant cannot be held liable because commercial sawmill operations did not develop in the manner advocated by plaintiff. Moreover, the court has found that the approach taken by plaintiff in predicting the success of its hypothetical enterprise was an unreasonably optimistic one. Although there were factors that would have placed a Tribal mill at somewhat of a competitive advantage, e.g., no taxes, Tribe-owned timber, there were other factors that cut in the opposite direction, e.g., location of mill, manpower-efficiency, lack of capital, free lumber obligations. Additionally, in light of the economic uncertainties that existed at various times during the claim period and which undoubtedly affected lumber market conditions, e.g., the Great Depression, the court is of the view that plaintiff's approach benefitted greatly by hindsight planning and predictions. In order for the commercial sawmill operation envisioned by plaintiff to have had any degree of success, it would have been necessary to have capital to underwrite its development. The record makes it clear that such capital was not available for any such development prior to 1946. This fact is reason enough to reject plaintiff's hypothetical mill as a basis for a profit award of some $30 million.

On this record, it cannot be denied that development of the Agency mills as a means of benefitting the Tribe, revenue wise, occurred very slowly. This slow development can be attributed in some significant part to absence of capital, the manpower problem, training Indians, cultural and social inefficiency, and the initial basis for the Agency mills—to provide lumber primarily for local needs, with revenue or profit considerations secondary. As time went on and economic conditions improved and changed, efforts were made to increase revenue for the Tribe by means of sawmill operations. Furthermore, once "semi-commercial" and then commercial operations

were undertaken, they suffered, at times, from inefficiency and other problems. Overall, the trial record on the Sawmill claim was sometimes confusing, conflicting and always reflective of the diametrically opposed views of the parties speaking through their experts. Plaintiff was wont to say that poor reports typified the entire claim period, while defendant stressed the favorable aspects of said reports, generally ignoring any negative comments. The truth, of course, lies somewhere in between the two extremes. The all or nothing approaches of the parties merely served to increase the burden on the court in its attempt to achieve a just result.

The main shortcoming of plaintiff's damages presentation is its fundamental premise that defendant had a duty to operate the mills in a commercial manner. On the other hand, the evidence cited does show instances of mismanagement of the sawmill facilities and timber resources, which undoubtedly caused damage of some degree to the Tribe. It is quite difficult, if not impossible, however, to relate, in any sort of meaningful way, the claimed damages to the cited instances of misconduct. Therefore, while the court finds that the record will not support plaintiff's claim for hypothetical profits of approximately $30.5 million, the record does suggest that a lesser award under the "fair and honorable dealings" clause is appropriate as compensation for the government's shortcomings in its operation and development of the sawmills. Given the court's general dissatisfaction with plaintiff's damages methodology, the virtually infinite selection of conceivable alternative approaches, and the state of the record generally, any award herein will, of necessity, be in the nature of a "jury verdict." *See Petrovich v. United States, supra,* 190 Ct.Cl. at 763, 421 F.2d at 1365.

In Part II, subpart A.2 of this opinion, *ante* pp. 359–79, the court discussed and dealt with plaintiff's Failure to Cut—Loss Due to Undercutting claim. The court there held that defendant should have harvested a certain amount of timber each year from 1921 to 1928 and from 1938 to 1946.

The court is of the opinion here that these amounts represent a logical starting point for this claim and can, with certain adjustments, serve as a basis for making an estimation of plaintiff's sawmill damages.

The court believes that the early years of the sawmill history would have been devoted to investigating the markets, developing the operation and attempting to ensure its viability, and striving to satisfy Reservation needs for lumber. Accordingly, the court does not feel that it would be proper to make any determinations with respect to years prior to 1921. In addition, the court is of the opinion that the circumstances of the Great Depression preclude, on the grounds of conjecture or speculation, any profit-oriented approach for the years 1929–1937 in light of the economic uncertainties of this period.

The amount of timber that the court feels defendant should have harvested during this period, *i.e.,* 1921–1928 and 1938–1946, was, as determined above, *see ante* p. 379, 177,000 M.B.F. Subtracting the amount of 74,263 M.B.F. actually harvested during this period, *see ante* p. 379, leaves a balance of 102,737 M.B.F. The court is of the view that defendant would have satisfied its fiduciary obligation, at a minimum, by seeing that half of this lumber, *i.e.,* 51,369 M.B.F., was processed into merchantable lumber. The court finds that one-half is a reasonable figure in light of *e.g.,* the needs for lumber on the Reservation, the uncertainty of the local markets, and the fact that a greater output would have necessitated primarily commercial operation, which the court has held defendant was not obligated to do. Using the average Arizona-New Mexico lumber price for this period of $28.72 results in a total potential sales volume of $1,478,385.

In some of their calculations, plaintiff's sawmill experts assumed that profits would be equal to 15 percent of sales. Plaintiff claims that this assumption is reasonable, citing a Forest Service publication entitled *The Forest Service Timber Ap-*

*praisal System—A Historical Perspective 1891–1981* (1982). Defendant attacks this figure as unwarranted and too high, although it does not respond specifically to the evidence cited by plaintiff. *But see supra* n. 5 (price of lumber in contrast with McGaffey Lumber Company established using profit of 10 percent of yearly investment, yielding profit of 9 percent of sales price). Rather, it relies on a report of its sawmill expert which purportedly established that sawmill operations were, in general,—inherently risky ventures during most of the period at issue. After considering the record as a whole, the court concludes that a profit factor of 7½ percent of sales is proper to reflect, *inter alia,* the transportation disadvantage faced by the mills, the relative inefficiency of the Indian workforce, and the requirements in the regulations of gratuitous lumber for indigent Indians. The court believes that consideration of these facts appropriate on this record. Applying the factor of 7½ percent to the potential sales figure of $1,478,385 results in an additional profit figure of $110,880.[86] The court holds that plaintiff is entitled to this sum as compensation for defendant's shortcomings in its management and operation of the Reservation sawmills during the period 1910–1946.

The court is aware that there are other approaches to quantifying damages that on the surface might appear to have greater technical appeal. In the end, however, the court is not convinced that their technical complexity would produce a result that is less likely to be arbitrary than the approach deemed reasonable by the court. In short, it is exceedingly difficult to quantify the damages involved when, for example, a forester is put to work as a carpenter for a relatively short period of time.

The court believes, on this complex, complicated and uncertain record, that the amount awarded on this fifth claim, justified on the basis of the liability inherent in the "fair and honorable dealings" clause, justly and reasonably accounts for the government's shortcomings in carrying out its fiduciary responsibilities in dealing with plaintiff's forest resources under difficult and uncertain financial, economic, social and cultural circumstances. One can easily state, on hindsight, that the government could have done a better job at sawmill management during the pre-1946 period and perhaps have obtained greater profit for the Tribe. However, on this record, and giving due regard to the realities of the time period, the government's management of the sawmills was at least adequate for the most part. The amount awarded herein is an effort to compensate the Tribe for those periods of time when the government's management of the sawmills was inadequate to the extent it reflected a breach of the fiduciary obligations owed the Tribe in management of its forest resources.

### F. Processing of Overmature Timber—Claim Period 1962–1978

In its sixth claim, plaintiff seeks to recover losses that allegedly resulted from cutting and processing overmature timber which plaintiff asserts would not have been incurred had said timber been harvested in earlier periods. Plaintiff's claim is comprised of three elements—increased logging costs of $2,875,938, reduction in stumpage payments of $2,442,770,[87] and sawmill processing losses of $1,260,509.[88]

---

**86.** Since the amount of timber actually harvested during this period was subtracted out before the profit calculation was made, the court can see no reason now to subtract the $20,000 in profit that plaintiff's experts admit was made during this period. In essence, the court is holding that the $110,880 is damages over and above the $20,000 in profits actually generated.

**87.** Plaintiff's proposed findings of fact, as well as its experts' (the Maters) reports, quantify the stumpage income reduction as $2,067,582. In

the calculation of this figure, the authors of the report carried forward a different figure that was lesser in amount. Presumably, plaintiff wishes the court to use the text figure.

**88.** Defendant makes reference to the fact that the Tribe controlled the design of the 1962 Navajo Forest Products Industry (NFPI) mill. From this reference, defendant appears to suggest that mill design may be responsible for problems in handling overmature timber. NFPI was a Tribal controlled enterprise free

As discussed in detail, *infra*, these damages are based on plaintiff's estimate of the amount of defect in the overmature trees that manifested itself as unmerchantable lumber when cut or milled. These damage elements make for a total sixth claim figure of $6,579,217. Plaintiff admits that the NFPI mill began to make a profit in 1962. In essence, the claim here is an attempt to increase the amount of such profit.

Defendant presents three arguments in response to plaintiff's sixth claim. First, it argues that this claim did not accrue until after August 13, 1946 and is therefore beyond the jurisdiction of the court. Second, it asserts that the value of the overmature timber cut after 1962 was much higher than that of second growth timber which would have been available for cutting subsequent to 1962 and thus more than offsets any increased costs associated with handling and processing said overmature timber. Finally, defendant takes issue with plaintiff's basic quantification of damages. For reasons that follow, the court concludes that plaintiff is entitled to no recovery on this claim.

Plaintiff claims that the timber harvested between 1962 and 1978 was overmature as a result of not being cut years earlier. The record indicates that as ponderosa pine get older, the proportion of timber that is defective, *i.e.*, unmerchantable, increases. This defect generally results from a condition known as "red rot." Processing overmature lumber, plaintiff alleges, is more costly than processing "normal" timber because the increased incidence of defect results in lower stumpage payments (the "scaler" subtracts obvious defect in determining the amount of timber delivered), increased logging costs (the logger must spread his total costs over a lower volume of saleable material), and increased production costs (some defect is not discovered until after sawmill processing has begun).

As indicated above, all forests suffer from some amount of timber defect. Plain-

tiff does not, nor could it, assert that defendant is liable for expenses related to all forest timber defects. Rather, plaintiff has attempted to isolate the proportion of defect due solely to overmaturity. In arriving at its percent of loss from overmaturity defect, plaintiff's experts analyzed "scale sheets" of the NFPI mill, *i.e.*, tables setting forth the length, diameter and defect of logs delivered to the mill, "for one typical week in the month of June for each of the years 1974–1979 and 1981 and 1982." 1978 was used as the claim cut-off date because the second cutting cycle began in 1979; 1981 and 1982 were used for comparison, and no data were available for the period 1962–1973. Figures for 1981 and 1982 gave an average "current natural forest defect" of 8 percent, which, when subtracted from the "general forest defect" for the period 1974–1978, left an average defect due to overmaturity of 9.2 percent. A 1956 study of the Navajo forest, apparently done by independent experts, placed the overmaturity defect at ·5 percent. Plaintiff interpolated linearly between these figures to arrive at an overmaturity defect of 6.332 percent for 1962. Plaintiff explains that this figure likely increased over the period 1963–1973, reaching approximately 9 percent at the end of the period. Plaintiff uses, however, not the average figure for the period of 7.664 percent, but instead the terminal figure of 9 percent. Plaintiff states that this was done "for convenience," but the court views it as unjustifiable and an overstatement of damages.

Plaintiff thereafter used the overmaturity factor to calculate its losses or increased costs in each of the three damage areas set forth above, to wit, stumpage payment reductions, increased logging costs, and higher cost of processing overmature logs in the mill. The court does not deem it expedient or necessary to set out plaintiff's calculations fully. Plaintiff's methodology, applying the figure of 7.664 percent determined as proper by the court for the period

from government operation, supervision or influence. The court, however, does not perceive

that this fact, *i.e.*, the design of the mill, effected this element of damages one way or another.

1962–1974, yields a damage figure of $6,159,132.

Defendant's first attack on plaintiff's overmaturity claim is jurisdictional. Although not denominated as such by plaintiff, this claim must be premised on a continuing wrong theory. From the standpoint of claim accrual, it is clear that this claim did not and could not have arisen until 1962 and thereafter when the overmature timber was harvested and processed, thereby generating the costs or losses at issue. Prior to that time, plaintiff had incurred no costs in connection with the timber and therefore suffered no damages in this regard. In short, all of the elements for plaintiff's cause of action had not coalesced before 1962. *See, e.g., Hartford Life Insurance Co. v. Title Guarantee Co.,* 520 F.2d 1170, 1173 (D.C.Cir.1975). Thus, defendant asserts that this claim is beyond the jurisdiction of the court because it arose after August 13, 1946.

However, the court's holding in *Navajo Tribe v. United States,* 218 Ct.Cl. 11, 586 F.2d 192 (1978), *cert. denied,* 441 U.S. 944, 99 S.Ct. 2163, 60 L.Ed.2d 1046 (1979), suggests that this claim may not be subject to the jurisdictional defense raised by defendant because it may be viewed as a "continuing claim." Plaintiff seemingly argues that defendant left the trees standing in the forest, accruing "red rot" from the 1800's until they were harvested in 1962 and thereafter. Thus, plaintiff argues, the development and growth of "red rot" over the years, prior to and after 1946, as a result of defendant's continuing wrong precludes application of defendant's jurisdictional defense to this claim. The problem presented is not an easy one. One can read the *Navajo* decision, *supra,* as supportive of a "continuing claim" approach to this claim. On the other hand, the concurring and dissenting opinion of Judge Nichols in that case (218 Ct.Cl. at 33–40, 586 F.2d at 206) cautions that one must tread carefully in the messy thicket of "continuing claim" situations in Indian cases.

■ In considering the claim at bar, the record will not permit one to determine how many trees, or which portions thereof, became unmerchantable subsequent to August 13, 1946. Since the cutting claim covers the period 1962–1978, some 16 to 32 years elapsed after the Congressional claim cut-off date of August 13, 1946. It is possible that "red rot" developed in some trees subsequent to, but not before August 13, 1946, sufficient to impair to some degree their merchantability. If this Congressionally mandated cut-off date is to have any meaning and significance, it would appear it should not be thwarted by application of a continuing claim theory to the facts of this claim. There is no question but that the claim herein accrued subsequent to August 13, 1946. Indeed, as stated above, plaintiff's claim period runs from 1962 to 1978, some 16 to 32 years after the jurisdictional cut-off date. This time span gives more weight to application of the principles that underlie the strict construction of statutory waivers of sovereign immunity than was the situation before the Court of Claims when it considered the applicability of the continuing claim in Indian Claims cases. *See Navajo Tribe v. United States, supra,* 218 Ct.Cl. at 25, 586 F.2d at 201. It is not without some significance that when the petitions in these cases were filed with the Indian Claims Commission in 1950 and 1951, the admitted accrual of this claim was over a decade or decades away. Congress clearly did not intend that claims that accrued some 16 to 32 years after August 13, 1946 be immune by judicial fiat from the jurisdictional cut-off date it established. The allegation of government wrongdoing relative to the overmaturity claim presents a difficult and serious problem in Indian cases such as these now before the court. The examples discussed by the majority opinion in the *Navajo* case, *supra,* are much, much different from the situation in these cases. Thus, the court feels the continuing wrong discussion in that case is a less potent precedent in these cases because of said factual difference. Moreover, the *Navajo* majority opinion, in discussing the continuing claim theory, clearly envisioned its application in a pure accounting type situation. *See id.* at 26–29, 586

F.2d at 201, 203. The Overmaturity claim is not an accounting claim in the true sense of the word. The claim does not involve receipts and disbursements or the accounting for disposition of Indian property. There was no accounting by the government to plaintiff relative to this Overmaturity claim and thus no exception by plaintiff relative thereto. On August 13, 1946, all the trees that now form the basis for plaintiff's Overmaturity claim were standing in plaintiff's forest. An accounting relative to them at that time was not necessary and was not conducted. It is the opinion of this court, after considerable thought, that this sixth claim should be barred on jurisdictional grounds. *See Navajo Tribe v. United States,* Nos. 69 & 299 (Uranium, Vanadium, Copper, Rock, Sand and Gravel Claims), slip op. at 51–54 (Cl.Ct. Dec. 3, 1985).

To the extent plaintiff's overmaturity claim is not time barred, the court is of the opinion that it must be rejected as being duplicative of plaintiff's Undercutting claim since the factual basis of plaintiff's complaint here is that the trees were allowed to stand too long before they were harvested, *i.e.,* became "overmature." The court previously awarded damages to plaintiff for defendant's failure to see that an adequate amount of timber was cut and harvested in the Undercutting claim. It is the court's view that these two claims are alternatives and concomitantly that to award additional damages here for the extra processing losses would result in an impermissible pyramiding of damages.

Analytically, the court sees this situation as indistinguishable from plaintiff's Loss of Mortality claim for the period 1921–1946. The court reasoned there that the award of damages on the Undercutting claim "placed plaintiff in the position it would have been if the obligation [to harvest] had been fulfilled." *Ante* p. 381. Here, had the government fulfilled that obligation, the Tribe would have had an additional $308,211 but no overmaturity claim inasmuch as all of the trees the government was required to harvest would have been cut down and thus not become overmature.[89] Conversely, the stumpage payments covered in this claim would make up for those "lost" by not harvesting the timber earlier.[90] Viewing these claims as offsetting each other is merely another way of saying that they are alternative in nature.

As indicated earlier, defendant's second response is that the value of the overmature timber was much higher than that of second growth timber because there was more lumber in the older trees, especially of the clear, high grades that command a premium price. Thus, defendant argues that the higher value associated with the overmature timber offsets any losses or costs which plaintiff seeks under its sixth claim. In support of this contention defendant relies on an analysis done by its expert, Llewellyn E. Kazebee (Kazebee), that compares the amounts and grades of lumber produced during the overmature cut with those of lumber produced during the second growth cut. This analysis concluded that the overmature trees produced $5,372,348 more than would have been realized in a harvest of second growth trees, over the same time period. Plaintiff countered this analysis with testimony from three of its experts to the effect that "the increased defects and deterioration in overmature trees far outweighed any gains in size." However, another of plaintiff's experts admitted in a report that "as a general principle it may be said that old trees are worth more than those which have been selectively cut."[91] The increased value of

---

89. There is no basis of which the court is aware for holding defendant responsible for overmaturity defects in trees it wasn't obligated to harvest at an earlier time. Thus, plaintiff's claim here is completely covered, as a legal matter, by its Undercutting claim.

90. The court's holding below, *post* p. 440, that plaintiff is not entitled to interest on the Under-

cutting claim admittedly makes the court's conclusion here easier to reach.

91. This expert's principal difficulty with the valuation of old growth was that the rate of increase in value as the trees aged was far less than that which could be obtained from other investments. That is, if the choices were harvesting timber now and investing the proceeds

old growth stands appears to be due to the increased volume of "clear" or high grade lumber found in the outer portions of the tree, taking a cross-sectional view.

Once again, the evidence on the issue is decidedly conflicting. Nonetheless, the court finds defendant's comparative analysis and the record as a whole to be persuasive proof that there was extra market value associated with the overmature trees relative to second growth stands. While overmaturity undoubtedly resulted in some trees that were severely defective, the court cannot escape the conclusion that it also resulted in other trees with large volumes of valuable high grade, clear lumber. In the court's opinion, plaintiff has failed to respond to defendant's analysis, which was based on actual production figures, in a manner sufficient for the court to discard it. Still, as defendant seems to realize to some extent, the extra revenue associated with the trees is not truly profit but rather in the nature of an offset to plaintiff's claimed damages. The conflicting and somewhat confusing nature of the record is such that a clear cut answer to the question of whether defendant's claimed revenue gains and plaintiff's claimed costs and losses are directly comparable is hard to come by. However, the court, on a very close question, finds that the record preponderates in favor of defendant's position, and thus the court accepts Kazebee's approach and conclusion relative to the overmaturity valuation question.

Accepting defendant's position does not complete the answer for it would appear that plaintiff was still damaged in the sum of $786,784 ($6,159,132–$5,372,348) due to increased costs and losses in processing the overmature trees. Stated another way, the increased revenues associated with the "old" timber are not sufficient to offset completely the costs and losses computed by plaintiff relative to harvest and milling of old timber (plaintiff's position).

However, defendant's final contention is that plaintiff's calculations overstate the amount of damages. The considerations advanced by defendant lead the court to conclude that plaintiff's loss is indeed overstated. First, defendant asserts, without specific rebuttal from plaintiff, that "[l]ogging costs per MBF increase as the size of the timber decreases (*i.e.*, it costs more to cut, limb, buck and haul many small trees for a given lumber volume than it does to harvest fewer larger 'overmature' trees)." This statement appears reasonable to the court, although no attempt at a quantification thereof can be made on this record. Additionally, full logging costs would not be incurred with respect to all of the defective trees, as the obviously defective ones would simply be left in the woods as "cull." Second, defendant, through its expert Kazebee, makes a similar argument regarding processing costs, *viz.*, large logs are cheaper to manufacture and not all defective logs go through the entire manufacturing process. Again, both statements seem reasonable. Approaching the matter as a "jury verdict" and exercising its best judgment, which is all the parties have a right to expect on this record, *see Specialty Assembling Co. v. United States, supra,* 174 Ct.Cl. at 184, 355 F.2d at 573, the court finds that the increased revenues generated by the larger trees at least equalled the higher costs and losses related to their increased amount of defects.[92]

---

*versus* simply letting the timber grow and realizing more sales revenue at a later time, the economically rational choice would be to harvest now—"It would be a poor investor, indeed, who could not find an investment yielding a higher rate of return than old growth timber." Although this may be true, the issue here is not whether it was imprudent to let the trees grow, but rather whether the plaintiff was directly damaged by harvesting the trees in their overmature state.

92. Another of defendant's experts, Dr. Latham, asserted in a report that overmaturity expenses were unavoidable in a virgin forest, *i.e.*, the only question is when the problem is encountered, and therefore these expenses should not be charged against defendant. In other words, whenever a virgin forest is harvested for the first time, overmaturity expenses are inherent and common in the logging and milling processes. Thus, under Dr. Latham's view, the costs and expenses plaintiff seeks would have been incurred to some degree in any event had

For all of the foregoing reasons, the court holds that the Tribe is entitled to no recovery on its sixth claim.[93]

### G. Unaccounted for Sales Invoices—Claim Period June 1939—June 1951

In its seventh, and final, claim, plaintiff seeks to recover damages allegedly due as a result of the government's failure to account adequately for the handling of the invoice system in use at the commercial sawmill between June of 1939 and June of 1951. Specifically, plaintiff asserts that the accounting system utilized by defendant was deficient in that it failed to keep a record of all invoices used at the mill.[94] Plaintiff's expert on this issue, Paul J. Gillis (Gillis), a certified public accountant, estimated, in the manner described below, that 11,013 invoices were unaccounted for. Gillis multiplied this figure by the average value of the accounted-for invoices, $403.24, to arrive at a figure of $4,440,882.12 ($403.24 × 11,013) that plaintiff seeks to recover under its seventh claim as fairly representing the damages it suffered as a result of defendant's accounting shortcomings at the mill.

As expected, defendant disputes this claim in its entirety. Defendant contends that the reports of its accountants and the testimony of its expert, Frank C. Sapienza (Sapienza), also a certified public accountant, "conclusively established that plaintiff's claim * * * is devoid of evidentiary support."[95]

Once again, the court is called upon to resolve a confused issue with respect to which conflicting evidence was presented. For reasons that follow, the court concludes that plaintiff is entitled to recover $925,000 on its Unaccounted for Sales Invoices claim.

It is a well settled rule of trust law that a trustee "is bound to keep clear and accurate accounts, and if he does not the presumptions are all against him, obscurities and doubts being resolved adversely to him." *See* G. Bogert, *supra*, § 962, at 19 (quoting *White v. Rankin*, 18 A.D. 293, 294, 46 N.Y.S. 228 (1897), *aff'd without op.*, 162 N.Y. 622, 57 N.E. 1128 (1900). *See also American Indians Residing on the Maricopa-Ak Chin Reservation v. United States*, 229 Ct.Cl. 167, 207, 667 F.2d 980, 1005 (1981), *cert. denied*, 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982). On the other hand, defendant is not to be charged merely for keeping poor records; there must be damage to the beneficiary. *See Buckle v. Marshall*, 176 Va. 139, 10 S.E.2d 506, 513 (1940). Accordingly, the issue is whether the Tribe has suffered any damages that may have been concealed by defendant's accounting practices. With the issue thus framed, the court will now turn to an examination of defendant's practices

the trees been harvested and milled at an earlier time period, although perhaps, in other trees. Such a view is reasonable and comports with common sense.

93. The court previously held that this claim was duplicative of plaintiff's Undercutting claim. The finding of no damage here does not obviate plaintiff's recovery there since even though plaintiff suffered no *additional* damage from the trees' growth, it still was damaged by not receiving the $308,211 in stumpage payments it would have received had the government fulfilled its harvesting obligation.

94. Plaintiff does not challenge defendant's accounting reports insofar as they relate to monies actually received by defendant. Rather, plaintiff complains that the reports are incomplete and do not reflect all lumber sales made at the mill.

95. It is to be noted that the invoice system complained of was started in 1939 and continued until 1952. Defendant, however, does not complain specifically that this claim is jurisdictionally barred insofar as it related to invoices issued after August 13, 1946. In contrast to some of plaintiff's other claims, the situation here is such that application of the continuing claim theory of jurisdiction is proper. The accounting system in use at the mill was in such a state of disarray that receipts covering periods before August 1946 were found in periods thereafter. Further, the scope of the problem is well defined here. In sum, this type of accounting continuing claim is one that the court believes was envisioned by the Court of Claims in *Navajo Tribe v. United States*, 218 Ct.Cl. 11, 586 F.2d 192 (1979), *cert. denied*, 441 U.S. 944, 99 S.Ct. 2163, 60 L.Ed.2d 1046 (1979).

and the parties' assertions concerning the ramifications thereof.

Invoices are detailed lists of goods sold to customers, containing such information as types of goods sold, price thereof, and total amount of purchase. Under a properly implemented and maintained system of accounting, invoices would have been completed and retained with respect to each sale of lumber from the sawmill. Whether or not this was done is the crux of plaintiff's claim. Plaintiff believes that the "missing" invoices represent sales of lumber with respect to which an improper issuance or retention of invoices occurred.

Defendant utilized a sequentially numbered invoice system to provide a controlled record of sales at the sawmill. In addition, defendant's collection system called for the recording of the invoice number on the official receipts used to keep track of the actual payments made. If properly utilized, this general system would have had the unpaid invoices retained in a secure place as accounts receivable.

Unfortunately, however, the "tools" available to defendant were not fully utilized. Invoices were not used *seriatim*, and some that one would expect to be in a close proximity by date appear years apart. Some numbers appear to have been used more than once, and a great quantity of still others fail to appear either on the payment receipts or in records of accounts receivable.[96] Defendant recognized that there were problems in its system in the early years of plaintiff's claim period. A 1942 field audit of Tribal accounts observed that it was "impossible" to locate invoices covering sales made prior to May 1, 1940 and that invoicing during this period generally was "exceedingly delinquent." Although the problem is not specifically mentioned in later reports, the parties differ as to whether this can be taken as an indication that the situation improved. In the court's opinion, the absence of later specific notations does not necessarily end the inquiry; it is clear from the evidence presented that the apparently random approach of the early years continued until the end of plaintiff's claim period.

In an attempt to quantify the number of "missing" invoices, plaintiff's expert, Gillis, analyzed the accounting reports prepared by defendant. The reports did not cover the actual invoices *per se*, but rather the receipts involved in the payment process. From these reports, Gillis estimated that the government was required to account for 22,700 invoices.[97] Specifically, Gillis arrived at this figure by determining that invoices representing 227 "blocks" of 100 invoices were represented in the receipts. The computer program used by Gillis listed 10,709 invoices. Gillis adjusted this figure to reflect the fact that some receipts contained more than one invoice number while still others were duplicates. Gillis concluded that 11,687 invoices had been accounted for and conversely that 11,013 remained missing (22,700–11,687). Gillis then divided the total amount collected during the claim period, $4,712,649.31, by the number of invoices accounted for, 11,687, to find the average dollar value of the accounted for invoices, $403.24. Since the value of lumber sales reflected by the missing invoices obviously could not be determined, Gillis felt that multiplying their number, 11,013, by the average value of those accounted for, $403.24, would give a reasonable approximation of the uncollected sales. The figure determined in this manner is $4,440,-882.12, and it is this amount, as stated above, that plaintiff seeks to recover on its claim. While plaintiff's approach appears, under the circumstances, to have surface rationality, the court cannot, in light of the other evidence presented at trial, accept it completely as a measure of the actual dam-

---

96. The situation is somewhat similar to that of an individual who not only uses his or her checks inconsistently as regards their *seriatim* number, but who also fails to keep a record of those voided, for whatever reason.

97. Gillis' initial estimate was 21,900, but he later revised it after additional information was discovered by the parties.

ages occasioned by defendant's lax accounting practices.

On cross-examination of Gillis, it was shown that his approach overlooked or missed numerous invoices; it was also disputed exactly what some of the symbols involved on the accounting sheets prepared by defendant represented, *viz.*, whether they may have been intended to be viewed as invoices. In addition, defendant's expert, Sapienza, testified that the information presented to plaintiff did not contain or reflect all of the invoices. To be sure, it is hardly fair to disparage plaintiff's approach because of the manner in which the government supplied it with information. Still, it is the court's duty to ensure that it doesn't award a windfall to plaintiff or unduly penalize the defendant. Fairness is, and must be, a two-edged sword.

In the court's view, serious concern about plaintiff's claim arises when one considers its magnitude and corollary. The revenues supposedly lost from the unaccounted for sales invoices are approximately 94 percent of those actually received, as reported by plaintiff. Stated another way, the essence of plaintiff's claim is that virtually half of the sales at the mill (in dollars) cannot be accounted for. A variance to this degree would suggest recklessness of a high order, if not outright fraud itself. There is no allegation of fraud, and plaintiff admitted that there was no showing of fraud. Sapienza, defendant's expert, testified that "there was no evidence that * * * any lumber went off the reservation without being paid for." In short, the court finds it well-nigh incredible that a problem of this nature could exist to the extent and for the time claimed without being discovered.[98]

The magnitude of plaintiff's claim is the focus of the government's main line of defense. If the missing invoices actually represented sales totaling approximately $4.5 million, then, the government reasons,

it necessarily follows that the sawmill had to have produced the rather large quantity of lumber that was the subject of those sales. To determine if it was possible for the mill to have produced timber with a total value equal to the amount of plaintiff's claim plus the amount actually received, Sapienza undertook a somewhat lengthy analysis of sawmill output during the claim years. First, he determined, using one of the plaintiff's expert's reports, the total amount of lumber harvested for each year during the claim period, which he assumed represented the maximum output of the sawmill. Next, he multiplied this figure by the relevant assumed average price to arrive at a "potential sales revenue" of $5,646,381.77. The "ending" inventory in 1951 was approximately 9 million board feet and had a value, based on the average of all lumber prices for the period 1939–1951, of $387,378.74. Sapienza then subtracted this figure from the previous total to produce a "total sales figure" of $5,259,003.03. The accounts receivable as of the close of the period were also subtracted, thus yielding "potential total sales revenue" of $5,078,074.14. Since this amount was approximately equal to, and in fact was less than the amount of revenue actually collected during this period, Sapienza accordingly concluded that plaintiff's claim for Unaccounted for Sales Invoices was groundless.

Plaintiff vigorously disputes both the acceptability and accuracy of this figure. In the words of its expert, Gillis, it is mere "fortuitous happenstance" that Sapienza's analysis came out the way it did. Gillis also testified that the approach was "not a substitute" for determining what happened to the invoices but rather only "corroborative." Accepting this view that Sapienza's method is only corroborative, it certainly doesn't corroborate plaintiff's approach. Indeed, it casts doubt on the viability of plaintiff's claim methodology. Moreover, the court finds the theory underlying de-

---

**98.** The court's feeling in this regard is supported by the situation reported in a government memorandum of October 18, 1944 recognizing bookkeeping problems of the Navajo Craft Guild. Moreover, at least one audit, covering the year 1944, characterized the sawmill bookkeeping as "very accurate."

fendant's approach to be no less reasonable then that of plaintiff's. Thus, the issue before the court is the proper weight to be assigned the different approaches utilized by the parties, through their experts, in this regard.

Plaintiff advances several arguments in attempt to persuade the court that its methodology is the more acceptable approach to the problem at hand. First, plaintiff claims that defendant's methodology is flawed inasmuch as it fails to take into consideration an opening inventory for the mill. The effect of this, plaintiff argues, is that it understates available sales revenue since any opening inventory represented additional material that could be sold, *i.e.*, over and above timber reported as harvested. It seems acceptable to assume that some inventory existed as the sawmills had been operating on the Reservation for years. Although neither party attempted to quantify the amount of inventory, Sapienza testified that the inventory factor wouldn't affect his calculation in any substantial manner. Nonetheless, some adjustment would have to be made, and the court will bear this in mind in considering the claim.[99]

Plaintiff next attacks the prices used by defendant in its calculation of available sales revenue. Defendant utilized various sources to obtain the price figures, including the report of plaintiff's sawmill experts, the Maters. Plaintiff contends, with some merit, that defendant should have used its own figures in this calculation since it vigorously disputed the accuracy of the Mater's figures during the trial. As between the Mater's figures and defendant's, the court agrees that defendant should have used its own price figures on the ground that they are, in the court's view, more accurate. However, as regards the other two sources of price data, *i.e.*, historical sawmill records and the Price, Waterhouse & Co. audit, the court is of the opinion that they represent the most accu-

rate data and therefore were properly used. Adjusting defendant's figures, including the ending inventory value, to reflect the adjustments called for above, results in additional potential sales revenue of $282,782.99. The calculations in this regard were admittedly rough estimates in the nature of a jury's approach to such a problem since detailed specificity is impossible on this record.

Finally, plaintiff challenges the core of defendant's analysis, *i.e.*, that the tabulated figures accurately represent mill production. Plaintiff's challenge has two prongs. First, plaintiff contends that there is no evidence or reason to believe that the timber harvest records are any more complete or reliable than those relating to the sales invoices. Plaintiff cites the 1945 Annual Report for the Tribal Sawmill, which notes that "log scaling was suspended at various times" from 1939–1943. Upon reading the report, it appears to the court that this failure can be attributed to a shortage of trained personnel during the early part of the war effort. The report states that proper practices were reinstated in the spring of 1943, and plaintiff has pointed to no later reports of a similar problem.

The 1945 Report discusses in more detail the year 1945. This one year out of a 12-year claim presents another issue over which the parties do battle. The government report relied on by Sapienza in his calculations reports a production for 1945 of roughly 6.7 MM.B.F., whereas this 1945 government report notes that production for 1945 was over 8.2 MM.B.F., a difference of 22 percent. There is no explanation in the record to account for this discrepancy. The discrepancy does, as plaintiff suggests, raise concerns regarding the accuracy of defendant's stumpage production figures. Some increase in defendant's stumpage figure would seem to be in order. However, the court cannot accept the pre-

---

**99.** Plaintiff also contests defendant's use of the ending inventory and accounts receivable to reduce the potential sales revenues. Both of these figures are, however, supported by substantial

evidence, *i.e.*, a Price, Waterhouse & Co. report, and the court therefore agrees with defendant's methodology in this regard.

mise that 22 percent is the proper figure to utilize for the entire claim period, especially in light of plaintiff's failure to point to any similar examples. The record on this issue is somewhat skimpy and clearly conflicting and therefore does not lend itself to a clear resolution of the matter. Although a determination by the court must, under such circumstances, be imprecise and somewhat arbitrary and subject to question by both parties, the court is nonetheless bound to make one inasmuch as the alternatives, *i.e.*, zero percent or 22 percent, are unacceptable. After careful consideration of the record as a whole, the court concludes that a factor of 8 percent fairly compensates for any inaccuracies in defendant's stumpage figures. Assuming a production understatement of 8 percent in defendant's stumpage production figure, there would be an additional $758,867 of potential sales revenue (Original Potential Sales ($5,259,003) + Original Ending Inventory ($367,378) + Price Adjustment, before inventory ($304,662) × 1.08 − Price Adjusted Ending Inventory ($409,257) − Original Potential Sales ($5,259,003)).

Plaintiff's other prong concerns Sapienza's failure to include an allowance for overrun in his calculation. The extent, if any, of overrun was a matter of great dispute between the parties in connection with plaintiff's Sawmill Mismanagement claim. Here, plaintiff relies principally on a 1956 Forest Development Study for the Navajo Timberlands that tested the overrun of the Navajo sawmill before modernization at 13.4 percent. This figure was based on "net" scale, however, *i.e.*, after deduction for defects. On the "gross" scale, the overrun factor was only 2.5 percent. Since the figures used by Sapienza appear to have been based on woods scaling, the court believes it is more accurate to use the 2.5 percent gross overrun figure. This amount of overrun, considered in conjunction with 8 percent underreporting and the accepted prices, would account for a total figure of $919,545 in potential sales revenue.

In light of these criticisms by plaintiff, some of which are entirely valid, the court cannot accept *en toto* defendant's analysis and thus the proposition it purports to establish, *i.e.*, that lax accounting practices resulted in no harm to the Tribe. On the other hand, the court is likewise equally convinced from the record as a whole that an award of almost $4.5 million as sought by plaintiff would not be justified. The court is not required to accept either one report or the other. *See Seminole Indians of Florida v. United States*, 197 Ct.Cl. 350, 361, 455 F.2d 539, 545 (1972) (Nichols, J., concurring) ("[T]he fact finder is not required to choose between swallowing an expert's report whole, or rejecting it utterly, and usually, neither course is right."). Accordingly, the court believes that the more reasonable approach, and one that accommodates itself to fair and honorable dealings to both parties, is that of defendant's, with certain modifications thereto to correct for its deficiencies and uncertainty.

As trustee, the burden was on defendant to keep and maintain accurate records. In view of this record, it is clear defendant's recordkeeping left much to be desired. Without more, the scales would tip in plaintiff's favor. However, it is quite possible that the Tribe may have suffered less harm than found by the court herein. Thus, the scales are, at least in part counterbalanced. Since it was defendant's obligation to provide an accurate accounting, all the doubts go against it. Accordingly, the court holds, reasonably construing the evidence presented in the light most favorable to plaintiff, that the sum of $925,000 will fairly and justly compensate it for defendant's failure to fulfill its accounting obligations, and thus awards this sum as damages to plaintiff. The court arrived at this figure by taking the additional $919,545 of potential sales revenue arrived at by reasonable adjustments to defendant's figures to respond to plaintiff's criticisms, and then rounding up to $925,000 to take into consideration defendant's omission of an opening inventory and accounts receivable and the other uncertainties involved in its approach. The court states that the conclusion it reaches herein is in the nature of

a jury verdict. It is the best the court could do on the record before it. *See Saulnier v. United States,* 161 Ct.Cl. 223, 227, 314 F.2d 950 (1963). It, *i.e.,* the court's best judgment, is all the parties have a right to expect on a record of this type. *See Specialty Assembling Packing Co. v. United States, supra,* 174 Ct.Cl. at 184, 355 F.2d at 572. Moreover, the court believes this result falls well within the pale of the "fair and honorable dealings" clause of the Indian Claims Commission Act.

### III.

Plaintiff seeks to recover interest on the amounts allowed as damages herein. This issue was fully discussed in the court's opinion of December 3, 1985 in *Navajo Tribe of Indians v. United States,* Nos. 69 & 299 (Uranium, Vanadium, Copper, Rock, Sand and Gravel Claims), slip op. at 78–81 (Cl.Ct. Dec. 5, 1985). The reasons set forth in that opinion for denying interest on amounts awarded to the Navajo Tribe in that phase of this broad and "never-ending" litigation are equally applicable to the interest claims advanced in this phase of this litigation at bar. Accordingly, plaintiff's interest claims on the amounts awarded herein are denied. *See Mitchell v. United States,* 229 Ct.Cl. 1, 16, 664 F.2d 265, 275 (1981), *aff'd* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983).

### IV.

The court concludes, for reasons discussed above, that plaintiff is entitled to recover $468,966 on its Failure to Cut claim (Part II. A), $24,479 on its Unpaid Stumpage claim (Part II. B), $13,638.60 on its Logging Waste claim (Part II. C), $110,880 on its Sawmill Mismanagement claim (Part II. E), and $925,000 on its Unaccounted For Sales Invoices claim (Part II. G), for a total recovery of $1,542,963.60. Plaintiff is entitled to no recovery on its Lack of Regeneration claim (Part II. D) or on its Processing Overmature Timber claim (Part II. F). The court further concludes that plaintiff is not entitled to recover interest on the claim awards set forth above. As noted previ-

ously, the claims at bar are not the only claims at issue in these consolidated cases. However, since there is no reason for delay relative to the entry of final judgment on the above-described claims, the clerk is directed, pursuant to Rule 54(b), to enter a final judgment of $1,542,963.60 for plaintiff relative to said claims. No costs are to be assessed.